**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                )
JAMES HARPER                    )
                                )
                    Plaintiff,  )
                                )
        v.                      )Civil Action No. 06-0161(RMC)
                                )
JOHN E. POTTER,                 )
Postmaster General,             )
U.S. Postal Service             )
                                )
                    Defendant.  )
_____)

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, John E. Potter, in his official capacity as
Postmaster General, United States Postal Service, respectfully
moves for summary judgment pursuant to Fed. R. Civ. P. 56 on the
grounds that there are no genuine issues of material fact and
that the defendant is entitled to judgment as a matter of law.
In support of this Motion, defendant submits the attached
memorandum of points and authorities, statement of material facts
as to which there is no genuine issue and exhibits.

Respectfully submitted,


___/s/_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney


___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                                 )
JAMES HARPER                     )
                                 )
                Plaintiff,       )
                                 )
     v.                          )Civil Action No. 06-0161(RMC)
                                 )
JOHN E. POTTER,                  )
Postmaster General,              )
U.S. Postal Service              )
                                 )
                Defendant.       )
_____)
```

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Defendant, John E. Potter, in his official capacity as Postmaster General, United States Postal Service ("USPS" or "Agency"), respectfully moves pursuant to Fed. R. Civ. P. 56 for an order granting defendant summary judgment as to Plaintiff's Complaint on the grounds that no genuine issue of material fact exists and defendant is entitled to judgment as a matter of law.

**INTRODUCTION**

Plaintiff James Harper's Complaint in this case contains one straightforward claim. It alleges that plaintiff had engaged in prior protected EEO activity and that this was a substantial contributing factor in defendant's decision to impose an adverse employment action. (Complaint ¶ 36). The only potentially adverse action set forth in the underlying administrative complaint is a letter of 7-day suspension plaintiff received on October 4, 2002 for not following official instructions. However, this letter was rescinded as a result of a grievance filed by the plaintiff under the Union contract and plaintiff

suffered no loss of time from work or pay.  He cannot establish any action that is materially adverse to him.  Moreover, plaintiff cannot establish any causal link between that activity and the alleged retaliatory alleged action here.  Thus, he is unable to establish a _prima_ _facie_ showing of retaliation.  Even if he were able to make a _prima_ _facie_ showing, defendant has legitimate non-discriminatory business reasons for the issuance of the suspension.  Finally, plaintiff presents no evidence of pretext.

## FACTUAL BACKGROUND

Plaintiff James Harper, an African-American male, was employed as a mail processor at the U.S. Postal Service (Postal Service or USPS) in Gaithersburg, Maryland during the relevant time frame.  (Report of Investigation (ROI), p. 33 (appended to this Motion as Exhibit (Ex.) 1); Transcript (Tr.) of July 21, 2005 EEOC Hearing 21:21, 25 (appended to this Motion as Ex. 2 )).

Plaintiff, in December 2001, became a member of a group known as "Brentwood Exposed."  (Tr. 25:13).  This is a group of Postal employees who sought to sue the Postal Service for perceived injustices in the way Postal management dealt with the 2001 anthrax crisis at the Brentwood Processing and Distribution Center (P&DC) in Washington, D.C.  (Tr. 102:4-8, 113:4-8).  Specifically, plaintiff believes that Postal employees were left in Brentwood after anthrax was discovered as a test to see the effect of anthrax on human beings.  (Tr. 21:6-13, 17-22).  Brentwood employees were chosen, according to plaintiff, because

2

the majority of employees at Brentwood are African-American.
(Tr. 21:17-22).  According to plaintiff, white employees on
Capitol Hill were treated differently because they were removed
from their building and given treatment from military doctors.
(Tr. 24:5-17).  Plaintiff spoke out on this issue on "numerous
occasions."  (Tr. 21:17-22).  Plaintiff's supervisor at all
relevant times to this Complaint was Ms. Lydia Hembry; she was
not a member of the same group, but her husband was.  (Tr.
113:13, 25, 114:1-3).  Ms. Hembry did not begrudge her husband
for joining the group.  (Tr. 114:1-5).  Ms. Hembry is an
African-American female who has also engaged in prior EEO
activity.  (Tr. 90:17-21).  Ms. Hembry was an acting supervisor
at the time of the events in question.  (Tr. 91:9-14).

Plaintiff works Tour 1 between the hours of approximately
10:30 p.m. to 7 a.m.  (Tr. 93:19-22).  Ms. Hembry was supervising
the flat sorter machine where plaintiff worked on the evening of
September 30 and the early morning of October 1, 2002.  (Tr. 91:
15-18).  The flat sorter is an automated piece of equipment that
processes first-class flat mail.  (Tr. 91:20-21).  "Flat mail" is
larger than a regular standard size letter.  (Tr. 91:23-25,
92:1).  Plaintiff was assigned to work on Feeder 3 on the flat
sorter machine on the evening in question.  (Tr. 94:5-6).

On September 30, 2002, plaintiff asked Ms. Hembry if he
could go to see a shop steward.  Ms. Hembry permitted plaintiff
to go to the union office at approximately 12 a.m. on October 1,
2002.  (Tr. 95:1-19).  Shortly thereafter, Ms. Hembry realized

3

she could not reach her productivity goal with only two people working at the machine feeder. (Tr. 21-24). At approximately 12:30 a.m., Ms. Hembry went to the union office and informed plaintiff that she needed him to take his break of 15-20 minutes and return to his assignment on the flat sorter machine. (Tr. 95:21-25, 96:1-16). Plaintiff reported back to the flat sorter machine at about 1:00 a.m. (Tr. 96:20-25).

Later in the shift, around 2:20 a.m., plaintiff was to be loading his ledge of his machine with mail, but instead he was talking on a cell phone. (Tr. 97:13-19). When asked whether he was on his cell phone, plaintiff failed to respond. Ms. Hembry instructed plaintiff to get off the phone and go to work. (Tr. 97:9-11, 98:6-15).

It is mandatory that all three ledges of the flat sorter machine be loaded prior to starting the machine. (Tr. 99:6-13). If the machine is started without the ledges being fully loaded, that counts against productivity. (Id.). Cell phone use on the workroom floor is strictly prohibited and employees are on notice of this through service talks. (Tr. 97:20-25).

Each of the three flat sorter machine operators stationed at each feeder of the flat sorter machine is required to keep their feeder loaded and process 5,000 or more flats per hour. (Tr. 100:9-15). Ms. Hembry is able to monitor the productivity of each flat sorter machine operator from a computer at her desk. (Tr. 101:1-18, 102:1-15). If one of the employees at one of the three feeders is not working up to productivity standards, his or

her name is automatically highlighted in red on Ms. Hembry's computer screen. (Tr. 103:6-9).

Later in the early morning of October 1, 2002, Ms. Hembry observed plaintiff sitting at her desk writing while machines were running and people were working. (Tr. 104:12-13, 111:1-11, 132:11-18). Ms. Hembry noticed that plaintiff was completing a Report of Hazard, Unsafe Condition or Practice, otherwise known as a Form 1767. (Tr. 104:12-25). Ms. Hembry inquired about the safety issue plaintiff was reporting, because, if it is an immediate problem, management has the obligation to abate it right away. (Tr. 104:18-22). Plaintiff indicated to Ms. Hembry that he was not reporting a safety issue that required immediate attention. (Tr. 104:23). Accordingly, Ms. Hembry instructed plaintiff to finish filling out this form on his lunch break and to get back to the flat sorter machine so as to be able to meet the upcoming dispatch deadline. (Tr. 105:1-8). Plaintiff responded that he would return to work, but that he intended to note on the form that he was not given time to complete it. (ROI, p. 98).

This incident took place at or about 3:30 a.m. which is the most critical time of the shift because employees are rushing to meet the 4:00 a.m. dispatch. (Tr. 111:14-16). Employees are responsible for getting the mail they have processed between 11 p.m. and 3:30 a.m. off the machines, containerized and on the dock prior to 4 a.m., at which time the dispatch trucks pull away. (Tr. 111:14-21).

Plaintiff completed the Form 1767 and turned it in at the end of his shift. (ROI, p. 75). On the form he indicated that "Supervisor Hembry [exhibited an] aggressive manner and attitude [and that she] is harassing me and causing undue stress making my work area unsafe." (Id.). Plaintiff recommended that Ms. Hembry take an anger management course. (Id.).

On October 10, 2002, Ms. Ella Vick responded to Plaintiff's filing of a Form 1767. (ROI, p. 43). She informed plaintiff that a complete investigation was conducted, and, based on the facts, plaintiff had no reasonable grounds to determine a hazard or unsafe condition existed. (Id.). She concluded that the Form 1767 appeared to address issues concerning the supervisor's attitude, as opposed to the work environment. (Id.).

On October 2, 2002, plaintiff went to the EEO office at the Southern Maryland Processing and Distribution Center in order to file an EEO complaint against Ms. Hembry for sexual discrimination. (ROI, p. 69). Plaintiff alleged that he was treated differently than women in the operation when Ms. Hembry asked him to keep his feeder loaded on the flat sorter machine. (Id.).

On October 4, 2002, Ms. Hembry issued plaintiff a notice of 7-day suspension for failure to follow official instructions. (ROI, p. 98). Ms. Hembry indicated in the letter that on October 1, 2002, she observed plaintiff standing in his work area not performing his duties at approximately 2:20 a.m. and that she had to walk over and instruct him to load his ledge. (Id.). At

6

approximately 3:30 a.m., she observed plaintiff sitting at a desk
filling out a Form 1767 and again she had to instruct him to go
to his assignment and load the mail.  (Id.).  Ms. Hembry
indicated in the letter of suspension that plaintiff had
previously, on July 26, 2002, been issued a letter of warning for
failure to follow official instructions.  (Id.).

On October 4, 2002, the date the notice of suspension was
issued, Ms. Hembry was totally unaware that plaintiff had filed
an EEO complaint against her on October 2. 2002.  (Haney Dec. ¶
2; ROI, p. 22 at Q&A 20-23, p. 27 at Q&A 6-8, Tr. 111:25,
112:1-24).

The Postal Service uses a system of progressive discipline.
(Tr. 106:6-17).  Discipline starts with an official discussion,
progresses to a letter of warning and then can progress all the
way up to removal.  (Tr. 106:6-25, 107:1-3).  Ms. Hembry decided
to give plaintiff a 7-day suspension based on the fact that
Agency records indicated that he was issued a letter of warning
for failure to follow instructions on July 26, 2002.  (Tr.
107:6-11).  A 7-day suspension is the next step after a letter of
warning.  (Id.).  Unbeknownst to Ms. Hembry at the time she
issued the 7 day suspension, the letter of warning had been
rescinded as part of a settlement of a Union grievance plaintiff
had filed and removed from plaintiff's file.  Consequently, it
could not be used in making a decision regarding progressive
discipline.  (Tr. 108:7-22, 151:20-25, 152:1-8; ROI, pp. 16 at
Q&A 9, 100).  If Ms. Hembry had known that the letter of warning

7

was rescinded, this would have changed the level of discipline she would have given.  (Tr. 109:1-10).

Ms. Hembry had legitimate non-discriminatory business reasons for issuing discipline.  Her reasons were cited in the letter itself and in her testimony before the Equal Employment Opportunity Commission (EEOC) where she testified that she issued the discipline because:

> [o]ver a period of time for that eight hours we worked, I had issues with Mr Harper's work behavior.  It is not that he hasn't been made unaware [sic] of his work standards when it comes to work and what is expected of him.  However, when you blatantly disregard the post office rules, the edicts and mandates set forth by the Postal Service, then it's my job as a supervisor to ensure that you need to do what you're supposed to be doing.  [He disregarded the rules regarding] no cell phone, absolutely no cell phone allowed on the workroom floor at any given time; not being gainfully employed and being productive while you're getting paid to do so.  When you are given official instructions to do your job, you're expected to do your job, not at your pace, not at your own time, but you are on the clock being paid so you are expected to do your job.  And it was a culmination of me having to tell him to get off the cell phone, not keeping the ledges loaded.  Then once again, sitting at a desk when he should be working, and just not being productive in nature, not performing his duties.
>
>                 ***
>
> [The discipline was issued for a] combination of Mr. Harper's work performance for the entire night.  My job as a supervisor is to instruct and guide the employees on the flat sorter for the efficiency and productivity of our customers.  If employees don't do their jobs, then we can't be successful.  As a supervisor, it is my job to ensure that the employees are gainfully employed at all times.  If they fail to meet the requirements, then it is my job to discipline them, and that is what happened.  It's a culmination of having to talk to Mr. Harper about his work habits, him not – having to repeat the instructions more than once, him ignoring me, pretending that he didn't hear me.  Mr. Harper, get off the cell point.  He kept talking, like I'll get off

8

when I get ready, I'm going to keep talking until I'm
finished.  He gets off the phone.  Then he goes back to
work.  Then he is not keeping the ledges loaded.  You
need to keep the ledges loaded.  We are required to
meet productivity.  If you don't do that, I'll leave
the machine.  I come back.  You're sitting at the desk.
Everybody is working but you.  You are covered up
writing.  So I approach you, Mr. Harper.  What are you
doing? Filling out a form.  Well, if it's not an
immediate safety hazard, Mr. Harper, then you need to
go to work.  The post office pays you to work.  Eight
hours work for eight hours pay with the exception of
your luncheon break.  And Mr. Harper is no different
from any other employee that works for me.  There are
standards that are set that I need each employee to
fulfill.  If you cannot fulfill your job, then
disciplinary action will be taken, and it's clear and
as simple as that.

(Tr. 109:16-25, 110:1-14, 133:20-25, 134:1-25, 135:1-6).

On October 17, 2002, plaintiff filed a Notice of Traumatic
Injury and Claim for Continuation of Pay/Compensation.  (ROI, p.
39).  In this Notice, plaintiff claimed that subsequent to the
issuance of the suspension on October 4, 2002, "Ms. Hembry
Supervisor Automation place [sic] me in a stressful environment
which cause [sic] my anxiety attacks.  I have headache and chest
pains.  I also suffer depression and anxiety attacks."  (ROI, pp.
39-42).  On January 3, 2003, the Department of Labor denied
Plaintiff's claim for an on-the-job injury because "the evidence
is not sufficient to establish that you sustained an injury as
defined by the Federal Employees' Compensation Act."  (ROI, p.
48).

Plaintiff then filed a union grievance challenging his 7-day
suspension and the suspension was rescinded on November 13, 2002.
(ROI, p. 9 Q&A 13, p. 18 Q&A 16, p 37; Complaint ¶ 23).  Thus,
plaintiff never lost time from work or pay due to the issuance of

the suspension.  (ROI, p. 37, Complaint ¶ 23).  All records associated with the suspension were removed from his personnel records and thus could not be used as the basis for progressive discipline.

### A.  **PROCEDURAL HISTORY**

On October 31, 2002, plaintiff filed second EEO complaint alleging that on October 4, 2002, Ms. Hembry issued him a 7-day suspension in retaliation for his filing of an EEO complaint on October 2, 2002.  (ROI, p. 81).  The October 2 and 31, 2002 EEO complaints were consolidated and docketed as Agency Case No. 1K-201-0004-03.[1]

The parties agreed to participate in an Alternate Dispute Resolution Process in an effort to resolve Plaintiff's outstanding EEO complaints.  (ROI, p. 89).  On December 3, 2002, the parties entered into a settlement agreement to resolve only the October 2, 2002 EEO complaint, but not the later October 31, 2002 complaint.  (ROI, pp. 103, 105 at ¶ 7).

On December 13, 2002, defendant sent plaintiff a Notice of Right to File Individual Complaint which was received by plaintiff on December 14, 2002.  (ROI, pp. 76-79).  The Notice specifically informed plaintiff that if he desired to pursue his complaint he needed to complete and return a formal EEO complaint to the Office of EEO Compliance and Appeals within 15 calendar

---

[1] The October 2, 2002 complaint alleged he was discriminated against because Ms. Hembry made him keep his ledge full.  The October 31, 2002 complaint involved the October 4, 2002 7-day suspension.

days of receiving the letter.  (ROI, p. 76).  In order to be timely, plaintiff would have had to file his formal EEO complaint on or before December 29, 2002.  However, he filed it one day late on December 30, 2002.  (ROI, Cover Page & p.57).

Defendant accepted the following issue for investigation: Whether plaintiff was discriminated against based upon retaliation (prior EEO activity) when on October 4, 2002, he was issued a 7-Day Suspension for Failure to Follow Official Instructions.  (ROI, p. 57).

On July 21, 2005, Administrative Judge Kurt C. Hodges at the Equal Employment Opportunity Commission conducted a hearing in this matter.  On July 27, 2005, he issued a bench decision in which he found that defendant had not retaliated against plaintiff (This decision is appended to this Motion as Exhibit 3).  The instant civil action followed.

On September 23, 2003, plaintiff filed another informal EEO complaint which was docketed as Agency Case No. 1K-201-0303-03. (Ex. 4).  A formal complaint followed on December 12, 2003.  (Ex. 5).  In this complaint, plaintiff complained of retaliation for prior EEO activity when on August 19, 2003, Postal Service management allegedly targeted him with verbal threats, letters of warning, 7-day suspensions and harassment that caused his mental health to decline.  (Id.).  Ms. Hembry was identified as a responsible management official in this complaint.  (Id.).  This EEO complaint is not presently before the Court.

11

**ARGUMENT**

## I.  Legal Standard for Motion for Summary Judgment.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

In determining whether there exists a genuine issue of material fact, the Court must view all facts, and reasonable inferences to be drawn from them, in a light most favorable to the non-moving party.  Anderson, 477 U.S. at 255.  If the evidence favoring the non-moving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50.  Indeed, in order to withstand summary judgment, the non-moving party may not rest upon mere allegations or denials.  Id. at 248.  The mere existence of some factual dispute is insufficient to withstand summary judgment; there must be a genuine issue of material fact.  Id. at 247-48.  There is no genuine issue of material fact if the relevant evidence of record, taken as a whole, indicates that a reasonable factfinder could not return a verdict for the party opposing summary judgment.  Id. at 248.  That is, if the submitted evidence is of such a character that it would not permit a reasonable fact finder to find in favor of the non-moving party, summary judgment

12

is appropriate.  Id. at 251.

Rule 56 does not require the moving party to negate the non-movant's claim or to show the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  Rather, when the movant files a properly-supported summary judgment motion, the burden shifts to the nonmoving party to show "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  The non-movant cannot manufacture genuine issues of material fact with "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co., 475 U.S. at 586, or with "conclusory allegations," "unsubstantiated assertions,""or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  See also Brown v. Small, 2006 WL 1888562 at *4 (D.D.C. July 7, 2006).

## II. Legal Standards Applicable to Claims of Employment Discrimination.

The ultimate issue in an employment discrimination case is whether the plaintiff has met his or her burden of demonstrating that the adverse employment action, if discrimination, or materially adverse consequences, if retaliation, complained of was motivated, at least in part, by intentional discrimination or retaliation.  Where, as here, a plaintiff offers no direct evidence of retaliation, plaintiff may create a triable issue of discrimination or retaliation by relying on the familiar framework first enunciated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 803-805 (1973).  See also Cones v. Shalala, 199 F.3d 512, 516 (D.C. Cir. 2000).

13

It should be remembered, however, that at all times the burden of proof remains with the plaintiff even when the plaintiff's case is built on inferential evidence under the McDonnell Douglas analysis.  In the summary judgment context, the central inquiry remains the evidence, or lack thereof, of discrimination or retaliation in a particular case.  The Court should weigh whether the plaintiff has proof that would permit a reasonable jury to conclude that discrimination was a motivating factor for the challenged action, looking to defendant's legitimate, non-discriminatory or non-retaliatory reasons for the challenged decision and the evidence as a whole, in order to determine whether there is a need for trial.  See, e.g., Holcomb, 2006 WL 45853 at *5 (quoting Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003)).  See also Brown v. Small, 2006 WL 1888562 at *5 (D.D.C. July 7, 2006) (RBW) (plaintiff must show that a reasonable jury could conclude from all of the evidence that the adverse employment action was made for a discriminatory reason).

Under the McDonnell Douglas test, plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If the plaintiff is able to establish a prima facie case, then the Court should weigh Defendant's legitimate, nondiscriminatory reason or reasons with any evidence plaintiff presents that defendant's stated reason merely was a pretext for discrimination.  Id.  At all times, plaintiff retains the ultimate burden of persuasion to

14

demonstrate that he was in fact the victim of intentional discrimination or retaliation.  <u>Burdine</u>, 450 U.S. at 252-53.

Before turning to the merits, a brief word is in order concerning the scope of review in employment discrimination cases.  Though plaintiff might wish it otherwise, the employment discrimination statutes did not transform federal courts into review boards for local employment decisions.  "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'"  <u>Barbour v. Browner</u>, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting <u>Dale v. Chicago Tribune Co.</u>, 797 F.2d 458, 464 (7th Cir. 1986)).  To the contrary, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'"  <u>Fischbach v. District of Columbia Dep't of Corrections</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting <u>Milton v. Weinberger</u>, 696 F.2d 94, 100 (D.C. Cir. 1982)).  <u>See also</u> <u>Barnette v. Chertoff</u>, – F.3d – , No. 04-5443, slip. op. at 2 (D.C. Cir. July 7, 2006).

### III.  Plaintiff Failed to Timely and Completely Exhaust His Admininstrative Remedies

The Plaintiff's suit is fatally flawed because he has failed to comply with federal regulations which require a federal employee to timely exhaust his administrative remedies as a prerequisite to filing suit in this Court.  It is well-settled that Title VII of the Civil Rights Act of 1964, the Rehabilitation Act, and the Age Discrimination in Employment Act, are the exclusive remedies available to federal employees for

workplace race, disability, and age discrimination, respectively. See, e.g., Brown v. General Serv. Admin., 425 U.S. 820, 832 (1976); Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 94 (1990). Pursuant to both federal law and regulation, prior to filing a suit under Title VII, the Rehabilitation Act, or the ADEA, a claimant must pursue and exhaust his administrative remedies. See 42 U.S.C. § 2000e-16(c); and generally, 29 C.F.R. § 1614.110. A plaintiff is typically barred from proceeding on his claim in Court, if he has failed to timely and fully exhaust available administrative remedies. Stewart v. Ashcroft, 352 F.3d 422, 425 (D.C. Cir. 2003); Bryant v. Bell Atlantic Maryland Inc., 288 F.3d 124, 132 (4th Cir. 2002) ("Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies."). See also Williamson v. Shalala, 992 F.Supp. 454, 457 (D.D.C. 1998); Smith v. First Union National Bank, 202 F.3d 234, 247-48 (4th Cir. 2000).[2]

Here, the plaintiff has failed to timely exhaust his administrative remedies in a fatal way. He failed to timely file his formal administrative complaint of discrimination with the Agency's EEO office within 15 calendar days of the receipt of his Notice of Right to File, as required by 29 C.F.R. § 1614.106(a). Plaintiff received the Notice of Right to File on December 14, 2002 and his formal EEO complaint was due on or before December

---

[2] The time requirements of Title VII operate like a statute of limitation, [which] is suspect to waiver, estoppel and equitable tolling. See Saltz v. Lehman, 672 F.2d 207, 208 (D.C. Cir. 1982).

29, 2002.  Plaintiff filed the formal EEO complaint on December 30, 2002, but it was one day late.

Courts have strictly enforced the time deadlines throughout the complaint process under Title VII, Zografov v. V.A. Medical Ctr., 779 F.2d 967, 968-69 (4th Cir. 1985).  "A plaintiff who fails to comply, to the letter, with administrative deadlines ordinarily will be denied a judicial audience."  Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir. 1985).  Here, where plaintiff failed to comply with a required deadline, his Complaint should be dismissed for failure to exhaust his remedies.

Plaintiff has not asserted and cannot prove grounds for equitable tolling.  Saltz v. Lehman, 672 F.2d 207, 208 (D.C. Cir. 1982).  A plaintiff must allege and prove more than garden variety confusion over the rules of federal sector EEO processing in order to meet his burden of proving that equitable tolling applies to a claim untimely filed.  The Supreme Court has held that while late-filed claims are not jurisdictionally barred, equitable tolling is allowable only in narrowly tailored circumstances.  Irwin v. Department of Veterans Affairs, 498 U.S. 89, 95-96 (1990); see Baldwin Co. Welcome Ctr. v. Brown, 466 U.S. 147, 152 (1984) (stating that procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded out of a vague sympathy for particular litigants and that experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law).

17

Here, the plaintiff has not alleged that he failed to receive Notice of Right to File.  There is no allegation that the U.S. Postal Service committed any misconduct, much less misconduct directed at tricking plaintiff into letting the statute of limitations pass.  Accordingly the plaintiff cannot meet his burden of establishing that equitable tolling applies in this case to excuse his failure to file his formal EEO complaint within the required 15 day period and the subject Complaint should be dismissed with prejudice for this reason.

### IV.  Defendant is Entitled to Summary Judgment As to Plaintiff's Claims Concerning the 7-Day Suspension

### A.  Prima Facie Case

Evaluation of a Title VII retaliation claim follows the same burden-shifting template as discrimination claims.  Cones v. Shalala, 199 F.3d 512, 520 (D.C. Cir. 2000).  First, the plaintiff must establish a prima facie case of retaliation; if she meets this burden, the employer must articulate a legitimate, nonretaliatory reason for its actions; once the employer articulates a non-retaliatory reason, the plaintiff has the ultimate burden of establishing that the reason asserted by the employer is pretext for retaliation.  Id.

Title VII provides, in part, that it is unlawful for an employer to discriminate against an employee because the employee "has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."  42

18

U.S.C. § 2000e-3(a).  Title VII's anti-retaliation provision
seeks to prevent an employer from interfering (through
retaliation) with an employee's efforts to secure or advance
enforcement of the Act's basic guarantees.  Burlington N. & Santa
Fe Ry. Co. v. White, --- U.S. ---, 2006 WL 1698953, *8 (June 22,
2006).

A prima facie case alleging retaliation or reprisal under
Title VII is established when the plaintiff demonstrates that (1)
he or she engaged in protected behavior; (2) the employer took an
action against plaintiff with material consequences such that it
would dissuade a reasonable worker from making or supporting a
charge of discrimination; and (3) there is a causal link between
the action and the protected activity.  Rochon v. Gonzales, 438
F.3d 1211, 1219-20 (D.C. Cir. 2006).  See also Burlington
Northern, 2006 WL 1698953, *8.  That is, a plaintiff must
demonstrate "materially adverse consequences . . . such that a
reasonable trier of fact could conclude that the plaintiff has
suffered objectively tangible harm" which would have dissuaded a
reasonable employee from making or supporting a charge of
discrimination.  Rochon, 438 F.3d at 1219 (citing Brown, 199 F.3d
at 457).  If plaintiff is able to establish a prima facie case of
retaliation, then the Court should apply the familiar McDonnell
Douglas analysis applicable to discrimination claims which is
discussed above.

The unrefuted facts demonstrate that plaintiff cannot
establish a prima facie case of retaliation because he cannot

19

establish that he was subjected to a material injury or harm that would dissuade a reasonable employee from making a charge of discrimination or retaliation. Burlington Northern and Sante Fe Railroad Co. v. White _ S. Ct. _, 2006 WL 1698953 (US).

"Minor changes in work-related duties or opportunities do not constitute an actionable injury unless they are accompanied by some other adverse change in the terms, conditions or privileges of employment." Stewart v. Evans, 275 F.3d 1126, 1135 (D.C. Cir. 2002) (holding that to establish adverse employment action in absence of diminution in pay or benefits, a plaintiff must show that tangible change in duties or working conditions constitute a material employment disadvantage); Burke v. Gould, 286 F.3d 513 (D.C. Cir. 2002).

Plaintiff cannot make a showing with respect to any of the prongs of a prima facie showing.  First, the 7-day suspension (which was never served) would not have dissuaded a reasonable person from making a future charge of retaliation.  There is no dispute that the suspension was never served and was rescinded shortly after its issuance.  It is also undisputed that plaintiff did not suffer any loss of pay or time away from work.  This differs from the situation in Burlington in which the employee had to live for 37 days without income not knowing during that time whether or when she could return to work.  Id.  Although plaintiff contends he became physically ill after the suspension, Burlington judges injury from the standard of a reasonable person.  A reasonable person would not become ill after having

20

been disciplined under these circumstances.  Moreover, this
rescinded suspension clearly did not dissuade plaintiff from
making a charge of retaliation, as the record demonstrates that
the following year plaintiff filed another EEO complaint of
discrimination naming Ms. Hembry as a responsible management
official.

In addition, there is no evidence that Ms. Hembry was aware
of any recent EEO activity by plaintiff.  Ms. Hembry does not
deny knowledge of Plaintiff's involvement in the organization of
Brentwood Exposed which opposed what it perceived as racially
motivated treatment by unnamed individuals after the anthrax
attacks of 2001.  However, this was not recent activity.  There
is simply no showing that this activity, which was not directed
at Ms. Hembry, would have motivated her to retaliate against
plaintiff.  Significantly, Ms. Hembry, a fellow African American,
testified that her husband was also a member of Brentwood Exposed
and she did not begrudge her husband for joining this
organization.

The only recent EEO activity which plaintiff pinpointed was
his filing of an EEO complaint on October 2, 2002.  However,
there is no genuine dispute of material fact that Ms. Hembry was
unaware of this activity at the time she issued the suspension on
October 4, 2002.  Plaintiff testified that Mr. Haney, the Plant
Manager, saw him leaving the EEO office and asked him how he was
doing.  (Haney Dec. ¶ 1).  According to plaintiff, he informed
Mr. Haney that he was having problems with Ms. Hembry, and Mr.

Haney promised plaintiff that he would talk to Mr. Martin and
Tucker, who were Ms. Hembry's managers.  Plaintiff concludes from
this alleged discussion that Ms. Hembry was aware that he filed
an EEO complaint on October 2, 2002.  Neither Messrs. Martin,
Tucker, nor Haney discussed plaintiff's EEO complaint with Ms.
Hembry.  (Haney Dec. ¶ 2; ROI, p. 27, Q&As 7-9, p. 31, Q&As 7-9;
p. 21, Q&As 20-23).  There is not a scintilla of evidence to
support plaintiff's erroneous conclusion that Ms. Hembry was
aware of his October 2, 2002 EEO complaint when she issued the 7-
day suspension.

Finally, even if plaintiff could make a _prima_ _facie_ showing,
which defendant denies, defendant has articulated legitimate
nondiscriminatory reasons for its actions.  At the time Ms.
Hembry issued the 7-day suspension she was unaware that
plaintiff's prior letter of warning had been rescinded.
Plaintiff was disciplined because he violated USPS' rules against
the use of cell phones on the work room floor; he failed to keep
his ledges loaded as required; and he was otherwise unproductive
and unresponsive to his supervisor's instruction.  While Ms.
Hembry mistakenly imposed the incorrect progressive discipline,
the evidence is clear that plaintiff's conduct warranted
discipline by his supervisor.

Plaintiff has failed to demonstrate any credible evidence of
a retaliatory motive or proffer any evidence of pretext.

22

## Conclusion

For the foregoing reasons, the Court should grant defendant summary judgment and dismiss the Complaint with prejudice.

Respectfully submitted,

\_\_/s/_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney


\_\_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney



\_\_/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
_____
                                 )
JAMES HARPER                     )
                                 )
               Plaintiff,        )
                                 )
      v.                         )Civil Action No. 06-0161(RMC)
                                 )
JOHN E. POTTER,                  )
Postmaster General,              )
U.S. Postal Service              )
                                 )
               Defendant.        )
_____)
```

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Defendant, John E. Potter, in accordance with Local Rule 7(h) submits the following Statement of Material Facts as to Which There is No Genuine Issue:

1.  Plaintiff James Harper, an African-American male, was employed as a mail processor at the U.S. Postal Service (Postal Service or USPS) in Gaithersburg, Maryland during the relevant time frame.  (Report of Investigation (ROI), p. 33 (appended to this Motion as Exhibit (Ex.) 1); Transcript (Tr.) of July 21, 2005 EEOC Hearing 21:21, 25 (appended to this Motion as Ex. 2 )).

2.  Plaintiff became a member of a group known as "Brentwood Exposed" in December 2001. (Tr. 25:13).  This is a group of Postal employees who sought to sue the Postal Service for perceived injustices in the way Postal management dealt with the 2001 anthrax crisis at the Brentwood Processing and Distribution Center (P&DC) in Washington, D.C.  (Tr. 102:4-8, 113:4-8). Specifically, plaintiff believes that Postal employees were left in Brentwood after anthrax was discovered as a test to see the

effect of anthrax on human beings.  (Tr. 21:6-13, 17-22).
Brentwood employees were chosen, according to plaintiff, because
the majority of employees at Brentwood are African-American.
(Tr. 21:17-22).  According to plaintiff, white employees on
Capitol Hill were treated differently because they were removed
from their building and given treatment from military doctors.
(Tr. 24:5-17).  Plaintiff spoke out on this issue on "numerous
occasions."  (Tr. 21:17-22).  Plaintiff's supervisor at all
relevant time to this Complaint, Ms. Lydia Hembry, was not a
member of the group, but her husband was.  (Tr. 113:13, 25,
114:1-3).  Ms. Hembry did not begrudge her husband for joining
the group.  (Tr. 114:1-5).

     3.  Ms. Hembry is an African-American female who has engaged
in prior EEO activity.  (Tr. 90:17-21).  Ms. Hembry was an acting
supervisor at the time of the events in question.  (Tr. 91:9-14).

     4.  Plaintiff works Tour 1 between the hours of
approximately 10:30 p.m. to 7 a.m.  (Tr. 93:19-22).

     5.  Ms. Hembry was supervising the flat sorter machine where
plaintiff worked on the evening of September 30 and the early
morning of October 1, 2002.  (Tr. 91: 15-18).  The flat sorter is
an automated piece of equipment that processes first-class flat
mail.  (Tr. 91:20-21).  "Flat mail" is larger than a regular
standard size letter.  (Tr. 91:23-25, 92:1).  Plaintiff was
assigned to work on Feeder 3 on the flat sorter machine on the
evening in question.  (Tr. 94:5-6).

     6.  On September 30, 2002, plaintiff asked Ms. Hembry to see

a shop steward and he was permitted to go to the union office at approximately 12 a.m. on October 1, 2002. (Tr. 95:1-19). About a half hour passed, and Ms. Hembry realized she could not reach her productivity goal with only two people working at the machine feeder. (Tr. 21-24). At approximately 12:30 a.m., Ms. Hembry went to the union office and informed plaintiff that she needed him to take his break of 15-20 minutes and return to his assignment on the flat sorter machine. (Tr. 95:21-25, 96:1-16). Plaintiff reported back to the flat sorter machine at about 1:00 a.m. (Tr. 96:20-25).

7. Later in the shift, around 2:20 a.m., plaintiff was to be loading his ledge of his machine with mail, but instead he was talking on a cell phone. (Tr. 97:13-19). When asked whether he was on his cell phone, plaintiff failed to respond. Ms. Hembry instructed plaintiff to get off the phone and go to work. (Tr. 97:9-11, 98:6-15).

8. It is mandatory that all three ledges of the flat sorter machine be loaded prior to starting the machine. (Tr. 99:6-13). If the machine is started without the ledgers being fully loaded, that counts against productivity. (Id.). Cell phone use on the workroom floor is strictly prohibited and employees are on notice of this through service talks. (Tr. 97:20-25).

9. Each of the three flat sorter machine operators stationed at each feeder of the flat sorter machine is required to keep their feeder loaded and process 5,000 or more flats per hour. (Tr. 100:9-15). Ms. Hembry is able to monitor the

productivity of each flat sorter machine operator from a computer at her desk. (Tr. 101:1-18, 102:1-15). If one of the employees at one of the three feeders is not working up to productivity standards, his or her name is highlighted in red on Ms. Hembry's computer screen. (Tr. 103:6-9).

10. Later in the early morning of October 1, 2002, Ms. Hembry observed plaintiff sitting at her desk writing while machines were running and people were working. (Tr. 104:12-13, 111:1-11, 132:11-18). Ms. Hembry noticed that plaintiff was completing a Report of Hazard, Unsafe Condition or Practice report, otherwise known as a Form 1767. (Tr. 104:12-25). Ms. Hembry inquired about the safety issue plaintiff was reporting, because, if it is an immediate problem, management has the obligation to abate it right away. (Tr. 104:18-22). Plaintiff indicated to Ms. Hembry that he was not reporting a safety issue that required immediate attention. (Tr. 104:23). Accordingly, Ms. Hembry instructed plaintiff to finish filling out this form on his lunch break and to get back to the flat sorter machine so as to be able to meet the upcoming dispatch deadline. (Tr. 105:1-8). Plaintiff responded that he would return to work, but that he intended to note on the form that he was not given time to complete it. (ROI, p. 98).

11. This incident took place at or about 3:30 a.m. which is the most critical time of the shift because employees are rushing to meet the 4:00 a.m. dispatch. (Tr. 111:14-16). Employees are responsible for getting the mail they have processed between 11

4

p.m. and 3:30 a.m. off the machines, containerized and on the dock prior to 4 a.m., at which time the dispatch trucks pull away. (Tr. 111:14-21).

12. Plaintiff completed the Form 1767 and turned it in at the end of his shift. (ROI, p. 75). On the form he indicated that "Supervisor Hembry [exhibited an] aggressive manner and attitude [and that she] is harassing me and causing undue stress making my work area unsafe." (Id.). Plaintiff recommended that Ms. Hembry take an anger management course. (Id.).

13. On October 10, 2002, Ms. Ella Vick responded to Plaintiff's filing of a Form 1767. (ROI, p. 43). She informed plaintiff that a complete investigation was performed, and, based on the facts presented, he had no reasonable grounds to determine a hazard or unsafe condition existed. (Id.). She concluded that the Form 1767 appeared geared to issues concerning the supervisor's attitude, as opposed to the work environment. (Id.).

14. Plaintiff had no conversation with Mr. Timothy Haney, then Plant Manager at the Curseen & Morris Processing & Distribution Center, at or about the time he filed his October 2, 2002 EEO complaint. (Declaration of Timothy Haney [hereinafter Haney Dec.] dated August 8, 2006 at ¶ 2).

15. On October 4, 2002, Ms. Hembry issued plaintiff a notice of 7-day suspension for failure to follow official instructions. (ROI, p. 98). Ms. Hembry indicated in the letter that on October 1, 2002, she observed plaintiff standing in his

5

work area not performing his duties at approximately 2:20 a.m. and that she had to walk over and instruct him to load his ledge. (Id.). Also, at approximately 3:30 a.m., she observed him sitting at a desk filling out a Form 1767 and she had to instruct him to go to his assignment and load the mail. (Id.). Ms. Hembry indicated in the letter that plaintiff had previously, on July 26, 2002, been issued a letter of warning for failure to follow official instructions. (Id.).

16. On October 4, 2002, the date the notice of suspension was issued, Ms. Hembry was totally unaware that plaintiff had filed an EEO complaint against her on October 2. 2002. (Haney Dec. ¶ 2; ROI, p. 22 at Q&A 20-23, p. 27 at Q&A 6-8, Tr. 111:25, 112:1-24).

17. The Postal Service uses a system of progressive discipline. (Tr. 106:6-17). Discipline starts with an official discussion, progresses to a letter of warning and then can progress all the way up to removal. (Tr. 106:6-25, 107:1-3). Ms. Hembry decided to give plaintiff a 7-day suspension based on the fact that the Agency records indicated that he was issued a letter of warning for failure to follow instructions on July 26, 2002. (Tr. 107:6-11). A 7-day suspension is the next step after a letter of warning. (Id.). Unbeknownst to Ms. Hembry at the time she issued the 7 day suspension, the letter of warning had been rescinded and removed from Plaintiff's file as part of a grievance settlement which means that defendant could not use it in making a decision regarding progressive discipline. (Tr.

6

108:7-22, 151:20-25, 152:1-8; ROI, pp. 16 at Q&A 9, 100). If Ms. Hembry had known that the letter of warning was rescinded, this would have changed the level of discipline she would have given. (Tr. 109:1-10).

18. Ms. Hembry had legitimate business reasons for issuing the discipline in question. These reasons were cited in the letter itself and in her testimony before the Equal Employment Opportunity Commission (EEOC) where she testified that she issued the discipline because:

> [o]ver a period of time for that eight hours we worked, I had issues with Mr Harper's work behavior. It is not that he hasn't been made unaware [sic] of his work standards when it comes to work and what is expected of him. However, when you blatantly disregard the post office rules, the edicts and mandates set forth by the Postal Service, then it's my job as a supervisor to ensure that you need to do what you're supposed to be doing. [He disregarded the rules regarding] no cell phone, absolutely no cell phone allowed on the workroom floor at any given time; not being gainfully employed and being productive while you're getting paid to do so. When you are given official instructions to do your job, you're expected to do your job, not at your pace, not at your own time, but you are on the clock being paid so you are expected to do your job. And it was a culmination of me having to tell him to get off the cell phone, not keeping the ledges loaded. Then once again, sitting at a desk when he should be working, and just not being productive in nature, not performing his duties.
>
> * * *
>
> [The discipline was issued for a] combination of Mr. Harper's work performance for the entire night. My job as a supervisor is to instruct and guide the employees on the flat sorter for the efficiency and productivity of our customers. If employees don't do their jobs, then we can't be successful. As a supervisor, it is my job to ensure that the employees are gainfully employed at all times. If they fail to meet the requirements, then it is my job to discipline them, and that is what happened. It's a culmination of having to talk to Mr.

Harper about his work habits, him not – having to
repeat the instructions more than once, him ignoring
me, pretending that he didn't hear me.  Mr. Harper, get
off the cell point.  He kept talking, like I'll get off
when I get ready, I'm going to keep talking until I'm
finished.  He gets off the phone.  Then he goes back to
work.  Then he is not keeping the ledges loaded.  You
need to keep the ledges loaded.  We are required to
meet productivity.  If you don't do that, I'll leave
the machine.  I come back.  You're sitting at the desk.
Everybody is working but you.  You are covered up
writing.  So I approach you, Mr. Harper.  What are you
doing?  Filling out a form.  Well, if it's not an
immediate safety hazard, Mr. Harper, then you need to
go to work.  The post office pays you to work.  Eight
hours work for eight hours pay with the exception of
your luncheon break.  And Mr. Harper is no different
from any other employee that works for me.  There are
standards that are set that I need each employee to
fulfill.  If you cannot fulfill your job, then
disciplinary action will be taken, and it's clear and
as simple as that.

(Tr. 109:16-25, 110:1-14, 133:20-25, 134:1-25, 135:1-6).

19.  On October 17, 2002, plaintiff filed a Notice of

Traumatic Injury and Claim for Continuation of Pay/Compensation.

(ROI, p. 39).  In this Notice, plaintiff claimed that subsequent

to the issuance of the suspension on October 4, 2002, "Ms. Hembry

Supervisor Automation place [sic] me in a stressful environment

which cause [sic] my anxiety attacks.  I have headache and chest

pains.  I also suffer depression and anxiety attacks."  (ROI, pp.

39-42).  On January 3, 2003, the Department of Labor denied

Plaintiff's claim for an on-the-job injury because "the evidence

is not sufficient to establish that you sustained an injury as

defined by the Federal Employees' Compensation Act."  (ROI, p.

48).

20.  Plaintiff filed a union grievance challenging his

suspension and the suspension was rescinded on November 13, 2002.

(ROI, p. 9 Q&A 13, p. 18 Q&A 16, p 37; Complaint ¶ 23).  Thus, plaintiff never lost time from work or pay due to the issuance of the suspension.  (ROI, p. 37).  All records associated with the suspension were removed from his personnel records.

21.  On October 31, 2002, plaintiff filed a second EEO complaint alleging that on October 4, 2002, Ms. Hembry issued him a 7-day suspension in retaliation for his filing of an EEO complaint on October 2, 2002.  (ROI, p. 81).  The October 2 and 31, 2002 EEO complaints were consolidated and docketed as Agency Case No. 1K-201-0004-03.

22.  The parties agreed to participate in an Alternate Dispute Resolution Process in an effort to resolve Plaintiff's outstanding EEO complaints.  (ROI, p. 89).

23.  On December 3, 2002, the parties entered into a settlement agreement to resolve only the October 2, 2002 EEO complaint, but not the later October 31, 2002 complaint.  (ROI, pp. 103, 105 at ¶ 7).

24.  On December 13, 2002, defendant sent plaintiff a Notice of Right to File Individual Complaint which was received by plaintiff on December 14, 2002.  (ROI, pp. 76-79).  The Notice specifically informed plaintiff that if he desired to pursue his complaint he needed to complete and return a formal EEO complaint to the Office of EEO Compliance and Appeals within 15 calendar days of receiving the letter.  (ROI, p. 76).  In order to be timely, plaintiff would have had to file his formal EEO complaint on or before December 29, 2002.  However, he filed it one day

9

late on December 30, 2002.  (ROI, Cover Page & p.57).

25.  Defendant accepted the following issue for investigation: Whether plaintiff was discriminated against based upon retaliation (prior EEO activity) when on October 4, 2002, he was issued a 7-Day Suspension for Failure to Follow Official Instructions.  (ROI, p. 57).

26.  On July 21, 2005, Administrative Judge Kurt C. Hodges at the Equal Employment Opportunity Commission conducted a hearing in this matter.  On July 27, 2005, he issued a bench decision in which he found that defendant had not retaliated against plaintiff.  This decision is appended to this Motion as Exhibit 3.  The subject civil action followed.

27.  On September 23, 2003, plaintiff filed another informal EEO complaint which was docketed as Agency Case No. 1K-201-0303-03.  (Ex. 3).  A formal complaint followed on December 12, 2003.  (Ex. 4).  In this complaint, plaintiff complained of disparity of treatment in retaliation for prior EEO activity when on August 19, 2003, Postal Service management allegedly targeted him with verbal threats, letters of warning, 7-day suspensions and harassment that caused his mental health to decline.  (Id.).  Ms. Hembry was identified as a responsible management official in this complaint. (Id.).  This complaint is not presently before the Court.

10

Respectfully submitted,


___/s/_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney



___/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney




___/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205