Exhibit 2, Part 1

050721A. TXT

1

```
 1              EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
 2                     Washington Field Office
 3  JAMES HARPER,         )
 4              Complainant,)
 5  v.                     )  Agency No.: 1K-206-0004-03
 6                         )
 7  JOHN E. POTTER, POSMASTER)  EEOC Case No.: 100-2004-00119X
 8  GENERAL, UNITED STATES   )
 9  POSTAL SERVICE,          )
10              Respondent. )
11                                   Suite 650
12                                   U.S. Postal Service
13                                   400 Virginia Avenue
14                                   Washington, D.C.
15                                   Thursday,
16                                   July 21, 2004
17              The parties met, pursuant to notice, at
18  9:09 a.m.
19  BEFORE:   HONORABLE KURT C. HODGES
20                     Administrative Judge
21  APPEARANCES:
22  For the Complainant:
23  ZACHARY J. WOLFE, Esquire
24  People's Law Resource Center
25  1725 I Street, N.W., Suite 300
26  Washington, D.C. 20006
27  (202) 265-5965
28  For the Agency:
29  ANDREW A. CHAKERES, Esquire
30  United States Postal Service
31  400 Virginia Avenue, S.W.
32  Washington, D.C.
33  (202) 314-6802
```

2

## C O N T E N T S

<table>
<tr><th>WITNESSES:</th><th>DIRECT</th><th>CROSS</th><th>REDIRECT</th><th>RECROSS</th><th>VOIR DIRE</th></tr>
<tr><td>For the Complainant:</td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>James Harper</td><td>17</td><td>47</td><td>68</td><td>--</td><td>--</td></tr>
<tr><td></td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>For the Agency:</td><td></td><td></td><td></td><td></td><td></td></tr>
<tr><td>Ray Robinson</td><td>72</td><td>77</td><td>--</td><td>--</td><td>--</td></tr>
<tr><td>Lydia Hembry</td><td>90</td><td>136</td><td>--</td><td>--</td><td>--</td></tr>
</table>

050721A. TXT

3

```
 1                    E X H I B I T S
 2
 3
 4   EXHIBITS           IDENTIFIED        RECEIVED
 5
 6
 7   A-1                119              119
 8   A-2                126              (Rej.)
 9   A-3                126              126
```

4

```
 1                  P R O C E E D I N G S
 2                                      (9:09 a.m.)
 3           JUDGE HODGES:  I declare this hearing open
 4   at approximately 9:09 a.m. on July 21st in the year
 5   2005.  We have convened in the matter of Mr. James
 6   Harper v. John E. Potter, Postmaster General, United
 7   States Postal Service.  This case will be referred to
 8   hear and after as 100-2004-0011 9X, and that's EEO Case
 9   No.
10           The court reporter is instructed to send the
11   completed transcript along with a copy to the
12   Administrative Judge.  I announce to the parties I
13   will issue a copy of the transcript and send those to
14   the parties along with my decision in this case.
15           My name is Administrative Judge Hodges.  I
16   have been assigned by the EEOC to conduct a hearing in
17   this matter.
18           Present in the hearing room this morning are
19   the Complainant, Mr. Harper; Complainant's counsel,
```

050721A.TXT

20    Mr. Wolfe; Agency counsel, Mr. Chakeres; Agency

21    counsel advisor, and can I have your name again,

22    please, ma'am.

23         MS. RODRIGUEZ:   Rodriguez.

24         JUDGE HODGES:   Ms. Rodrigues.   The court

25    reporter and myself, Administrative Judge Hodges.


                                                      5

1         We have a number of witnesses that have been

2    approved to testify.   While off-record, there was a

3    discussion regarding two witnesses that had been

4    produced by the Complainant.   I explained to the

5    parties that I would allow them to make arguments on

6    the record whether they should be allowed to testify

7    during the liability phase of the hearing.

8         It is already part of the record, but I will

9    note for the record that I believe during February of

10   2005 the Complainant's prehearing statement was

11   submitted, and Mr. Chakeres, do you recall when the

12   Agency's prehearing statement was submitted?

13        MR. CHAKERES:   I think it was around the

14   same time, Your Honor.   I can give you the date in

15   just a second here.

16        The Agency's prehearing statement was

17   submitted on February 18, 2005.

18        JUDGE HODGES:   There was a prehearing order

19   issued by myself ordering the parties to submit the

20   prehearing statement.   I'm going to read into the

21   record the instructions that were provided.   The

050721A.TXT
22    portion that pertains to the witnesses read as

23    follows:

24         "The parties are ordered to submit a

25    prehearing report no later than February 18, 2005, in

6

1    accordance with the following requirements:

2         "A list of proposed witnesses setting forth

3    for each witness the full name, current job title,

4    former job title, if relevant, and the agreed proffer

5    as to the witness's testimony sufficient to establish

6    if the testimony is relevant and not repetitious.

7         "Testimony at the hearing will be limited to

8    the proffer made in the prehearing report.  The

9    administrative judge's determination of which

10   witnesses to approve will be based solely on the

11   written proffer submitted in the prehearing report.

12   Failure to provide an adequate proffer may result in

13   the witness's disapproval."

14        Subsequent to the issuance of this order, an

15   additional hearing notice and order was issued by

16   myself, and the parties were -- okay, let me rephrase.

17        Mr. Chakeres, since you are the moving

18   party, do you have any idea as to the approximate time

19   frame that the bifurcation order was issued?

20        MR. CHAKERES:  The order was issued on --

21        JUDGE HODGES:  Okay, I have a copy here.

22   According to my records, the bifurcation issue was

23   ordered on March 17, 2005.  And the parties were

24   informed that I intended to bifurcate the issue of

                    Page 4

050721A.TXT

25    damages and liability at the hearing.  During the

7

1    hearing I would receive evidence regarding liability

2    only.  If discrimination was found, I would authorize

3    an additional discovery period and conduct a

4    subsequent hearing to resolve the damages issue.

5          Now, I believe there was an order issued,

6    and if we could go off the record one moment, I need

7    to locate the order.

8          (Discussion held off the record.)

9          JUDGE HODGES:  During the March 2005 time

10   frame, within the March 17th order the parties were

11   afforded an opportunity to, or let me rephrase.  I

12   authorized the parties to conduct discovery in this

13   matter, and the parties were authorized to conduct

14   discovery, including areas related to damages.

15         So Mr. Wolfe, was that discovery in fact

16   completed?

17         MR. WOLFE:  Can I have your indulgence for a

18   moment, Your Honor?

19         JUDGE HODGES:  Sure.

20         (Pause.)

21         MR. WOLFE:  Thank you, Your Honor.

22         Yes, the discovery was conducted subsequent

23   to Your Honor's March 17, 2005 order consisting of

24   written discovery requests and a deposition from the

25   Agency.

050721A.TXT

8

1              JUDGE HODGES:  Okay, Mr. Chakeres, same

2     question?

3              MR. CHAKERES:  Your Honor, discovery was

4     conducted, but we read the order as providing that

5     discovery was only limited as to liability, and that

6     discovery on damages would be taken at a later date.

7              JUDGE HODGES:  Okay.  So does that then mean

8     that you did not conduct discovery in the area of

9     damages between March 17th and today?

10             MR. CHAKERES:  Yes, Your Honor.

11             JUDGE HODGES:  Okay.  The Agency has moved

12    and requested that Ms. Toliver and Ms. Harper not be

13    allowed to testify during the liability phase of the

14    hearing due to the Complainant's failure to offer a

15    description of that testimony in his proffer.

16             At this time, Mr. Wolfe, I would like for

17    you to do two things.  One, make an argument as to why

18    I should allow these witnesses to testify; and two,

19    provide me a brief description of what their area of

20    testimony will be.

21             MR. WOLFE:  Thank you, Your Honor.

22             The two witnesses will testify as to Mr.

23    Harper's credibility and discuss the emotional harm of

24    the offensive action and it goes to his state of mind

25    at the time of the offense.

9

Page 6

050721A. TXT

1            The testimony should be allowed to go
2    forward for a number of reasons.  Most basically, when
3    they were identified in Your Honor's order setting
4    forth this hearing date, both Donna Harper and Cynthia
5    Toliver are listed as witnesses who have been approved
6    to testify on July 21st, at this hearing in Your
7    Honor's order of June 6th.
8            Therefore, it's not surprising that they are
9    here to testify at this hearing, and they should be
10    allowed to go forward and that they would testify as
11    stated in the order by Your Honor.
12            Our prehearing brief was adequate to the
13    requirement that was set forth to us.  At the time
14    that the prehearing brief was submitted, it was our
15    belief that there would be a single hearing on both
16    liabilities and damages.  We believe that those two
17    witnesses would be appropriate.  Their primary area of
18    testimony is as to liability, and in particular, as to
19    the emotional cost of the Complainant, but they also
20    have relevant testimony that would support Mr.
21    Harper's credibility.
22            We were instructed to list the area of
23    testimony that was sufficient to establish the
24    witness's relevance and that it's not repetitious.  We
25    believe that we have met that requirements and they

                                                        10

1    should be allowed to testify as to what is admittedly
2    a tangential matter, but as the case has now been

050721A.TXT

3    bifurcated, rather than hearing from only Mr. Harper,

4    I believe it would assist the Commission to hear from

5    these other witnesses as well on the issue of his

6    credibility.

7              JUDGE HODGES:  Mr. Chakeres.

8              MR. CHAKERES:  Your Honor, your orders have

9    been very specific.  For the prehearing, we were

10   supposed to identify the witnesses and the subject

11   matter that they would testify to.

12             Following that order, Complainant identified

13   Ms. Toliver and Ms. Harper as witnesses going to

14   liability damages and emotional cost.

15             Based on their representations, the Agency

16   did not conduct any discovery with regard to those

17   individuals because your order bifurcated the issue of

18   discover on liability and damages.  Had the Agency

19   known that these people were going to be proffered as

20   witnesses on liability issues, the Agency would have

21   been able to take discovery.

22             The fact that they are now being called at

23   the last moment on liability issues is severely

24   prejudicial to the Agency, and it's contrary to your

25   orders.

11

1              JUDGE HODGES:  Thank you.  I have afforded

2    both parties an opportunity to make arguments on the

3    record and preserve its arguments for purposes of

4    appeal.  The order that I have previously referenced

5    expressly requested a written proffer of the proposed

Page 8

050721A.TXT

6      testimony of the witnesses.

7                The prehearing report that was submitted by

8      Complainant identified these two witnesses as

9      providing testimony regarding the emotional harm to

10     Complainant, and this prehearing report was submitted

11     prior to any bifurcation order that was rendered.

12               The order specifies that the testimony would

13     be limited to the proffer made by the parties, and

14     that disapproval may result based on the adequacy or

15     inadequacy of the proffer.

16               Based on the preceding history, I have

17     determined that there is a procedural defect with

18     offering these witnesses to testify today on the area

19     of liability notwithstanding their identification in

20     my hearing notice.

21               So I am going to grant Mr. Chakeres's

22     motion.  I am not allowing Ms. Harper and Mr. Toliver

23     to testify regarding the area of liability.  However,

24     they will be allowed to testify regarding the areas of

25     damages in the event that discrimination is found.


                                                          12

1                I believe we have a proffer from those

2      witnesses, so you have that preserved for purposes of

3      appeal.  The remaining witnesses we do have today are

4      the Complainant, Mr. Robinson and Mr. Hembry.

5                MR. CHAKERES:  Ms. Hembry.

6                JUDGE HODGES:  Excuse me.  Ms. Hembry.

7                Let's talk a little bit about the issue

                          Page 9

050721A.TXT

8    before moving to the opening statements.  My

9    understanding is that we are addressing a letter of

10   warning that was issued to the Complainant.

11           Does the Complainant agree that that is the

12   issue pending adjudication?

13           MR. WOLFE:  Yes, Your Honor.  A notice of

14   suspension.

15           JUDGE HODGES:  Excuse me.  Notice of

16   suspension?  Was the suspension carried out?

17           MR. WOLFE:  It was later rescinded, Your

18   Honor.

19           JUDGE HODGES:  Okay.  Do you have the

20   approximate month and year that the notice was issued?

21           MR. WOLFE:  October 4, 2002.

22           JUDGE HODGES:  Okay, Mr. Chakeres, do you

23   agree that that is the issue pending adjudication?

24           MR. CHAKERES:  Yes, Your Honor.

25           JUDGE HODGES:  All right.

13

1            MR. CHAKERES:  And it's on the basis of

2    retaliation.  The sole issue is retaliation.

3            JUDGE HODGES:  Okay.  This hearing is a

4    continuation of the investigatory process.  The

5    purpose of the hearing is give the Complainant an

6    opportunity to be heard on his complaint, and to

7    supplement the investigative record through the

8    examination, cross-examination of witnesses.

9            My function is to serve as a presiding

10   official and to conduct an equitable and orderly and

Page 10

050721A.TXT

11    expeditious hearing.

12            Any objections, please direct to me and not

13    to the opposing party.  Interruptions will not be

14    permitted.  Repetitious or irrelevant testimony will

15    be not be permitted.

16            Prior to the hearing today, a prehearing

17    conference was conducted by telephone.  During that

18    conference the parties attempted to reach a settlement

19    agreement.  They were not successful.  The parties

20    have been informed that they can notify the judge at

21    any point in time if they want to re-initiate those

22    discussions.

23            Okay, I am ready to receive opening

24    statements at this point.  I will start with the

25    Complainant.  I will give you approximately five

14

1    minutes to summarize the evidence you intend to

2    present today.

3            MR. WOLFE:  Thank you.  Could I ask the

4    indulgence to take a one-minute break so I could

5    advise the witnesses that they won't be needed today?

6            JUDGE HODGES:  Certainly.  Let's go off the

7    record, please.

8            (Discussion held off the record.)

9            MR. WOLFE:  Your Honor, I will make my

10    opening statement brief since the issues are

11    straightforward in this case.

12            Mr. Harper was a long-time employee of the

050721A.TXT

13   Postal Service, and enjoyed his work, had enjoyed good

14   relationships with the supervisors, and enjoyed

15   positive performance evaluations, and general work

16   environments up until say the anthrax attacks that

17   occurred in 2001.

18           At that point Mr. Harper became extremely

19   concerned that the Postal Service's and the government

20   in general response to the anthrax attack reflected

21   racism.  He made these claims in a number of fora,

22   including in the media and publicly as well as on the

23   job to his supervisors.

24           He subsequently found himself coming under

25   intensified scrutiny.  He frequently described the

15

1   relationship that subsequently developed after his

2   complaints of racism as discrimination.  He did this

3   informally in a number of conversations with

4   supervisors and with others.  He did this in meetings

5   with supervisors, and he did this through engaging in

6   the EEO process.

7           All of this constituted protected

8   activities.  It involves Mr. Harper's good faith

9   allegations that he was being subjected to unlawful

10   discrimination.

11           This hearing really has to do with the

12   October 4th notice that he would be suspended for

13   seven days.  This was purportedly based on his filling

14   out a form that is entitled "Report of Hazard or Unfit

15   Condition or Practice."  It's really a self-evidently

050721A.TXT

16    absurd basis to suspend someone for filling out a form

17    that's a safety form.

18              He was filling it out in the context of his

19    complaints of harassment and discrimination stating

20    that his supervisor was creating such a hostile

21    environment to him through repeated harassment and

22    discrimination that it was no longer safe for him to

23    be on the job and requesting assistance.

24              When that supervisor saw that form, she

25    instructed him to return to work.  He returned to

16

1    work.  There is dispute that he immediately returned

2    to work upon being instructed to, so somehow that

3    warranted a seven-day suspension.

4              It is clear to us that this is in a line of

5    harassment and discrimination, and targeting Mr.

6    Harper for complaining about discrimination at the

7    Postal Service.

8              JUDGE HODGES:   Thank you.  Mr. Chakeres.

9              MR. CHAKERES:   Your Honor, we feel that

10    you're sufficiently educated on the issues in this

11    case, and that there is no need to make an opening

12    statement.

13              JUDGE HODGES:  Okay.  At this time I am

14    ready to receive the testimony of the Complainant.  I

15    will ask Mr. Harper to take a seat at the end of the

16    table, please.

17              And Mr. Harper, would you please state your

050721A.TXT

18    first and last name for the record.

19            MR. HARPER:  James Harper.

20            JUDGE HODGES:  Would you spell your last

21    name, please?

22            MR. HARPER:  H-A-R-P-E-R.

23            JUDGE HODGES:  Would you raise your right

24    hand?

25    //

17

1            Whereupon,

2                        JAMES HARPER

3            having been duly sworn, was called as a

4    witness and was examined and testified as follows:

5            JUDGE HODGES:  Thank you.  A couple of

6    instructions.

7            Mr. Wolfe is going to ask you a series of

8    questions.  Please let him finish the question before

9    you answer.  If Mr. Chakeres objects, do not answer

10    the question until I have discussed the objection with

11    counsel.  If I want you to answer, I will then signal

12    to you to answer the question.

13            Please keep your voice raised so that you

14    can be heard in the room.  Please try and speak one at

15    a time so the court reporter can record your

16    testimony.  Okay?

17            THE WITNESS:  Yes, sir.

18            JUDGE HODGES:  Mr. Wolfe, you may begin.

19            MR. WOLFE:  Thank you, Your Honor.

20                    DIRECT EXAMINATION

050721A.TXT

21          BY MR. WOLFE:

22          Q    Good morning Mr. Harper.

23          A    Good morning.

24          Q    When did you start working at the Postal

25     Service?

                                                    18

1           A    In March of 1988.

2           Q    In those first say dozen years that you were

3      at the Postal Service, what was your relationship with

4      your employer like?

5           A    It was very good.  I received awards.  I

6      became an acting supervisor.  I taught a class which I

7      developed, and taught employees as well as

8      supervisors.  I was a service improvement captain, and

9      also a safety captain on the job.

10          Q    Did you hold the position, the same position

11     for your entire tenure with the Postal Service?

12          A    I was a mail processor during the time that

13     I worked for the post office.  Yes, I kept the title

14     as mail processor.

15          Q    What sort of awards have you received?

16          A    I received awards for safety, and I received

17     an award for outstanding job performance.

18          Q    Okay.  Can you remember when that was?

19          A    I believe it was around '90 -- round about

20     '91 - '92 for the awards.

21          Q    I'm sorry.  That was for both of the awards

22     that you mentioned was '91 or '92?

050721A.TXT
23      A    Yes.

24      Q    Thank you.

25           Were you ever suspended prior to 2001?

                                                              19

1       A    I had a suspension in 1989.

2       Q    What was that about?

3       A    It was for attendance.

4       Q    Anything else?  Any other suspensions prior

5  to 2001?

6       A    Well, actually it was two suspensions in

7  1989 for attendance, and that was it.  That was the

8  last time I was suspended.

9       Q    Okay.  Any other forms of discipline other

10  than the attendance-related problems that you've

11  referenced?

12      A    No.

13      Q    Did you have complaints from the supervisors

14  about your work performance prior to 2001 that didn't

15  rise to the level of having anything written?

16      A    No.

17      Q    When you were an acting supervisor?

18      A    I was acting supervisor in 1991 to '92, and

19  again in 2000.

20      Q    Did your relationship with the Postal

21  Service change at some point?

22      A    Yes.

23      Q    When was that?

24      A    It was after the anthrax in 2001, October

25  2001.

                        Page 16

050721A.TXT

20

1        Q      Okay.  In what way did your relationship

2    change with them?

3        A      Once the anthrax attack closed down the

4    building, we went -- me and some other employees went

5    to find out what actually happened to us; you know,

6    why was we left in that building.

7               And what we found out that we was left in

8    the building, that the plant manager, Mr. Tim Haney,

9    Postmaster General John Potter, and others in the

10   postal officials knew that the building was affected

11   with anthrax, but they continued to let us stay in

12   that building.

13       Q      Why do you think they let you stay in the

14   building?

15              MR. CHAKERES:  Objection, Your Honor.

16              MR. WOLFE:  It goes to his statements about

17   allegations of racism.

18              JUDGE HODGES:  The objection, I assume, will

19   be speculation?

20              MR. CHAKERES:  Yes.  He testifying as to

21   somebody else's state of mind.

22              JUDGE HODGES:  Okay.

23              MR. WOLFE:  His good faith belief in his

24   allegations of racism are important in this case.

25              JUDGE HODGES:  Again, his opinions as to

050721A.TXT

21

1    what the motivations are relevant, and I will allow

2    it.

3              MR. WOLFE:   Thank you, Your Honor.

4              BY MR. WOLFE:

5         Q    You can answer that question?

6         A    I believe that we was left in the building

7    because we was used as a test.  We was used to see

8    what the effect of the anthrax would do on us, and

9    that the anthrax was a military weapon, and it was

10    never used before.  It was told to us it was never

11    used before and we was being -- we believe it was

12    used, set in the building, stayed in that building

13    because it was a test.

14         Q    Did you ever express your opinion with

15    regard to the Postal Service's handling of the

16    anthrax?

17         A    Yes, I did on numerous occasions when I

18    spoke in the news media on film as well as in print.

19    Also I was a part of a group where we was exposed,

20    where we found different evidence that we was treated

21    unfairly because I believe that we was black, and we

22    was left in that building.

23              I expressed that to the employees.  As we

24    gathered information, I brought it back up to the area

25    I was working at, which was Gaithersburg, Maryland,

22

1    and told the employees and the supervisors some of the

050721A. TXT

2    issues that we found.

3        Q    Why do you think that you were treated

4    differently because you were black?

5        A    I believe that we was treated differently

6    because on that Monday it was -- in October of 2001,

7    once they found out that the letter contained anthrax

8    was on Capitol Hill they closed down the office which

9    it was found in, and they also closed down seven other

10   buildings on Capitol Hill where they knew that the

11   letter came through the post office, and we had

12   discussions that prior to that Monday when we found

13   out that it was on Capitol Hill that we had found the

14   letter in the post office, they left the post office

15   open.

16            During that time they told us that it was

17   okay, there was no anthrax in the building.   Mr.

18   Tucker, my MDO at the time, manager of distribution

19   operation at the time, had a meeting with us, and he

20   threatened us that if we didn't stay in that building

21   and we didn't continue working, that we would be

22   fired.   And fearing for my job, I continued to work,

23   coming to work and staying in the building.

24            I believe that when my manager, Mr. Tucker,

25   and my plant manager, Mr. Haney, came down to the

                                                              23

1    floor and told us that the building was safe, that I

2    believe that that time that they thought -- that they

3    knew that it was safe.

            Page 19

050721A.TXT

 4              But once we found out from Mr. Haney's own
 5    notes that he knew that anthrax was in the building,
 6    and he told Mr. Potter that anthrax was in the
 7    building, and he continued to let us work in there.
 8         Q    And this story that you just told comparing
 9    what happened on Capitol Hill, and what happened in
10    that situation, what did that have to do with your
11    statement that you were treated differently because
12    you were black?
13         A    From that statement there, I knew that -- I
14    believe that we was left in the building because we
15    was black and we was being tested.  The anthrax was
16    being tested on us.
17              Once I expressed my views in the news media
18    and during different meetings, I was targeted by
19    postal managers, my floor managers, and harassed.
20    They give me letters of warning, seven-day
21    suspensions, and it was without cause and it had to be
22    rescinded, but they continued to give me additional
23    actions.
24         Q    In what meetings did you talk about your
25    views that they were treating Postal Service workers

                                                      24

 1    different because they are black?
 2         A    We have daily talks when we started work.  I
 3    worked at night, which was tour 1 for the post office,
 4    10:30 p.m. to 7 a.m.  And we would have talks when we
 5    came in, and during that time I would express the fact
 6    that we was treated different, and we were left in the
                          Page 20

050721A.TXT

 7    building because we was black, and Capitol Hill had --

 8    they was removed from their building, and they also

 9    was given treatment from military doctors and the

10    Capitol Hill physicians whereas the postal employees,

11    we had to go to our own doctors, which my doctor

12    didn't know anything about anthrax.  She had to learn

13    by -- on the internet, she told me.

14           And Capitol Hill doctors treated all the

15    employees up there.  They was offered antibiotics, and

16    they was offered all the treatment that you would

17    treat anthrax patients with whereas we wasn't.

18    Q     Who did you talk to about this?

19    A     I talked on the record with the media.  I

20    talked to Washington Post, to Channel 7 news, Forrest

21    Holmes.  I talked to -- in the meetings with all the

22    supervisors present.  I discussed it with Mr. Haney.

23    I discussed it with Mr. Jerry Lane.  I discussed it

24    with -- in meetings where Mr. Tucker was present, Ms.

25    Henley was present, Mr. Brown.  These are supervisors

                                                            25

 1    in the post office.  Ms. Harper, Ms. Saunders, and

 2    basically we also had town hall meetings where I

 3    discussed it, and I discussed that with the senior

 4    engineer.  He was in charge of the clean up at the

 5    time.  And his name escapes me, but he was the

 6    engineer in charge of the clean up, and he was the

 7    person that -- for the post office that was in charge

 8    of clean up.  If his name comes back to me, I will

                          Page 21

050721A.TXT

9    state it.

10        Q    Thank you.

11            What time period were you having these

12   discussions?

13        A    It started around December of 2001, and it

14   continued up and to the time I left out of the post

15   office in February of 2004.

16        Q    Who is Lydia Hembry?

17        A    Lydia Hembry was the acting supervisor in

18   charge of the flat sorter machines stationed at the

19   Washington, D.C. office while we was assigned at

20   Gaithersburg, Maryland Post office.

21        Q    And when did you first know her?

22        A    I knew her from the post office, from the

23   Brentwood Post Office.  We worked together before at

24   that plant, at the Brentwood plant.  She wasn't an

25   acting supervisor at the time, and I was -- she was a

26

1    mail handler and I was a clerk, so we -- our jobs

2    intertwined with each other.

3            But while we was at the Gaitherburg Post

4    Office, the Washington, D.C. Post Office was stationed

5    at Gaithersburg, she was my acting supervisor.  She

6    was my first -- started working for her in August of

7    2002.

8        Q    Okay.  What was your relationship like with

9    her?

10        A    In July of 2002, I was -- I received a

11   letter of warning from Mr. Kenny Brown, and that

Page 22

050721A.TXT

12    letter was rescinded, and as a result of that he moved

13    me -- he had a discussion with Ms. Hembry, and they

14    decided to move -- switch me with Mr. Tim Williams.

15    Mr. Williams was working on the flat sorter at the

16    time, and he came over and worked in my position on

17    the delivery bar code sorter, and they placed me on

18    the flat sorter with Ms. Hembry.

19              Immediately, once I became on the flat

20    sorter, Ms. Hembry started harassing me.

21        Q    What do you mean by harassing?

22        A    She would -- we would be on a machine, and

23    she would walk off the machine and go in her office,

24    and she would page me to come in her office.  And then

25    when I came into the office she would state that I

27

1     wasn't working up to her standards.

2               And this was just about on a daily basis, or

3     she would make comments that I'm not going to receive

4     any special treatment because I am a member of

5     Brentwood Exposed.

6         Q    I would like to show you something.  This is

7     from page 18 of the Report of Investigation.

8               MR. WOLFE:  I have a copy for opposing

9     counsel and the administrative law judge.

10              JUDGE HODGES:  Thank you.

11              BY MR. WOLFE:

12        Q    Do you recognize that, Mr. Harper?

13        A    Yes, I do.

050721A.TXT
```
14       Q    Why don't you take just a moment to take a
15   look at it.
16            (Witness reviews document.)
17            BY MR. WOLFE:
18       Q    Ready, sir?
19       A    Yes.
20       Q    It references down there just above the
21   block that says, "I declare under penalty of perjury
22   the foregoing is true and correct," "Mr. Harper, in my
23   opinion, wants special treatment because he is a
24   spokesperson for Brentwood Exposed."
25            Do you see that?
```

                                                          28
```
1        A    Yes, I do.
2        Q    What does that mean to you?
3             MR. CHAKERES:  I'm going to object, Your
4    Honor.  The document speaks for itself.
5             JUDGE HODGES:  Overruled.  You may answer.
6             THE WITNESS:  This is -- what it means to me
7    is that this is one of the reasons why she was
8    harassing me, because she felt then that I was a part
9    of Brentwood Exposed; that she felt that I was a
10   threat, and the information now was given to the
11   employees might have more employees seeking the truth
12   of what really happened to us in the post office.
13            BY MR. CHAKERES:
14       Q    And tell us again, what is Brentwood
15   Exposed?
16       A    Brentwood Exposed is a group of postal
```
                         Page 24

050721A.TXT

17    employees that came together to find out the true

18    story of what happened to us and why we was left in

19    Brentwood Post Office after it was known that we had

20    anthrax in the building.

21        Q    Okay.  And some of those statements that you

22    described before when you were comparing Capitol Hill

23    and believing the Postal Service were treated

24    differently because they are black, were those

25    statements that you made individually or as part of

                                                    29

1    Brentwood Exposed?

2        A    Individually.

3        Q    Did Brentwood Exposed give similar

4    statements?

5        A    People in Brentwood Exposed all talked with

6    the media.

7        Q    Why did you think Ms. Hembry was giving you

8    these pieces of disciplinary?

9            MR. CHAKERES:  Objection, Your Honor.

10    Again, it's getting into the state of mind of Ms.

11    Hembry, and it's just his opinion as to what is going

12    on.

13            JUDGE HODGES:  Well, if he was told by Ms.

14    Hembry as to why these acts were occurring, that

15    certainly would be appropriate.  If he learned it

16    through documentation or speaking with others, they

17    are maybe appropriate, so it's just in the phrasing of

18    the question.

                        Page 25

050721A.TXT
19              MR. WOLFE:  Your Honor, the question goes to
20    Mr. Harper's belief that he was subjected to
21    discrimination.
22              JUDGE HODGES:  Well, that's fine if you ask
23    him do you have an opinion as to why she issued the
24    letter, that would be appropriate.  Once again, but he
25    is not competent to testify as to what her state of

                                                              30
1     mind or motivations were unless he had the basis to
2     know that.
3               MR. WOLFE:  I understand.  Thank you for the
4     clarification, Your Honor.
5               JUDGE HODGES:  You're welcome.
6               BY MR. WOLFE:
7         Q    Mr. Harper, do you have an opinion as to why
8     Ms. Hembry was issuing these disciplines to you?
9         A    I believe that she was issuing these -- all
10    these discipline to me because she wanted -- once she
11    issued it to me, you know, it was well known that I
12    would be disciplined for stating my belief, and she
13    was trying to hold down other employees from speaking
14    out because of what had happened to us at Brentwood
15    compared to what happened at Capitol Hill.
16              So I believe that she was discriminating
17    against me to keep other employees from making any
18    statements or coming up to speak out as far as being a
19    part of this group or any other group.
20        Q    When you say you believe she was
21    discriminating against you, what do you mean by that?
                         Page 26

050721A.TXT

22          A    I believe that she had targeted me out

23    because I was speaking out on what had happened to us

24    at Brentwood, Brentwood Post Office, and compared to

25    what was happening on Capitol Hill.



                                                          31

1           Q    Anything else that you mean by

2     discriminating against you?

3           A    Well, she also discriminated against me

4     because there was -- I was -- I at one point was one

5     of two males that was up there, and --

6                MR. CHAKERES:  Objection, Your Honor.  This

7     isn't relevant.

8                MR. WOLFE:  Your Honor, the Report of

9     Investigation includes allegations of sex

10    discrimination.

11               JUDGE HODGES:  Did you contend that with

12    respect to the notice gender is the basis of

13    discrimination the Complainant has alleged in this

14    matter?

15               MR. WOLFE:  It's motivation in part, Your

16    Honor.

17               JUDGE HODGES:  But the question is, is that

18    a basis that was identified that you are claiming was

19    the basis of discrimination, as to why the notice was

20    issued?

21               MR. WOLFE:  It's retaliation for allegations

22    of sex discrimination, yes, Your Honor.

23               JUDGE HODGES:  Okay.  Okay, the information

                          Page 27

050721A.TXT

24    is coming in to demonstrate the prior EEO protected

25    activity.  In other words, he opposed discrimination,

                                                      32

1     so I will allow it.  You may answer.

2              THE WITNESS:  Yes, thank you, Your Honor.  I

3     was -- I was at one time one of two males in the

4     section that we were working in, and there was no

5     other action given to any females or, you know, anyone

6     else the way that it was given to me.  There was no

7     action for anybody that was feeding the machine the

8     same as I was, or no action for anybody filling out a

9     safety form 1767 like I was, and there was no action

10    for the seven-day suspension for failure to follow

11    instructions, you know, for me going back to work

12    according to her instructions.  No one else ever

13    experienced this.

14              BY MR. WOLFE:

15    Q     Did you ever complain to anyone about what

16    you just described?

17    A     Yes, I have.

18    Q     Who did you complain to?

19    A     I complained to Ms. Vick who is Ms. Hembry's

20    supervisor.  I also complained to Mr. Tucker who was

21    at the time acting senior supervisor on the floor.

22    Q     Did you ever tell Ms. Hembry that you felt

23    you were being discriminated against?

24    A     Numerous times, yes, I did.

25    Q     When?

                      Page 28

050721A.TXT

33

```
 1        A     When she confronted me saying that I wasn't
 2   working up to her expectations, and I wasn't working
 3   up to the job standards.  I also filed grievances as
 4   far as the harassment that Ms. Hembry was -- against
 5   me, was putting against me.
 6              I had told her again in the presence of Mr.
 7   Tucker and Ms. Vick in a meeting.
 8        Q     During what time period were these
 9   discussions taking place?
10        A     The discussions was taking place between
11   August and September 2003.
12        Q     I'm going to show you another document and
13   ask you to walk us through it a bit.  This is from
14   pages 62 and 63 of the Report of Investigation.
15              MR. WOLFE:  And I have copies for Agency
16   counsel and the --
17              JUDGE HODGES:  Thank you.
18              BY MR. WOLFE:
19        Q     Mr. Harper, why don't you take a moment to
20   recognize the pages.
21              (Witness reviews document.)
22              THE WITNESS:  Okay.
23              BY MR. WOLFE:
24        Q     Have you finished?
25        A     Yes.
```

050721A. TXT

34

1       Q       Thank you.

2               I want to turn your attention to the second

3       page of what I handed you, which was page 63 at the

4       bottom, and I would like you to walk through some of

5       these meetings and ask you to tell us what you

6       remember about them.

7               The first one listed there is the September

8       17, 2002 meeting.  Do you remember that?

9       A       Yes.

10      Q       Tell us about that meeting.  What happened?

11      A       That meeting there was Mr. Tucker, Ms. Vick,

12      Ms. Hembry and myself.

13      Q       What did you talk about?

14      A       Well, we talked about the harassment that

15      Ms. Hembry was placing upon me.  I informed them that

16      I had a grievance in, and Ms. Hembry continued to

17      harass me, and I asked them to ask Ms. Hembry to stop

18      harassing me and let the grievances take its course of

19      action.

20              Ms. Vick and Mr. Tucker said they didn't see

21      anything wrong with what Ms. Hembry was doing, so I

22      told them at that time that I would be going and

23      filing an EEO if this harassment hasn't stopped.

24              At that time Mr. Tucker ended the meeting at

25      that point, and said -- opened the door and he smiled

35

1       and said that he would let the EEO process, you know,

2       go through before he would handle it.
Page 30

050721A.TXT

3      Q    Okay.  There was also -- you referenced a

4   September 23rd meeting here.

5      A    Yes.

6      Q    Do you remember that meeting?

7      A    Yes.

8      Q    What was that meeting about?

9      A    That was a meeting Mr. Tucker had with us

10   flat sorter employees.  Ms. Hembry took us into the

11   room where we had the meeting, and Mr. Tucker came in

12   and he stated that he would allow his supervisors to

13   do anything they want in order to get the job done

14   that he wanted them to do, and he stated that he would

15   allow them to violate the contract, and if and when it

16   came time to pay, then he would pay.

17      Q    Did you say anything during the course of

18   that meeting?

19      A    I asked some questions to him, yes.

20      Q    What did you ask him?

21      A    One of the questions I recall asking, I

22   recalled asking him to clarify that, and he told me --

23   well, he told the employees during the period then

24   that he would allow supervisors to do whatever they

25   want in order to get the job done, and if and when it

                                                          36

1   came time to pay, that he would pay.

2      Q    Let me show you an official declaration, it

3   say from page 21 of the ROI.  Would you review that?

4            (Witness reviews document.)

                      Page 31

050721A.TXT
```
 5                THE WITNESS:   Okay.
 6                BY MR. WOLFE:
 7        Q     Have you finished reading it?
 8        A     Yes.
 9        Q     Okay.  I want to ask you to take a look at
10   the handwritten response in her block that's labeled
11   A18. See what I'm talking about there?
12        A     Yes.
13        Q     There is a reference there to 9-20-02, and
14   then in parens, "not completely sure of the date but
15   around there," and then a description of a meeting.
16   Is that a fair reading of it?
17        A     Yes.
18        Q     What is that meeting there, and just to be
19   clear, it's on the bottom it's signed by -- do you
20   recognize the signature?
21        A     Yes, I do.
22        Q     Whose signature is that on the bottom?
23        A     Lydia F. Hembry.
24        Q     Okay.  Can you tell from the statement what
25   meeting she is referring to?
```

```
                                                          37
 1                MR. CHAKERES:  Objection, Your Honor.
 2                MR. WOLFE:  It goes to the nature of the
 3   meeting that he has had.
 4                JUDGE HODGES:  How would he know from the
 5   statement without speculating?
 6                MR. WOLFE:  I'm asking him if he is familiar
 7   with the meeting that Ms. Hembry references here, and
```

050721A.TXT

8      I would like to talk to him about that meeting.

9               JUDGE HODGES:   Okay, objection sustained.

10     Don't answer the question.

11               BY MR. WOLFE:

12     Q      Have you had a meeting with Ms. Hembry on or

13     around September 20, 2002?

14     A      Yes, I did.

15     Q      And what was -- in that meeting, what took

16     place in that meeting?

17     A      The meeting was with Mr. Tucker and Ms.

18     Vick, Ms. Hembry and myself.

19     Q      And what occurred in that meeting?

20     A      During that meeting I asked Mr. Tucker and

21     Ms. Vick to intervene about the harassment that Ms.

22     Hembry was facing towards me, and I instructed them

23     that I would be going to file an EEO if they didn't --

24     if the harassment didn't stop, and at that point Mr.

25     Tucker stopped the meeting, and he opened the door,

38

1      smiled at me and told me it would be dealt with during

2      the EEO process.

3      Q      Do you think the description of the meeting

4      on the piece of paper that was just handed to you,

5      it's under the A18, is that an accurate description of

6      the meeting that you've had with Ms. Hembry?

7               MR. CHAKERES:   Objection, Your Honor.

8               JUDGE HODGES:   Okay, he was present at the

9      meeting.   He is asking him whether or not this --

Page 33

050721A.TXT
```
10              MR. CHAKERES:  Okay, I'll withdraw the
11    objection.
12              JUDGE HODGES:  Okay, overruled.  You may
13    answer.
14              THE WITNESS:  Yes.  Yes, this is an accurate
15    description.
16              BY MR. WOLFE:
17        Q    You've talked about telling Ms. Hembry and
18    others that you were going to file an EEO. Did you
19    ever file an EEO?
20        A    Yes, I did.
21        Q    When did you first do that?
22        A    It was on the 2nd of October, 2002.
23        Q    What was the basis of that complaint?  Why
24    did you file it?
25        A    I filed it because Ms. Hembry was harassing
```

                                                    39
```
 1    me.
 2        Q    How did you go about filing?
 3        A    I had to go up to -- I was stationed in
 4    Gaitherburg, Maryland, Suburban Post Office.  I had to
 5    go to the Southern Maryland Post Office in Capital
 6    Heights to file the EEO complaint.
 7        Q    And describe that process for us.
 8        A    I went up to the Southern Maryland Post
 9    Office, and I had to go through the doors, the same
10    doors that management goes through, and I had to go to
11    the EEO office.
12              I went in the EEO office, and filed my
```
                         Page 34

050721A.TXT

13    complaint.  Upon leaving out of that office, I was

14    confronted by Mr. Haney.  Mr. Haney asked me what was

15    I doing up there, and I told Mr. Haney that I was up

16    there to file a complaint, EEO complaint against Ms.

17    Hembry.  And he asked me what was it about.  I told

18    him that it was about her harassing me.

19          He told me at that time that he would get

20    with Darrell Martin, who was acting plant manager, Mr.

21    Melvin Tucker, and Ms. Faye Hembry, and find out what

22    was going on.  He said he would get back with me.

23    Q    And I'm sorry, who is Mr. Haney?

24    A    Mr. Haney was the plant manager at Brentwood

25    at the time of the closing of the Brentwood Post

                                                              40

1     Office, and at the time that I seen him on October 2,

2     2002, he was acting Capital Area manager.

3     Q    Did you tell anyone else that you had filed

4     an EEO complaint?

5     A    Told my wife, my sister, well, my family,

6     and I told the shop steward, Ray Robinson, and I

7     believe a couple employees.

8     Q    Okay.  I have another document for you to

9     look at.  This is from page 44 of the report.

10          MR. WOLFE:  I have copies.  And again I'll

11    ask you, and just tell me when you have had a chance

12    to review that.

13          (Witness reviews document.)

14          THE WITNESS:  Okay.

                          Page 35

050721A.TXT

15            BY MR. WOLFE:

16        Q    Okay?

17        A    Yes.

18        Q    What is that?

19        A    This is Form 1767.  This is a postal form,

20    Report of Hazardous and Unsafe Conditions or Practice.

21        Q    Okay.  Do you remember filling out this

22    form?

23        A    Yes, I do.

24        Q    Just tell us about what happened.  Why did

25    you fill out this form?


                                                            41

1         A    Well, because the harassment wouldn't stop

2    from Ms. Hembry, and at this point it was causing

3    reverse action on my health.  I filled out this form

4    to report an unsafe condition, which was Ms. Hembry

5    harassing.

6         Q    Do you remember the process of filling out

7    the form?

8         A    Yes, I was at the supervisor's desk, which

9    is all part of our work area, and I was filling out

10    this form.  Ms. Hembry came over and she asked me what

11    was I doing, and I told her I was filling our a safety

12    hazardous form.  She asked me if it was -- was the

13    safety hazard around my work area, and I told her yes

14    it was.

15            And she asked me -- well, she instructed me

16    then that I would have to fill this out during my

17    lunch or break, and she instructed me to go back to

050721A.TXT

18    work.

19            I told her that I would fill it out on my

20    luncheon break, but I also noted on the form that she

21    made me fill it out at that time, and after that I

22    went to work.

23        Q    How much time had passed from when she told

24    you to back to work before you got up and went back to

25    work?


42

1        A    It was less than a minute.  Once I

2    instructed her that I would -- I would go back to work

3    and I would fill this out on my lunch break, then I

4    would write it on the form, I was at work.  I was

5    right there in the area.  All that was our work area.

6        Q    When was the next time you heard about this

7    form?

8        A    At lunch I filled it out, and after lunch I

9    gave it to Ms. Hembry.  Ms. Hembry took a look at it,

10    and at the time Ms. Vick was around.  She just passed

11    it to Ms. Vick and said, here, you have to handle it.

12    She instructed me to go back to work, and I went back

13    to work.

14        Q    Did you ever hear anything about the form

15    again?

16        A    I did when I -- when I was receiving the

17    seven-day suspension.

18        Q    When did that happen?

19        A    October 4, 2002.

Page 37

050721A.TXT

20          Q     So you remember receiving the notice itself

21    that said you were going to be suspended?

22          A     Yes, I do.

23          Q     How did that come to pass?

24          A     Ms. Hembry called me in the office and said

25    that she was issuing me a PDI, which is a -- to my

43

1     belief, a pre-disciplinary investigation, and she told

2     me that I will be receiving a seven-day suspension for

3     failure to follow instruction.

4                 Around about 40 - 45 minutes later she

5     called me back in the office, and she issued me the

6     seven-day suspension for failure to follow

7     instruction, and on it she was stating that I was

8     filling out this form here, and she stated that I

9     returned back to work, but it was unacceptable, so

10    she's issuing me the seven-day suspension.

11          Q     Did she explain anything further about what

12    meant by unacceptable?

13          A     No, she just stated that I failed to follow

14    her instruction, and that's why she was issuing me the

15    seven-day suspension.

16          Q     Did you have an understanding of what that

17    meant?

18          A     I didn't understand it because when she

19    instructed me to go back to work, I went back to work.

20          Q     What went through your mind when you were

21    given the suspension notice?

22                MR. CHAKERES:  Objection, Your Honor.  I

Page 38

050721A.TXT

23    think this is getting into damages.

24            JUDGE HODGES:   What is the relevance here,

25    the thought process?

                                                              44

1             MR. WOLFE:   It again has to do with the

2     perception of retaliation and good faith that he was

3     being discriminated against.

4             JUDGE HODGES:   Okay.  Well, you have asked

5     him questions as to why he believes it was the result

6     of discrimination.   Again, that would be appropriate.

7     But how he reacted to getting the letter does go to

8     damages, so I will sustain the objection.

9             MR. WOLFE:   Thank you, Your Honor.

10            BY MR. WOLFE:

11    Q     Why were you pursuing this, Mr. Harper?

12    A     Cause after this, once I got this letter, my

13    health worsened.  I had to go to the emergency room

14    after this letter.  I was --

15    Q     I'm sorry, I didn't mean to get into this

16    area.  I have to rephrase.

17            What are you hoping to achieve by pursuing -

18    - by being here in this hearing and pursuing this

19    case?

20    A     Well, this was a case of retaliation because

21    the night that I filled out this form, which is

22    October 1st -- October 2nd, the morning of October 2nd

23    when I got off at 7:00, I left from there and went to

24    the Southern Maryland Post Office to file the EEO.

                        Page 39

050721A.TXT
25              On October 4th, when she gave me this, I

                                                      45

1    clearly thought that this was a retaliation for me

2    telling them that I was going to file an EEO, and I

3    thought that she was targeting me once again on this

4    harassment and undue stress that she caused me.

5         Q    I'm sorry.  I just want to go back and

6    verify a time line here.

7              You were filling out this form and had this

8    interaction with Ms. Hembry on what day?

9         A    This form is dated October 1st.  I came in

10   October 1st at 10:30 p.m., and got off my tour of duty

11   October 7th at 7:00 a.m.

12             During the course of my tour, this is when I

13   filled out the form.

14        Q    And from there you went where?

15        A    At the end of my tour October 2nd at 7:00, I

16   was at the Gaithersburg Post office, Suburban Post

17   Office, Maryland post office, and I went to Southern

18   Maryland Post Office.

19        Q    To do what?

20        A    To file the EEO.

21        Q    And what happened when you -- where did you

22   go when you left the EEO office?

23        A    I was about to go to my car, and that's when

24   I was confronted by Mr. Haney.

25        Q    Did you work again on October 2nd?

050721A. TXT

46

1        A    Yes, I did.

2        Q    Did anyone say anything to you about the

3    form that you had -- the October 1st form?

4        A    Not at that time, no.

5        Q    When did you get off of work from that shift

6    on October 2nd?

7        A    I got off that shift on October 3rd.

8        Q    Did you work again on October 3rd?

9        A    Yes, I did.

10        Q    Anybody say anything to you about the

11    October 1st form during that shift?

12        A    During the course of the night, that's when

13    I received my seven-day suspension.

14        Q    That happened on October 4th that --

15        A    October 4th.

16            MR. WOLFE:  I don't have anything further.

17    Thank you.

18            JUDGE HODGES:  Okay, let's take a quick

19    recess and begin with the cross-examination.  While we

20    are on the recess, Mr. Harper, please do not speak to

21    anyone about the questions or the complaint other than

22    counsel.  Is that understood?

23            THE WITNESS:  Yes, sir.

24            JUDGE HODGES:  Let's go off the record,

25    please.

050721A.TXT
1          (Whereupon, a short recess was taken.)
2          JUDGE HODGES:  We are back on record after a
3   brief recess.  We are ready to begin with the cross-
4   examination.
5          Mr. Harper, I would like to remind you that
6   you are still under oath, and I would also like to
7   remind both of you to try and speak one at a time.
8          Mr. Chakeres.
9          MR. CHAKERES:  Thank you, Your Honor.
10                     CROSS-EXAMINATION
11         BY MR. CHAKERES:
12    Q    Good morning, Mr. Harper.
13    A    Good morning.
14    Q    Let's talk about the events that led up to
15   your issuance of a seven-day suspension letter.
16         You reported to work on September 30, 2002,
17   correct?
18    A    Yes.
19    Q    And what time did you report to work?
20    A    At 10:30 p.m.
21    Q    Okay.  And at 10:30 p.m., what were you
22   doing when you started work?
23    A    At 10:30 p.m.  When I came in, we was placed
24   in the manual section of the flat sorter area to
25   manually case mail.

                                                      48
1    Q    Did you talk to Ms. Hembry at all?
2    A    During that time, I asked to speak to a shop
3   steward.
                    Page 42

050721A.TXT

4        Q        Okay.  Did you talk to Ms. Hembry and ask

5    her that you wanted to speak to a shop steward?

6        A        Yes.

7        Q        Was this at the beginning of your shift?

8        A        Yes.

9        Q        Did you go see a shop steward that night?

10       A        Yes.

11       Q        Where did you go see a shop steward?

12       A        Where?

13       Q        Yes.

14       A        In the shop steward office in Gaithersburg,

15    Maryland.

16       Q        So you went to the union office in the

17    plant?

18       A        Yes.

19       Q        Who did you meet there?

20       A        Mr. Ray Robinson.

21       Q        What time did you go to the union office?

22       A        At about 12:00 midnight.

23       Q        What time -- was Ms. Hembry at the union

24    office?

25       A        Not at the time, no.

49

1        Q        Did she ever show up at the union office?

2        A        Yes, she did.

3        Q        What time did she show up at the union

4    office?

5        A        Around about 12:00 -- 12:30.

Page 43

050721A.TXT

6      Q    Okay.  And at 12:30 when she came to the

7    union office, what did she say?

8      A    She told me that Mr. Tucker said that you

9    can only stay in the union office for a half an hour.

10    I would have to leave.  She then instructed me to take

11    a break and then report back to the work assignment,

12    which was flat sorter machine.

13      Q    Did you follow her instruction?

14      A    I did.  Yes, I did.

15      Q    How long was the break?

16      A    My break was around about 15 minutes.

17      Q    What time did you report to the flat sorter?

18      A    At or about 1:00, somewhere around that

19    time.

20      Q    So this was at 1 a.m. on October 1st you

21    showed up the flat sorters?

22      A    At or about 1:00, yes.

23      Q    Was there anybody at the flat sorter machine

24    area?

25      A    There was no employee or supervisor there at

50

1    the time.

2            JUDGE HODGES:  I'm sorry to interrupt.  Did

3    you say this was October 1st?

4            MR. CHAKERES:  Yes, Your Honor.

5            JUDGE HODGES:  Okay, thank you.

6            MR. CHAKERES:  It gets a little confusing

7    because he punches in at 10:30 September 30th.

8            BY MR. CHAKERES:

050721A.TXT

9        Q    So at 1 a.m. on October 1st you were at the

10       flat sorter machines, correct?

11       A    Yes.

12       Q    Were the machines operating?

13       A    No.

14       Q    Now, let's give the judge a bit of history

15       here.  When Brentwood closed down, the mail that was

16       regularly processed at Brentwood couldn't be processed

17       there; is that correct?

18       A    Yes.

19       Q    So we will call that the Brentwood mail.

20       Some of the Brentwood mail became processed at

21       Suburban; is that correct?

22       A    Yes.

23       Q    You were processing Brentwood mail at

24       Suburban on October 1, 2002, correct?

25       A    Yes.

51

1        Q    How many flat sorter machines was available

2        for Brentwood mail to be processed at the Suburban

3        plant?

4        A    One.

5        Q    So you had one flat sorter machine, correct?

6        A    Yes.

7        Q    Now, the flat sorter machine has an area

8        called feeders, correct?

9        A    Yes.

10       Q    What is a feeder?

Page 45

050721A.TXT
11          A      Feeder is where the mail enters the machine,

12    where the employees would place the mail onto the

13    machine to go through the machine to be processed.

14          Q      How many feeders are there?

15          A      There is three feeders.

16          Q      So there is one employee at each feeder?

17          A      Yes.

18          Q      Okay.   Now, as the mail goes through the

19    machines for processing, it gets dropped at different

20    bins; is that correct?

21          A      Yes.

22          Q      Okay.   According to where it has to go, it's

23    being sorted for destination, correct?

24          A      Yes.

25          Q      Okay.   Are there employees working at the


                                                        52

1    flat sorter machine that are sweepers?

2          A      The machine has bins on both sides of it,

3    and there is an employee on both sides, an employee

4    per side as far as the area where the mail drops,

5    which the employee is called the sweeper.

6          Q      Okay.   So you have basically the employees

7    that are feeding the machines, correct?

8          A      Yes.

9          Q      And there is employees that are sweeping the

10    machine, correct?

11          A      Yes.

12          Q      Okay.   At 1:00 when you arrived at the flat

13    sorter machine, were there any feeders or sweepers?
                        Page 46

050721A.TXT

14        A     No.

15        Q     There was nobody there?

16        A     No.

17        Q     How long were you at the machine until the

18   machine started operating and people began feeding and

19   sweeping?

20        A     Probably about an hour and a half.

21        Q     When did the flat sorters start operating?

22        A     At or around about 2:30 - 2:40 a.m.

23        Q     So from 1:00 until 2:30, there was no

24   activity in your section?

25        A     No.


                                                         53

1         Q     Was there any employees with you?

2         A     No flats or employees, no.

3         Q     Were there any supervisors with you?

4         A     Supervisor Ms. Saunders came around.  I told

5    Ms. Saunders that I didn't see Ms. Hembry, and I told

6    her that I was on my assignment as Ms. Hembry

7    instructed me to be.

8         Q     Okay.  Where were you standing during this

9    period?  Were you at the supervisor's desk or were you

10   at the feeder section?  Were you at the sweeper

11   section?

12        A     No, at the supervisor's desk.

13        Q     And for an hour and a half you were at the

14   supervisor's desk with nothing to do?

15        A     Well, I was waiting further instruction.  I

                        Page 47

050721A.TXT
16   instructed Ms. Saunders that I was there and I didn't
17   see Ms. Hembry, and I was awaiting further
18   instructions from her.
19            JUDGE HODGES:  I'm not sure that was
20   responsive.  Can we try that again?
21            You asked him whether or not for an hour and
22   half there with anything to do.  Were you there for an
23   hour and a half?
24            THE WITNESS:  Yes.
25            JUDGE HODGES:  Okay.  And then I assume he

                                                              54
1   was responding to the second part of the question,
2   which was the nothing to do, so I just wanted that
3   broken up.  So can you respond to the question that
4   you had nothing to do?
5            THE WITNESS:  Yes, Your Honor.  I was
6   awaiting further instructions.
7            JUDGE HODGES:  Okay, next question.
8            BY MR. CHAKERES:
9       Q    Weren't you actually working at the flat
10   sorter section between 1:00 and 1:45 on October 1?
11      A    Not that I recall.
12      Q    Weren't other employees working at the flat
13   sorter section, working on the flat sorter machine
14   while it was operating between 1:00 and 1:45 a.m. on
15   October 1?
16            MR. WOLFE:  Objection.
17            JUDGE HODGES:  Mr. Chakeres?  I don't want
18   to assume.  What is the relevance?
                            Page 48

050721A.TXT

```
19              MR. CHAKERES:  It's going to the credibility
20      of the witness.
21              JUDGE HODGES:  Okay.  Overruled.  You may
22      answer.
23              THE WITNESS:  Not that I recall.
24              JUDGE HODGES:  When you say "not that I
25      recall," does that mean there were no other employees
```

                                                        55

```
 1      working between 1 and 1:45 at the flat sorter, or you
 2      just have no memory?
 3              THE WITNESS:  There was no employees working
 4      there, Your Honor.
 5              JUDGE HODGES:  Okay, next question.
 6              BY MR. CHAKERES:
 7          Q   At 2:00, where were you standing?  At 2
 8      a.m., where were you standing?
 9          A   I was around the machine.
10          Q   Were you standing by the feeder section or
11      by the supervisor's desk?
12          A   I believe I was standing around the
13      supervisor's desk.
14          Q   Well, which one is it, the machine or the
15      supervisor's desk?
16          A   It's all one area.  The supervisor's desk is
17      two feet away from the machine, and it's all one area.
18      The supervisor's desk holds the computer that programs
19      the machine, the telephone to call the electronic
20      technician if we have a problem.
```

                           Page 49

050721A.TXT
21      Q    What time did you see Ms. Hembry?

22      A    As I recall, it was after two.

23      Q    What did she say to you?

24      A    I believe it -- at that time some mail had

25    arrived, and I believe that was around about the time

56

1    I was filling out the form.

2      Q    Were you filling out the form when she first

3    arrived and talked to you, or was that later?

4      A    I believe it was around the first -- when

5    she came to the machine.  Somewhere around that time.

6           JUDGE HODGES:  Okay, I'm having a hard time

7    following your testimony.  There was a question that

8    Hembry approached you and you were asked what time it

9    was.  Then you were asked where you filling out the

10   form at the time that she arrived.  And what's your

11   answer to that question?

12          THE WITNESS:  I wasn't filling out the form

13   as soon as she arrived, Your Honor, to my belief, but

14   it was soon after she arrived that I started filling

15   out the form.  The machine wasn't started yet, and I

16   didn't receive instructions to report to the feeder

17   areas because at the time I wasn't assigned to any

18   area, whether it was the feeder or the sweeper area.

19          JUDGE HODGES:  Mr. Chakeres.

20          BY MR. CHAKERES:

21      Q    At the beginning of your tour, did you

22   report -- did you look at the assignment sheet?

23      A    At the beginning of the tour, the assignment
                          Page 50