Exhibit 2, Part 2

050721A.TXT

24    sheet isn't filled out.

25        Q    When is the assignment sheet completed?

57

1        A    It's some time in between the time we get

2    there and the time that the supervisor come over to

3    you to get us to go on the machine.

4        Q    Did Ms. Hembry tell you that you should be

5    working at the feeder section when she approached you

6    at 2:00?

7        A    I don't recall if she told me that, no.  At

8    the time I wasn't assigned to any area whether it be

9    the feeder, the sweeper or the manual cases.  All

10    that's part of our job.

11        Q    Did you have a discussion with Ms. Hembry

12    about being on a cell phone?

13        A    Being on a cell phone?

14        Q    Yes.

15        A    There is no cell phone in our work area.

16        Q    You don't have a cell phone?

17            JUDGE HODGES:  Okay, the question is cell

18    phone.

19            THE WITNESS:  Cell phones.

20            BY MR. CHAKERES:

21        Q    C-E-L-L.

22        A    No, not at that date, no, no, and there was

23    no discussion whatsoever.

24            JUDGE HODGES:  Let's reset because I'm not

25    sure he understood what you saying.  I think he

Page 51

050721A.TXT

58

```
 1    thought you said sulfer, so restate the question,

 2    please.

 3              BY MR. CHAKERES:

 4        Q    Okay, let's start again.  Do you have a cell

 5    phone?

 6        A    Yes.

 7        Q    Did you have a cell phone in October of

 8    2002?

 9        A    Yes.

10        Q    Did you have a discussion with Ms. Hembry

11    about your use of the cell phone on the workroom

12    floor?

13        A    On October 1st?

14        Q    Yes.

15        A    No, I didn't.

16        Q    Did you ever have a discussion with Ms.

17    Hembry about use of the cell phone on the workroom

18    floor?

19        A    Yes, I did.

20        Q    When?

21        A    I couldn't recall the date.

22        Q    Now, do you recall giving a deposition in

23    the office -- in this office, don't you?

24        A    Yes.

25        Q    Let me ask you this.  Were you ever
```

050721A.TXT

59

 1    reprimanded for using a cell phone on the workroom
 2    floor?
 3        A    No, and I remember during the deposition I
 4    told you that at that time everyone had a cell phone,
 5    including managers and supervisors, and it was
 6    commonplace to have a cell phone on the workroom
 7    floor.
 8        Q    Okay.  Now, what time did you start filling
 9    out your 1767?
10        A    I believe I stated that it was around 2:20
11    a.m.
12        Q    So you didn't start filling out your 1767
13    until 2:20 a.m?
14        A    I believe that was the time, yes.
15        Q    Didn't you previous testify you started
16    filling out your form at 2:00?
17        A    I said at or about 2:00.
18        Q    So --
19        A    Around 2 - 2:20, in that area, yes.
20        Q    So Ms. Hembry came up to you first at 2:00,
21    is that right?
22        A    Yes, around that time she came back to the
23    area, yes.
24        Q    And Ms. Hembry came up to you and said you
25    should be working on the feeder section, and you

60

 1    should be at the flat sorter; isn't that right?

050721A.TXT

```
 2          A    No, I don't recall that she came up.  At
 3    that time, as I stated, that they came back around to
 4    the flat sorter area.  I'm not quite sure at what time
 5    she told me to go to the flat sorter.  But during that
 6    time that she told me to go to the -- well, to the
 7    feeder area.
 8          Q    Didn't you in fact start filling out the
 9    1767 at 3:30 a.m. that day?
10          A    No, I didn't.  At 3:30 was the time when I
11    went to lunch.
12          Q    Are you sure?
13          A    Yes.
14          Q    Positive?
15          A    Yes.
16          Q    Are you familiar with the clock ring?
17          A    Yes.
18          Q    Do you know how to read one?
19          A    No.
20          Q    And you've never seen a clock ring?
21          A    As far as on the computer, no.  I've seen
22    one before but I don't know how to read it.
23          Q    Okay.  Now, where did you get the 1767 from?
24          A    It was on the supervisor's desk.
25          Q    Why did you complete the 1767?
```

```
                                                      61
 1          A    Because at the time I felt like I was being
 2    harassed by Ms. Hembry, and her harassment caused me
 3    undue safety.
 4          Q    What did she do to believe that you were
```

050721A.TXT

5    being harassed on October 1?

6         A    It was the fact that she came in there and

7    told me that I was being -- that I only had a half an

8    hour to talk with the shop steward that caused me

9    undue stress and tension.

10              And then when she came back around to the

11   machine, I felt that I was going to be further

12   harassed.

13        Q    Now, were you filling out the form before

14   Ms. Hembry got there or after Ms. Hembry got there?

15        A    After Ms. Hembry got there.

16        Q    Did you talk to Ms. Hembry when she arrived?

17        A    I don't recall the exact information.  I

18   mean, the exact conversation that we had.

19              JUDGE HODGES:  Okay, I need a clarification

20   on the response.  Does that mean that you had a

21   conversation but you don't recall the details of it,

22   or you all did not talk when she arrived?

23              THE WITNESS:  I had a conversation.  I don't

24   recall the details of it.

25              JUDGE HODGES:  Okay, next question.

                                                        62

1              BY MR. CHAKERES:

2         Q    At that time that she had the conversation

3    with you you weren't completing the 1767, correct?

4         A    No.

5         Q    Okay.  Did she tell you what to do or where

6    to go?

                        Page 55

050721A.TXT
```
 7         A    Not at that time, no.  I don't recall.

 8         Q    You can't recall what you did?

 9         A    Not at the moment.  Not at the first talk,

10    no.

11         Q    Let's talk a little bit about the September

12    17th meeting you testified to.  Who was at the

13    meeting?

14         A    It was Mr. Tucker, Ms. Vick, Ms. Hembry and

15    myself.

16         Q    Wasn't it actually Mr. Tucker and Ms. Vick

17    who were at the meeting?

18         A    Ms. Hembry was there as well.

19         Q    Are you sure?

20         A    Yes.

21         Q    There wasn't just Ms. Hembry and Mr. Tucker?

22         A    No.  It was Ms. Vick as well.

23         Q    You're sure?

24         A    Yes.

25         Q    What about at the September 23rd meeting,
```

                                                         63
```
 1    who was there?

 2         A    It was Ms. Hembry, Mr. Tucker, the members

 3    of the flat sorter, employees of the flat sorter

 4    machine.  I believe it was Ms. Bowe, Ms. Kusar.

 5    Previously I stated that I didn't remember the one

 6    lady's name.  Her name was Ms. Renee Nichols.

 7         Q    Let me show you what's been previously

 8    marked as Agency Exhibit No. 2.  Can you identify that

 9    for the record, please?
```
                      Page 56

050721A.TXT

10        A      This is the form that I filed to --

11               JUDGE HODGES:  One moment.  Hold on.

12               Can we go off the record for a moment,

13        please?

14               (Discussion held off the record.)

15               JUDGE HODGES:  Mr. Chakeres, you may resume.

16               BY MR. CHAKERES:

17        Q      Can you please identify Agency Exhibit No. 2

18        for the record, please?

19               MR. WOLFE:  Your Honor, we object to the use

20        of the Agency exhibit.  We were not provided a witness

21        list.  This is not a document that appears within

22        the -- excuse me -- an exhibit list.  It's not a

23        document that appears within the Report of

24        Investigation, and it wasn't our understanding that

25        this was going to be offered into the hearing today.

64

1                JUDGE HODGES:  Okay.

2                MR. CHAKERES:  This was a document produced

3        by the Complainant, it's his document for one.

4                Two, this is for impeachment purposes.  The

5        document is being offered for impeachment purposes.

6                JUDGE HODGES:  Okay.  So the document was

7        not attached to the prehearing submission; is that

8        correct?

9                MR. CHAKERES:  Correct.

10               JUDGE HODGES:  Okay.  And you are now moving

11        for admission of the document as evidence?

050721A.TXT
12          MR. CHAKERES:  No, Your Honor.
13          JUDGE HODGES:  All right.  All right, you
14  may proceed.
15          BY MR. CHAKERES:
16      Q   Can you please identify Exhibit No. 2 for
17  the record?
18      A   Yes.  I believe this is a form that I filled
19  out.  It's a --
20          JUDGE HODGES:  Please keep your voice
21  raised.
22          THE WITNESS:  Yes.  It's a statement that I
23  made to the Department of Labor.
24          BY MR. CHAKERES:
25      Q   Is it your handwriting that appears on

                                                    65

1  Exhibit No. 2?
2      A   Yes, it is.
3      Q   Did you prepare Exhibit No. 2 in part to
4  further your claim with the Department of Labor that
5  you had been unable to work due to harassment?
6      A   Yes.
7      Q   And the purpose of Exhibit No. 2 was for you
8  to act or at least state the facts that you felt
9  supported your claim of harassment; isn't that
10  correct?
11      A   Yes.
12      Q   Okay.
13      A   Harassment and also I was determined to have
14  post traumatic stress disorder.

050721A.TXT

15          Q      Okay.  Now, on Exhibit No. 2, page 2, can
16    you turn to that page?  Can you please read the first
17    full paragraph into the record?
18          A      "During the September 17th meeting with both
19    Ms. Vick and Mr. Tucker, I told them that I would not
20    intervene," this don't seem like my handwriting right
21    here.
22                 "During the September 17th meeting with both
23    Ms. Vick and Mr. Ticker, I told them that they would
24    not intervene, that I would file the complaint with
25    the EEO office."  Yes, that's my handwriting.


                                                        66

1          Q      Okay, it's your handwriting?
2          A      Yes.
3          Q      And you are stating that at the September
4    17th meeting Ms. Vick and Mr. Tucker were there,
5    correct?
6          A      Yes.
7          Q      You didn't mention Ms. Hembry being at this
8    meeting, did you?
9          A      Well, what this is saying is --
10          Q      I'm sorry.  Just answer my question.  Did
11    you mention that Ms. Hembry was at this meeting?
12          A      This wasn't written to mention Ms. Hembry.
13          Q      Did you --
14                 JUDGE HODGES:  Okay, at this point -- look,
15    look, everybody stop.
16                 At this point just answer his questions.
                           Page 59

050721A.TXT
17    You will get a chance on redirect to explain or

18    expound on any answers that you wish, okay?

19              THE WITNESS:  Yes, Your Honor.

20              JUDGE HODGES:  All right.  So do we have an

21    answer to the question?  Did you mention Ms. Hembry?

22              THE WITNESS:  Not in that paragraph.

23              JUDGE HODGES:  All right, next question.

24              BY MR. CHAKERES:

25        Q    Okay, let's turn back a page, page 5.  Could


                                                              67

1     you read the full page into the record?

2         A    Page 5 says, "In September 2002, I requested

3     to talk to my managers, Ms. Vick, and after seeing the

4     manager Mr. Tucker.  With Ms. Vick, I had meetings

5     with her on September 3rd, the 10th and the 17th of

6     2002.  Mr. Tucker, I had a meeting with on September

7     17th and 23rd.  Ms. Vick claims that she had -- that

8     she seen nothing wrong with Ms. Hembry's action.  Mr.

9     Tucker told me --

10             JUDGE HODGES:  Okay, let's stop here.  If

11    we're not admitting the document as evidence, reading

12    it into the record is the same as admitting it into

13    evidence.  Is there a particular sentence or sentences

14    that you want him to read that is contradictory to any

15    prior testimony he has --

16             MR. CHAKERES:  All right, Your Honor.  I'll

17    rephrase the question.

18             BY MR. CHAKERES:

19        Q    Could you tell me where on page 5 you
                          Page 60

050721A.TXT

20      mention that Ms. Hembry was in attendance at any of

21      your September 2002 meetings?

22          A     On page 5 of this form, I didn't write to

23      mention that Ms. Hembry was in a meeting.  So it's not

24      on page 5 that Ms. Hembry was in the meeting.

25                MR. CHAKERES:  Your Honor, I don't have any


68

1       other questions.

2                 JUDGE HODGES:  Okay.  Mr. Wolfe, redirect?

3                 MR. WOLFE:  Thank you, Your Honor.

4                         REDIRECT EXAMINATION

5                 BY MR. WOLFE:

6           Q     Mr. Harper, do you remember when you

7       completed the document that you were just reviewing?

8           A     This was after October 4th.  It was during

9       the claim to the Department of Labor.

10          Q     Apart from -- after October 4th, do you have

11      any memory about when it was done?

12          A     I couldn't recall the exact date that it was

13      done.

14          Q     Do you think it was done shortly thereafter?

15          A     I believe it was around the date of

16      October - November 2000.

17          Q     Okay.

18          A     2002.

19          Q     Why did you write this?

20          A     I wrote this as a statement to the

21      Department of Labor why I'm filing the claim to the

Page 61

050721A.TXT
22    Department of Labor as well as explaining my
23    condition, my illness.
24         Q    Okay.  When you filled out the form, did you
25    have any understanding about what Department of

                                                    69

1    Labor's interest would be in who the individuals
2    involved were?
3                   MR. WOLFE:  Objection; leading, Your Honor.
4                   JUDGE HODGES:  Sustained.
5                   BY MR. WOLFE:
6         Q    Why did you name people in this letter at
7    all?
8         A    What I was doing with the Department of
9    Labor was explaining to them that what had happened,
10    and the actions that I took to prevent it getting to
11    this point here.
12         Q    Why didn't you mention Ms. Hembry?
13                   MR. WOLFE:  Objection.  I'll withdraw the
14    objection.
15                   JUDGE HODGES:  You may answer.
16                   THE WITNESS:  I didn't mention Ms. Hembry
17    because as this was written it was written to explain
18    what actions I took and not who was in what meeting,
19    but what actions that I took and who I talked with
20    about the people that was harassing me.
21                   BY MR. WOLFE:
22         Q    What did you expect them to do at the
23    Department of Labor to deal with this?
24         A    I expected the Department of Labor to -- I
                        Page 62

050721A.TXT

25      filed a claim to get a disability claim with the

70

1       Department of Labor.  I didn't know that they was

2       going to give it to the post office as far as to use

3       to intimidate me.  I thought that I was going to file

4       a claim and they were going to process my claim.

5              MR. WOLFE:  I don't have anything further,

6       Your Honor.

7              JUDGE HODGES:  Mr. Chakeres?

8              MR. CHAKERES:  No re-cross, Your Honor.

9              JUDGE HODGES:  All right.  Mr. Harper, it

10      appears you have completed your testimony this

11      morning.  I would like you to return to your seat,

12      your original seat.

13             Mr. Harper, since there is a possibility

14      that we may reconvene due to the bifurcation of the

15      issue of liability and damages, I am ordering you not

16      to speak to any person regarding these questions on

17      your complaint which would include the witnesses who

18      might testify at the subsequent proceedings.

19             Do you understand the order?

20             THE WITNESS:  Yes, Your Honor.

21             JUDGE HODGES:  If there is any information

22      that that reveals the order has not been followed, a

23      sanction could be imposed up to and including a

24      judgment entered in favor of one party or the other.

25             Do you understand that?

Page 63

050721A.TXT

71

```
 1              THE WITNESS:  Yes, Your Honor.
 2              JUDGE HODGES:   Thank you so much.
 3              (Witness excused.)
 4              JUDGE HODGES:   Let's go off the record
 5    briefly.
 6              (Whereupon, a short recess was taken.)
 7              JUDGE HODGES:   Back on the record after a
 8    brief recess.   We have completed the Complainant's
 9    examination.   We are now ready to begin with Mr.
10    Robinson.
11              Mr. Robinson, would you please state your
12    first and last name?
13              MR. ROBINSON:   Ray Robinson.
14              JUDGE HODGES:   Would you spell your last
15    name, please?
16              MR. ROBINSON:   R-O-B-I-N-S-O-N.
17              JUDGE HODGES:   Would you raise your right
18    hand?
19              Whereupon,
20                        RAY ROBINSON
21              having been duly sworn, was called as a
22    witness and was examined and testified as follows:
23              JUDGE HODGES:   Thank you.   A couple of
24    instructions.
25              Mr. Chakeres is going to ask you some
```

Page 64

050721A.TXT

1     questions.  Please let him finish the question before
2     you answer.  If Mr. Wolfe objects to a question, do
3     not answer until I have discussed the objections with
4     counsel.  I will signal to you when I want you to
5     answer.
6            Please keep your voice raised, and please
7     speak one at a time.
8            Mr. Chakeres, you may begin.
9            MR. CHAKERES:  Thank you, Your Honor.
10                       DIRECT EXAMINATION
11           BY MR. CHAKERES:
12     Q     Mr. Robinson, you are employed by the Postal
13     Service; is that correct?
14     A     Yes.
15     Q     How long have you been employed with them?
16     A     Since 1988.
17     Q     In October 2002, where were you working?
18     A     Gaithersburg.
19     Q     The Gaithersburg plant?
20     A     Yes.
21     Q     What tour did you work?
22     A     Tour 1.
23     Q     What hours was that?
24     A     Ten-thirty at night to seven in the morning.
25     Q     Okay.  Are you also a union official?

73

1     A     Yes.
2     Q     In your capacity as a union official, what

Page 65

050721A.TXT
3    do you do?

4         A    When employees have a dispute, we file

5    grievances or try to correct it by talking to

6    management.

7         Q    Okay.  And as a postal employee, what do you

8    do?

9         A    Currently, I am a small bundle sorter clerk.

10   At that time I worked in automation.

11        Q    Okay.  And automation, does that include

12   flat sorter machines?

13        A    Yes.

14        Q    Are you familiar with the flat sorter

15   machine operation?

16        A    Yes.

17        Q    On October 1, 2002, did you happen to have

18   an occasion to meet with Mr. Harper?

19        A    October?

20        Q    One, 2002.

21        A    Yes.  To be more precise, I mean what was it

22   in reference to?

23        Q    A grievance he wanted to file.

24        A    Yes.

25        Q    Okay.  Do you recall what time of day you


                                                       74
1    met with Mr. Harper?

2         A    You have to explain what the grievance is

3    pertaining to.

4         Q    Do you recall Mr. Harper being disciplined

5    for failing to follow instructions and receiving a
                          Page 66

050721A.TXT

```
 6    seven-day letter?

 7         A    Yes.

 8         Q    Okay.  Immediately prior to the issuance of

 9    that letter, do you recall having a meeting with Mr.

10    Harper at the plant?

11         A    We did met.

12              You mean he came to see me?

13         Q    Yes.  And do you recall that being October

14    1?

15         A    I don't know the exact -- I mean, you're

16    talking about three years ago, but I remember meeting

17    with Mr. Harper.

18         Q    Do you recall that the meeting occurred at

19    midnight?

20         A    It was between 10:30 and 7 because that's

21    when I work.

22         Q    Some time during that period?

23         A    Right.

24         Q    Okay.  Do you recall it being at midnight?

25              MR. WOLFE:  Objection; leading.
```

                                                             75

```
 1              JUDGE HODGES:  The witness has already

 2    indicated that he doesn't remember.  He doesn't know

 3    the precise time.

 4              THE WITNESS:  I know we met.  It had to be

 5    between 10:30 and 7.

 6              BY MR. CHAKERES:

 7         Q    Okay.  Do you recall Ms. Hembry coming to
```

                          Page 67

050721A.TXT
8       the meeting?

9           A    Right.  I do recall, yes.

10          Q    What did Ms. Hembry do when she came to the

11      meeting?

12          A    She banged on the door and interrupted us

13      and told him that he needed to get back right away or

14      whatever.

15          Q    Get back to where?

16          A    Work.

17          Q    Okay.  Did she say where he was supposed to

18      go?

19          A    That I don't recall.

20          Q    Okay.  Do you recall what time it was when -

21      - did Mr. Harper follow her instruction and get back

22      to work?

23          A    Yes.

24          Q    Do you recall what time he left the union

25      office?

                                                            76

1           A    I finished wrapping up whatever he had.

2       Then he went back.

3           Q    At 1:00 in the morning, are the flat sorter

4       machines normally operating?

5               MR. WOLFE:  Objection; relevance.

6               MR. CHAKERES:  His credibility, Your Honor.

7               JUDGE HODGES:  It may also go to the

8       rationale or the reason for the agency's action, so

9       will allow it.

10              Before you answer, please.
                        Page 68

050721A.TXT

11          MR. WOLFE:  Your Honor, to speculate whether
12      they are normally in operation doesn't have anything
13      to do with whether or not the agency's actions were
14      justified.  We're talking about what happened on a
15      specific day.
16          JUDGE HODGES:  Well -- okay. So the general
17      nature of the question as opposed to what happened on
18      10-1-02?
19          MR. WOLFE:  Correct, Your Honor.
20          JUDGE HODGES:  Okay.  Do you want to
21      rephrase or clarify the question?
22          BY MR. CHAKERES:
23      Q    Do you recall in October 1, 2002, whether or
24      not the flat sorter machines were operating between
25      the hours of 1:00 and 2:00 a.m.?

77

1       A    I really can't say.
2       Q    Would it be more likely than not that they
3       were operating during that period of time?
4           MR. WOLFE:  Objection; relevance and
5       speculation.
6           JUDGE HODGES:  He's already indicated he
7       doesn't know whether they were operating.  Sustained.
8           MR. WOLFE:  Okay, I have no other questions,
9       Your Honor.
10          JUDGE HODGES:  Mr. Wolfe?
11          MR. WOLFE:  Could I have a moment to confer
12      with my client?

Page 69

050721A.TXT
13                    JUDGE HODGES:  Sure.

14                    MR. WOLFE:  Thank you.

15                    Let's go off the record, please.

16                    (Whereupon, a short recess was taken.)

17                    JUDGE HODGES:  I believe we are ready to

18        begin with the cross-examination, Mr. Wolfe.

19                    MR. WOLFE:  Thank you, Your Honor.

20                              CROSS-EXAMINATION

21                    BY MR. WOLFE:

22        Q      Good morning, Mr. Robinson.

23        A      Good morning.

24        Q      We haven't had the opportunity to meet.  My

25        name is Zachary Wolfe.  I am the attorney for Mr.

                                                                78
1         Harper here.

2                      Do you know him?

3         A      Yes.

4         Q      How long have you known him?

5         A      We've worked together for quite awhile.

6         Q      We were just discussing the seven-day

7         suspension letter that he received on October 4, 2002.

8         Do you remember that?

9         A      I believe I did the case.

10        Q      What do you mean by you did the case?

11        Sorry.

12        A      He filed a grievance, and I did the case.

13        Q      Okay.  What happened to it?

14        A      I believe it was removed, rescinded, but I

15        don't have it in front of me.

050721A.TXT

16       Q     Do you remember why it was rescinded, what
17   happened in the case?
18       A     Exactly what did he get suspension for?  If
19   you can refresh my memory.
20       Q     Well, let me refresh your memory.
21             MR. CHAKERES:  I have one here.
22             MR. WOLFE:  Great.  Thank you.
23             MR. CHAKERES:  This is Exhibit 3 to the
24   Report of Investigation, page 35.
25             MR. WOLFE:  Thank you.

                                                         79

 1             BY MR. WOLFE:
 2       Q     Why don't you take a look and let me know
 3   when you have had a chance to review it.
 4             MR. CHAKERES:  Your Honor, while he is
 5   reviewing it, I would state an objection because this
 6   going beyond the scope of direct.
 7             JUDGE HODGES:  He is allowed to do that on
 8   cross.
 9             MR. CHAKERES:  Okay.
10             (Witness reviews document.)
11             BY MR. WOLFE:
12       Q     Are you all done?
13       A     Yes.
14       Q     Okay.  Do you remember this document
15   previously?
16       A     Yes.  Yeah, I remember that.
17       Q     What did you think of it?

                    Page 71

050721A.TXT

18        A    What happened was that the reason why it was

19    rescinded was, number one, he did go back to his

20    assignment, so it wasn't anything he failed to follow.

21    And second of all, there was a problem with the letter

22    of warning that was cited.  It had been rescinded as

23    well, so that's why they had to take it back.

24        Q    Okay.  How many grievances have you handled?

25        A    Probably 3,000 and something.


80

1        Q    Okay, so you've seen a lot of disciplinary

2    actions?

3        A    Yes.

4        Q    What did you think of this one when you saw

5    it?

6            MR. CHAKERES:  Objection, Your Honor.  It's

7    really not relevant.

8            JUDGE HODGES:  What is the relevancy of his

9    opinion regarding the issuance of the letter?

10            MR. WOLFE:  It goes to the credibility of

11    the agency's position that the action was justified.

12            JUDGE HODGES:  It goes to the reason for the

13    issuance of the notice.

14            MR. CHAKERES:  His personal opinion does

15    not, Your Honor. What he is doing is giving a personal

16    opinion regarding what he thought of the discipline.

17    That's not -- that goes to--

18            JUDGE HODGES:  I'll explain in a minute.

19            MR. CHAKERES:  Okay.

20            JUDGE HODGES:  He is the union steward.

Page 72

050721A.TXT

```
21              MR. CHAKERES:   Right.
22              JUDGE HODGES:   He certainly would be
23   familiar with the collective bargaining agreement and
24   perhaps the rules or policies that are associated with
25   discipline.   Based on his experience, we have heard
```

81

```
 1   testimony of 3,000 grievances filed, his opinion
 2   regarding the reason that was relied upon for issuing
 3   the notice may have some relevance to whether or not
 4   the policies were followed, whether or not the
 5   policies were consistently applied, et cetera.
 6              MR. CHAKERES:   But none of those questions
 7   were asked, Your Honor.
 8              JUDGE HODGES:   Right, I'm giving you the
 9   rationale as to why I am letting it in.   Overruled.
10   You may answer.
11              THE WITNESS:   What was the question?
12              BY MR. WOLFE:
13        Q    What did you think of this notice of action
14   when you saw it?
15        A    That it was my understanding that it didn't
16   have any justification, and it seemed like harassment.
17        Q    Why do you say that it seems like
18   harassment?
19        A    Because an employee, they are encouraged to
20   fill out 1767 whenever there is a problem.   So even if
21   they didn't agree with the 1767, the mere fact that he
22   only stated to them -- as a matter of fact his exact
```

Page 73

050721A.TXT
23    words, they state, you advised me that you would go to
24    your assignment, but you would note on 1767 that I had
25    not allowed you time to fill it out.

                                                                82

1              That means that he went back to his
2     assignment.  He just let her know I have a problem
3     with you not letting me fill it out, and he gave it
4     back.
5         Q    Have you ever had conversations with Mr.
6     Harper before about his relationship with his
7     supervisors?
8              MR. CHAKERES:  Objection, Your Honor.  Now
9     we're getting into hearsay.  We are getting to
10    extraneous matters.
11             JUDGE HODGES:  Okay, what was the
12    Complainant's statement?  I don't understand where you
13    are going or how this relates to the notice.
14             MR. WOLFE:  It doesn't relate to the notice.
15    It relates to Mr. Harper's prior protected activity.
16             JUDGE HODGES:  Okay.  You are offering it to
17    show that he engaged in prior EEO activity or opposed
18    discriminatory practice?
19             MR. WOLFE:  Yes, Your Honor.
20             JUDGE HODGES:  Okay.  Overruled.  You may
21    answer.
22             BY MR. WOLFE:
23        Q    Have you had occasion to discuss with Mr.
24    Harper his relationship with his supervisors?
25        A    He felt that they were harassing him.
                          Page 74

050721A. TXT

83

```
 1        Q    Did he ever say anything in your presence
 2   about feeling that he was being discriminated against?
 3        A    Yes.
 4        Q    Do you remember any of those conversations
 5   specifically?
 6        A    I can't remember the exact conversation, but
 7   based on conversations he felt he was being
 8   discriminated against.
 9        Q    Okay.  More than one conversation?
10        A    Yeah, basically most of the time it was just
11   group when we got out the building he was connected
12   with, and because he had fears of coming in the
13   building and he instructed management, they seemed to
14   single him out.
15        Q    Is that the Brentwood Exposed?
16        A    Yes.
17        Q    Okay.  And I'm sorry, how long have you know
18   Mr. Harper?
19        A    I went to tour 1, I believe it was five, so
20   probably five years ago, so since then I went to
21   automation, so that's when I basically met Harper.
22        Q    And I'm sorry, what year was that?
23        A    2000, around 2000.
24        Q    Okay.  What's your impression of him?
25             MR. CHAKERES:  Objection, Your Honor.  He is
```

Page 75

050721A.TXT

84

1    calling for opinion testimony.  I mean, it's --

2            MR. WOLFE:  He knows Mr. Harper and can

3    answer regarding his credibility.

4            JUDGE HODGES:  So being offered to establish

5    his truthfulness?

6            MR. WOLFE:  Yes.  Yes, Your Honor.

7            JUDGE HODGES:  Okay.  Could you respond to

8    that, please?

9            MR. CHAKERES:  Again, Your Honor.

10           JUDGE HODGES:  Is this proper evidence to

11   establish --

12           MR. CHAKERES:  No.

13           JUDGE HODGES:  -- truthfulness?

14           MR. CHAKERES:  No.  It's not.  There has not

15   been any foundation laid under the Federal Rules of

16   Evidence for the admission of opinion testimony

17   regarding the character of a witness.

18           JUDGE HODGES:  Okay, and what is the proper

19   foundation?

20           MR. CHAKERES:  Well, let me get my rule of

21   evidence book.

22           JUDGE HODGES:  I have one here too.  I just

23   wanted to see if you wanted to cite it on the record

24   before I proceed?

25           MR. CHAKERES:  I would like to go through

85

1    the rule and have the rule in front of me, Your Honor.

050721A.TXT

2          JUDGE HODGES:  Okay.  All right, then let's

3     go off the record for a moment.

4          (Whereupon, a short recess was taken.)

5          JUDGE HODGES:  Prior to going off the

6     record, there was an objection made by Mr. Chakeres

7     regarding a question to the witness of his opinion

8     with respect to Mr. Harper's character.

9          I am citing Rule 608, which discusses the

10    evidence of character and comments of witness.  That

11    rule specifies that the credibility of the witness may

12    be attacked or supported by evidence in the form of

13    reputation or opinion subject to the limitations, and

14    one of the limitations is that the evidence of

15    truthful character is admissible only after the

16    character of the witness for truthfulness has been

17    attacked by opinion or reputation.

18          In this case, that has not occurred.

19    Therefore the question is not admissible.  So the

20    objection is sustained.  Let's proceed.

21          BY MR. WOLFE:

22     Q    Mr. Robinson, have you handled other

23    grievances for Mr. Harper?

24     A    Yes.  Are you talking about 2002 or after

25    that?

                                                    86

1      Q    From 2002 forward, yes.

2      A    Yeah.  As a matter of fact, there is more

3     recent.

                    Page 77

050721A.TXT
```
 4        Q      How many do you think you have done for him?
 5               MR. CHAKERES:  Objection, Your Honor.  This
 6      is getting irrelevant because he is testifying as to
 7      matters that happened after the incidents that are at
 8      issue in this case.
 9               MR. WOLFE:  I'll rephrase.
10               JUDGE HODGES:  Okay.  All right.
11               BY MR. WOLFE:
12        Q      Have you done grievances for Mr. Harper that
13      involved actions against him or disciplinary actions
14      taken against him prior to October 1, 2002?
15        A      Before 2002?
16        Q      When the incident occurred, not necessarily
17      when you dealt with the grievance.
18        A      Yes.  I know I've done more than the one
19      here.
20        Q      Apart from the one that's mentioned, have
21      you done others for him regarding disciplinary actions
22      that occurred prior to October 1, 2002?
23        A      I know I did other grievances.  I'm not sure
24      about whether it was discipline.
25        Q      Okay.
```

                                                        87
```
 1        A      But I done others.
 2        Q      And what happened to that one?
 3        A      This one right here, not the October 2nd,
 4      there was a problem with the one cited 7-26-02.
 5      That's why they had to take that one back, the
 6      furthest one in October.
```
                        Page 78

050721A.TXT

7      Q    I'm sorry.  What was the problem with that
8   one?
9      A    A letter of warning for failure to follow?
10      Q    Yes.
11      A    I don't know what the problem was.  I do
12   know they had to take it back.  There was some
13   procedural error or something like that.
14      Q    Okay, so it had been rescinded?
15      A    Yes.
16      Q    Okay.  Have you ever known him to challenge
17   a disciplinary action taken against him that was not
18   later rescinded?
19         MR. CHAKERES:  Objection, Your Honor.
20         MR. WOLFE:  It's a specific fact that goes
21   to his truthfulness.
22         JUDGE HODGES:  Okay.  Well, the fact that it
23   was rescinded doesn't mean that he is either truthful
24   or untruthful.
25         MR. WOLFE:  He is raising unfounded


                                                          88
1   complaints, and the witness can testify to that.
2         JUDGE HODGES:  Objection sustained on
3   relevancy ground.
4         MR. WOLFE:  I have nothing further then,
5   thank you.
6         JUDGE HODGES:  Mr. Chakeres?
7         MR. CHAKERES:  I have nothing, Your Honor.
8         JUDGE HODGES:  Then it appears, Mr.
                    Page 79

050721A.TXT

```
 9   Robinson, you have completed your testimony this

10   morning.  Thank you very much for coming and

11   testifying.

12          You are ordered not to speak to anyone about

13   these questions or this complaint.  That would include

14   other witnesses in this matter.  If the order is not

15   followed, a sanction may be imposed up to and

16   including a judgment entered in favor of one party or

17   the other.

18          Do you understand the seriousness of that

19   order?

20          THE WITNESS:  Yes.

21          JUDGE HODGES:  Thank you very much.  You are

22   excused.  Have a good afternoon.

23          (Witness excused.)

24          JUDGE HODGES:  Let's go off the record.

25          (Whereupon, a short recess was taken.)
```

                                                          89

```
 1          JUDGE HODGES:  We are back on the record

 2   after a recess.  We have completed the testimony of

 3   Mr. Robinson.  We are now ready to begin the testimony

 4   of Ms. Hembry?

 5          MS. HEMBRY:  Hembry.

 6          JUDGE HODGES:  Okay, would you please state

 7   your first and last name, ma'am?

 8          MS. HEMBRY:  Lydia Hembry.

 9          JUDGE HODGES:  And spell your last name for

10   us?

11          MS. HEMBRY:  H-E-M-B-R-Y.
```

050721A.TXT

12          JUDGE HODGES:  And would you raise your
13   right hand, please?
14          Whereupon,
15                    LYDIA HEMBRY
16          having been duly sworn, was called as a
17   witness and was examined and testified as follows:
18          JUDGE HODGES:  Thank you.  A couple of
19   instructions.
20          Mr. Chakeres is going to ask you a series of
21   questions.  Please let him finish the questions before
22   you answer.  If Mr. Wolfe objects to the question, do
23   not answer the question until I have discussed the
24   objection with counsel.  If I want you to answer, I
25   will indicate that I want you to answer.


                                                          90
1           Please give a verbal response to each
2    question, and please try and keep your voice raised so
3    the court reporter can record the testimony.
4           Mr. Chakeres, you may begin.
5           MR. CHAKERES:  Thank you, Your Honor.
6                    DIRECT EXAMINATION
7    BY MR. CHAKERES:
8    Q    Good morning, Ms. Hembry.
9    A    Good morning.
10   Q    Ms. Hembry, where are you employed?
11   A    At Cursain Thomas Morris, here in D.C.
12   Q    Are you employed by the Postal Service?
13   A    Yes.

050721A.TXT

14          Q      How long have you been employed with the
15    Postal Service?
16          A      Twenty years.
17          Q      Have you had -- have you ever filed an EEO
18    complaint?
19          A      Yes, I have.
20          Q      How many have you filed?
21          A      One.
22          Q      Currently, what is your position?
23          A      I am supervisor, United States Postal
24    Service.
25          Q      Where are you employed?

                                                                91

1           A      Pardon?
2           Q      Where are you employed?
3           A      At Cursain Thomas, Morris.
4           Q      Prior to being a supervisor at Cursain
5     Thomas Morris, where were you employed?
6           A      At the Postal Service.
7           Q      At what facility?
8           A      Suburban Maryland.
9           Q      What was your position at Suburban?
10          A      Acting tour 204B supervisor.
11          Q      What's a 204B supervisor?
12          A      It is a detailed position as a supervisor,
13    but we hold the same responsibilities as a regular
14    supervisor.
15          Q      Now, when you were at Suburban, what were
16    your duties and responsibilities?
                        Page 82

050721A.TXT

17        A    I was a supervisor in charge of the flat
18   room, flat sorter.
19        Q    And what did this flat sorter do?
20        A    The flat sorter is an automated piece of
21   equipment that processes first-class flat mail.
22        Q    Can you explain what flat mail is?
23        A    Flat mail is different from a letter.  It is
24   a larger type of envelope.  It's a larger piece like a
25   newspaper, magazines, anything larger than a regular


                                                        92
1    standard size letter.
2         Q    Now, what type of mail were you processing
3    on the flat sorter?  Not flat mail, but was this mail
4    that was destined for where?
5         A    Washington, D.C., all over the Washington,
6    D.C. metropolitan area.
7         Q    Why were you processing mail at Suburban for
8    the Washington, D.C. area?
9         A    We were displaced through the closure of the
10   Brentwood facility because of anthrax.
11        Q    What was it like to perform your old duties
12   from Brentwood at Suburban?
13        A    It was very challenging.
14        Q    Why is that?
15        A    Because at Brentwood, we had three flat
16   sorter machines.  When the building shut down, we were
17   transported to the Suburban facility with only one
18   machine to process the exact volume of mail.
                    Page 83

050721A.TXT

19    Q    So what you used to do on three machines you

20    now had to do on one machine.

21    A    Correct.

22    Q    Is that right?

23    A    Correct.

24    Q    In October 2002, did you supervise Mr.

25    Harper at Suburban?

93

1    A    Yes, I did.

2    Q    What position did he hold?

3    A    He is a mail processor.

4    Q    What were his duties and responsibilities?

5    A    As a mail processor, he would be required to

6    work on any automated piece of equipment in the plant

7    in addition to facing or sticking manual letters or

8    flats.

9    Q    Was he assigned to a particular operation?

10    A    Yes, he was assigned to the flat sorter

11    operation.

12    Q    Okay.  Over what period of time -- I'll

13    withdraw that question.

14         Were you working at Suburban on October 1,

15    2002?

16    A    Yes, I was.

17    Q    Were you supervising Mr. Harper that day?

18    A    Yes, I was.

19    Q    Okay.  When did the tour begin for that

20    October 1, 2002 day?

21    A    The tour began at 10:30, the night before.

050721A.TXT

22     It was at 10:30 p.m. leading into 7:00 the following

23     morning.

24          Q     So the tour began at 10:30 p.m. on September

25     30, 2002?

94

1          A     Correct.

2          Q     What time did Mr. Harper report to work?

3          A     10:30.

4          Q     What was Mr. Harper's assignment that day?

5          A     Mr. Harper was assigned to work the flat

6     sorter on feeder 3.

7          Q     How would he know what his assignment was

8     that day?

9          A     As a supervisor, I assigned to make a daily

10    assignment sheet, which is located at the flat sorter,

11    so all employees who work the flat sorter would come

12    up to the flat sorter desk, look at what positions

13    that they would be working, and then report to the

14    manual case because the way the system is set up two

15    or three tour -- our tour doesn't begin until 11:00,

16    which means from 10:30 to 11 there is a changeover

17    period.

18                So when they clock in, they come over to the

19    desk, see what their positions are, and they report to

20    the manual case until 11:00 or five of 11.

21         Q     Is the duty roster report always prepared at

22    the beginning of the tour?

23         A     Yes, it is.

Page 85

050721A.TXT

24        Q      Okay.   Now on September 30, 2002, when Mr.

25   Harper reported to work, what happened after he

                                                                95

1    reported to work?

2         A      Okay, Mr. Harper clocked in, and informed me

3    that he wanted to see a shop steward.

4         Q      Did you say whether or not he could or could

5    not go?

6         A      I told him that I would find out and let him

7    know because the procedure is when an employee

8    indicates that they wish to see a shop steward, then

9    management has to contact the shop steward because

10   they have different responsibilities.  It may be that

11   the shop steward is unavailable or working on another

12   case or has meetings set up.  So we both have to agree

13   on a set time for the employee to leave the operations

14   it doesn't hinder the operation.

15        Q      Was he eventually allowed to go to the

16   union, to see the union steward?

17        A      Yes.

18        Q      What time did he go to the union office?

19        A      Twelve o'clock.

20        Q      What happened after that?

21        A      Due to the mail volume at that particular

22   time, about half an hour passed and I realized that I

23   could not reach my productivity goal with only two

24   people working at the feeder.  So at about a half an

25   hour later, I decided that I needed Mr. Harper to

050721A. TXT

96

1   return to his assignment.

2       Q    So what did you do when you decided he

3   needed to return to the assignment?

4       A    Went to the union office, knocked on the

5   door, informed Mr. Harper and the shop steward that I

6   was going to have to stop their meeting due to the

7   needs of the flat sorter operation.  That if Mr.

8   Harper needed additional time, that he would be

9   granted that time later, but right now I needed him to

10  take his break and return back to the operation after

11  his break.

12      Q    What time was this that you went to the

13  union office?

14      A    It was about 12:30.

15      Q    How long was Mr. Harper's break?

16      A    About 15 - 20 minutes.

17      Q    Now, did he report back to the flat sorter

18  machine?

19      A    Yes, he did.

20      Q    At what time did he report to the flat

21  sorter machine?

22      A    About 1:00.

23      Q    Was the flat sorter machine operating at

24  1:00?

25      A    Yes.

050721A.TXT

97

1     Q     Were there employees at the flat sorter
2   machine at 1:00?
3     A     Yes.
4     Q     Were you processing mail on the flat sorter
5   machines at 1:00?
6     A     Yes.
7     Q     So there were feeders and sweepers working?
8     A     Correct.
9     Q     Did there come a time when you had to talk
10   to Mr. Harper about his work performance that day?
11     A     Yes.
12     Q     When was that?
13     A     If my memory serves me correctly, it was
14   probably around 2:00 - 2:20.  The machine was running
15   and I have to walk around the machine constantly
16   because there is mail flow in and out, things are
17   going on.  And when I looked back at the feeder, Mr.
18   Harper was standing at his feeder talking on a cell
19   phone.
20     Q     Is it okay for employees to talk on a cell
21   phone while working on the floor?
22     A     Absolutely not.  We hold service talks.  It
23   is strictly prohibited for any employee, including
24   management, to be on the work floor talking on a cell
25   phone.

98

1     Q     Why is that?
2     A     It's just one of our policies.  It's not

050721A.TXT

3    allowed.

4        Q    What did you tell Mr. Harper to do at that
5    point?

6        A    Well, when I noticed he was on the cell
7    phone and I looked and I saw the other two people
8    working, and I saw the mail, I walked right up to him
9    and I said, "Are you on the cell phone?"  And he was
10   talking, and I said, "I need you to get off the cell
11   phone and go to work."

12            Mr. Harper just kept talking as if I hadn't
13   said anything to him.  So I said, "Mr. Harper, you
14   need to get off the phone right now and start putting
15   the mail through the machine."

16       Q    Do you recall whether or not the machine was
17   about to run and that he needed to fed the ledge, or
18   was the machine actually running?

19       A    The machine wasn't actually running at that
20   time, but the way the flat sorters run is that I give
21   the employees time to set the machine up.  What you
22   have to do is -- the type of mail that we process, you
23   have to load the ledgers, which is about four feet in
24   length, and the type of mail that they have to put
25   through the machine, they have to take it out of the

                                                        99

1    container.  They have to turn around, literally take
2    it out of the container, put it on the ledge, face the
3    mail in a ceratin direction, and then fill the ledge
4    up, which can take -- with three particular feeders

                     Page 89

050721A.TXT
5     takes about five to 10 minutes.
6          So I have to allow them time to do that
7     because what I'm trying to do is maximize the
8     productivity of the machine.  If I start the machine
9     without the ledgers being fully loaded, once the
10    machine is up and running, that counts against
11    productivity.  So it's mandatory that all the ledgers
12    are fully loaded to capacity prior to me starting the
13    run.
14         Q    Now, as a supervisor, do you have the
15    computer at your work station?
16         A    Yes.
17         Q    Okay.  And what does the computer do?
18         A    The computer allows me to enter the types of
19    runs.  It tells me how much mail is being sorted, the
20    through-put volume, the time the machine starts,
21    stops, number of rejects, what each particular person
22    assigned to the feeder is actually producing.
23         So at any given time I can leave that
24    operation, come back, pull the screen up, and I can
25    tell who is doing what on the machines.


                                                              100
1          Q    When you are at your desk and you're looking
2     at the computer, can you tell how much mail volume an
3     employee is feeding into the machine --
4          A    Yes.
5          Q    -- at any given time?
6          A    Yes.
7          Q    Okay.  Is there anything that alerts you as
                              Page 90

050721A.TXT

8       to whether or not the productivity is good or bad?

9           A    Yes.   The required productivity for

10      Brentwood is 13,500 pieces per hour, which means that

11      each person at their feeder is required to keep their

12      feeder loaded, process 5,000 pieces or higher.  If it

13      falls below that, then their work station goes into

14      the red zone, which lets me know that someone is not

15      feeding.

16              All three feeders are -- if all three

17      feeders are in the green, that means everybody is

18      producing at 5,000 or higher.

19              JUDGE HODGES:  I'm sorry to interrupt.  You

20      say 5,000 per hour?

21              THE WITNESS:  Pieces.

22              JUDGE HODGES:  Five thousand pieces per

23      hour?

24              THE WITNESS:  Yes.

25              JUDGE HODGES:  Okay.


101

1               BY MR. CHAKERES:

2           Q    Now, in order to feed the mail, can you

3       explain to the judge what you have to do with the

4       feeder to actually feed the mail?

5           A    Okay.  Even though we have first-class mail

6       that we process, we get all types of mail that come in

7       with that, which means that we get newspapers, we get

8       magazines that are return to sender, bad addresses,

9       plastic pieces, non-machineable is what we call them.

Page 91

050721A.TXT
```
10    Anything that the machine cannot actually go through
11    the system and read, they would have to cull out.  We
12    call it culling.
13              So a feeder would be responsible for culling
14    the mail first because in order to -- for the machine
15    to read it, it has to be machineable mail.  So they
16    would have to pick the mail up out of the flat tube,
17    riffle through it, load it at a 45-degree angle, but
18    make sure that pulling out non-machineable pieces
19    because if the non-machineable pieces went through, it
20    would jam the machine up.
21              So it's a culling and loading process.
22        Q    Did you ever have to talk to Mr. Harper
23    about his productivity on the feeder?
24        A    Yes.
25        Q    How many times did you have to do that?
```

102
```
 1        A    Several times.
 2        Q    Why was that?
 3        A    Mr. Harper would not keep his ledge loaded.
 4        Q    How do you know it wasn't being kept loaded?
 5        A    I can just go to the screen and look or just
 6    watch his work.
 7        Q    Okay.  While you are watching him working,
 8    can you watch the other employees working?
 9        A    Yes.  They are right next to each other,
10    one, two, three.  The feeders, they go in a rotating
11    position.  You have feeder 1, feeder 2, feeder 3, and
12    so they rotate on an hourly basis.  So I can either
```
Page 92

050721A.TXT

13    stand right behind them out in the aisleway, in front

14    of the machine, or at the computer desk.

15        Q    Now, you mentioned the red zone.  It

16    actually looks red on the screen?

17        A    It is red.  If everything is running as it

18    should and everybody is producing at a speed that they

19    should be producing, all the colors on the machine are

20    green.  Anytime you see red, that's a bad sign.

21    That's not good.

22        Q    Well, let me understand it correctly.  The

23    flat sorter machine has three feeders, correct?

24        A    Correct.

25        Q    All three feeders are being monitors on a

103

1    computer?

2        A    Correct.

3        Q    And you can tell who is doing what on your

4    computer?

5        A    Correct.

6        Q    And the people who are not working -- not up

7    to productivity standards, you can see them

8    highlighted as red?

9        A    Correct.

10        Q    Okay.  And when you kept seeing Mr. Harper

11    in that red zone, you would talk to him about it?

12        A    Right.

13            MR. WOLFE:  Objection.  Asserted basis for

14    the disciplinary action in this case is not Mr.

050721A.TXT
15    Harper's productivity.

16            JUDGE HODGES:  Okay.  Relevancy.  What is

17    the relevancy of this area?

18            MR. CHAKERES:  The relevance is Mr. Harper

19    was testifying that he is being continuously harassed

20    by Ms. Hembry because he kept being told that he

21    wasn't working up to productivity standards, and this

22    is an explanation as to why the agency kept talking to

23    him about his productivity standards.

24            JUDGE HODGES:  Okay, harassment is not an

25    issue in the adjudication.  What is at issue is the

                                                        104
1     rationale for the notice, okay.

2            MR. CHAKERES:  Okay.

3            JUDGE HODGES:  So I will sustain the

4     objection at this point.

5            BY MR. CHAKERES:

6        Q    Okay.  Now let's move to October 1.  You

7     talked about reprimanding Mr. Harper for being on the

8     cell phone.  Did anything else happen on that

9     occasion, on that day?

10       A    Yes.

11       Q    What else happened?

12       A    Later that day I was at the back of the

13    machine coming up, and Mr. Harper was sitting at my

14    desk, the supervisor's desk writing.  Machines were

15    running and Mr. Harper was sitting at the desk

16    writing.

17            So my first question is what are you doing.
                        Page 94

050721A.TXT

18        He informed me that he was filling out a 1767, which
19        is a form we use for safety or unsafe practice.  I
20        wanted to know what the safety issue was, because if
21        it's an immediate safety, then it's up to management
22        to abate that safety issue right away.
23               He said it was not.  But the way he was
24        writing, he was kind of like covered like he didn't
25        want me to see what he was doing.


                                                              105

1                So I said, "Well, Mr. Harper, if it's not an
2         immediate safety, then I'm advising you to write that
3         up on your luncheon break.  You need to get back to
4         the machines."  The machines are running.  Mail needs
5         to be worked and processed to get out on a dispatch
6         time, and if it's not anything that's in peril at this
7         particular moment, then you need to do that on your
8         break and lunch, and go back to the machine, and work.
9                He kept writing for a few minutes, and he
10        said, "Well, I'll do that, but I'm going to notate on
11        the form that you're not giving me time to fill it
12        out."
13        Q    What time did this incident occur?
14        A    That was probably around -- I want to say
15        3:30 because it was right before lunch.
16        Q    What time did Mr. Harper go to lunch that
17        day?
18        A    Four o'clock.
19        Q    As a result of the incidents on August 1,
                          Page 95

050721A.TXT
20    did you take any action against Mr. Harper?

21         A    Yes, I did.

22         Q    Let met show you what has been marked as

23    Report of Investigation, Exhibit No. 3.

24         A    Mm-hmm.

25         Q    Can you identify that for the record,

106

1    please?

2         A    That is a notice of suspension of 14 days or

3    less.

4         Q    Why did you issue the notice of suspension

5    for 14 days or less?

6         A    The procedure is when you issue any employee

7    any type of discipline it is progressive in nature,

8    meaning that the first thing that you do when you

9    notice that an employee has any type of issues with

10    either their work performance or attendance, then you

11    start off with an official discussion, where you sit

12    down with the employee, address what the issues are,

13    and hopefully by talking with the employee letting him

14    know that they aren't working up to standard, these

15    are some things that I'm noticing about your work

16    habits, these are some things that I need for you to

17    change, the employee will get that.

18         If it does not get better, then you go to a

19    letter of warning.  Once again, the letter of warning

20    is a written document stating that we have had an

21    official discussion about your behavior.  It's not

22    improving, so now I'm issuing an official letter of

Page 96

050721A.TXT

23    warning, which indicates that you are being warned

24    officially that if this conduct continues, that

25    further or future disciplinary action will be taken,


107

1    including and up to removal from the Postal Service.

2            So what I would do is go in steps because

3    it's progressive in nature.

4        Q    And why did you choose a seven-day

5    suspension?

6        A    Because according to the records on file at

7    Suburban at that time, Mr. Harper had already been

8    issued a letter of warning for work performance, which

9    means that the next step for work performance or any

10   type of grievance would be a seven-day suspension or

11   14-day or less.

12       Q    Was there any procedural problem with the

13   issuance of the suspension letter?

14       A    Yes, it was.

15       Q    What was it?

16       A    Usually when you issue a letter of warning

17   or higher, the grievant gets to meet with the shop

18   steward and management will meet with the union

19   official to try to solve that grievance at a step 1

20   procedure.

21           Any resolution that is made is put in the

22   employee's file.  That way when -- if or when the time

23   comes you have to discipline them again, you will know

24   what the next step would be based on the resolution of

Page 97

050721A.TXT
25        the previous action.


                                                                108

1            Q    Was that information in the file?

2            A    No, it was not.

3            Q    Did that information affect the procedural

4        merit of your seven-day suspension?

5            A    Yes, it did.

6            Q    How so?

7            A    Once a resolution has been made on a

8        previous discipline, then you can't -- you can't up an

9        issue.  Say for instance he was given a letter of

10       warning.  If the letter of warning was rescinded from

11       that file, it means that letter of warning does not

12       exist, which means if another supervisor or management

13       has to discipline an employee, then they would have to

14       start all over, meaning that they would be issued a

15       letter of warning.  You would start all over.

16           Q    So the problem with the seven-day suspension

17       was you were citing prior discipline had been

18       rescinded?

19           A    Correct. That had been rescinded and removed

20       from his file.

21           Q    And you didn't know that, did you?

22           A    No.

23           Q    Would you have altered the level of

24       discipline you would have given Mr. Harper had you

25       known that?


                                Page 98

050721A.TXT

1          A     Yes, I would have.

2          Q     Why is that?

3          A     Because there is no point of me issuing

4     action if it is not going to stick.   The whole purpose

5     of issuing discipline is to be progressive in nature,

6     and hopefully correct the behavior, but you must do it

7     correctly.   And if something is already resolved, then

8     it would benefit no one for me to go to the next step

9     because procedurally it's going to get kicked out

10    anyway.

11         Q     Now, let's talk about the substance of the

12    discipline.

13         A     Mm-hmm.

14         Q     Why did you feel Mr. Harper deserved

15    discipline?

16         A     Over a period of time for that eight hours

17    that we worked, I had issues with Mr. Harper's work

18    behavior.   It is not that he hasn't been made unaware

19    of his work standards when it comes to work and what

20    is expected of him.

21               However, when you blatantly disregard the

22    post office rules, the edicts and mandates set forth

23    by the Postal Service, then it's my job as a

24    supervisor to ensure that you need to do what you're

25    supposed to be doing.