Exhibit 2, Part 3

050721A.TXT

1      Q    What was the rules that he disregarded?

2      A    The no cell phone, absolutely no cell phone

3   allowed on the workroom floor at any given time; not

4   being gainfully employed and being productive while

5   you're getting paid to do so.

6           When you are given official instructions to

7   do your job, you're expected to do your job, not at

8   your pace, not at your own time, but you are on the

9   clock being paid so you are expected to do your job.

10          And so it was a culmination of me having to

11  tell him to get off the cell phone, not keeping the

12  ledges loaded.  Then once again, sitting at a desk

13  when he should be working, and just not being

14  productive in nature, not performing his duties.

15     Q    Now, on the Report of Investigation, Exhibit

16  3, the beginning lines of your letter you mention an

17  incident at 2:20 a.m. in the letter, right?

18     A    Mm-hmm.

19     Q    Was that the cell phone incident you talked

20  about?

21     A    Correct.

22     Q    And you also in your letter mention that Mr.

23  Harper was at the supervisor's desk preparing a 1767

24  at 3:30, correct?

25     A    Correct.

111

1      Q    Okay.  At that point in time when Mr. Harper

2   was preparing his 1767, what was going on at the flat

3   sorter machine?

Page 100

050721A.TXT

      4       A     The machine was running and people were
      5   working.  He was the only one that was not working.
      6       Q     Was mail actually going through the system
      7   at that time?
      8       A     Off feeder 1 and 2, yes.
      9       Q     So there was definitely work to be done --
     10       A     Yes.
     11       Q     -- at that point?
     12             At 3:30 a.m., how critical is it to make
     13   sure that the mail is being processed?
     14       A     That is the most critical time of the day
     15   because we have a 4:00 dispatch, which means
     16   everything we do from 11 to 3:30 -- between 3 and 3:30
     17   goes out of the door at 4:00.  Trucks pull out the
     18   door at 4, which means I have to get the major volume
     19   of my mail off the machine, processed, containerized
     20   and on the dock, and I need the mail to move, and we
     21   need to move it quickly.
     22       Q     Now, what date did you issue the notice of
     23   suspension?
     24       A     October 4th.
     25       Q     Prior to October 4th, had you talked to


                                                            112
      1   anybody in management about Mr. Harper filing an EEO
      2   claim against you?
      3       A     No.
      4       Q     Had you talked to Mr. Haney about an EEO
      5   complaint?
                            Page 101

050721A.TXT
```
 6      A     No.

 7      Q     Had you talked to Mr. Tucker?

 8      A     No.

 9      Q     Had you talked to Mr. Martin?

10      A     No.

11      Q     And for purposes of identification, Mr.

12   Haney was who?

13      A     Mr. Haney was the plant manager.

14      Q     And who is Mr. Martin?

15      A     I think he was working under him in some

16   other level.  I think he's the plant manager now so

17   they might have been doing maybe a detail plant

18   manager kind of thing.

19      Q     Who was Mr. Tucker?

20      A     He was our MDO.

21      Q     What is his relationship to you?

22      A     He is my manager.

23      Q     Okay.  So he is your boss?

24      A     Right.

25      Q     Now, are you familiar with a group called
```

113
```
 1   Brentwood Exposed?

 2      A     Yes.

 3      Q     What is it?

 4      A     If I'm not mistaken, it's a group of

 5   employees that got together after the anthrax incident

 6   and decided that they wanted to sue the Postal Service

 7   for injustices they felt like happened to them because

 8   of anthrax.
```
Page 102

050721A. TXT

```
 9        Q     Okay.  Were you ever asked to join Brentwood
10   Exposed?
11        A     Yes.
12        Q     Did you?
13        A     No.
14        Q     Why not?
15        A     I do not believe in what they stand for.
16        Q     What is your marital status?
17        A     I'm married.
18        Q     Okay.  Where does your husband work?
19        A     He works at Cursain Morris.
20        Q     What does he do?
21        A     He's a mail handler on tour 2.
22        Q     Did he work at Brentwood just prior to the
23   anthrax exposure?
24        A     Yes, he did.
25        Q     Was he asked to join Brentwood Exposed?
```

                                                    114

```
 1        A     Yes.
 2        Q     What did he do?
 3        A     He joined.
 4        Q     Did you hold it against him?
 5        A     Not at all.
 6        Q     Now, let me show you what -- let me ask you
 7   to identify a couple of documents for the record.  The
 8   first one will be Agency Exhibit No. 1.
 9              Can you identify that for the record?
10        A     This is what we call a TACS form, which a
```

                           Page 103

050721A.TXT

11    supervisor can pull up at any given time to look at

12    clock rings or clock ring errors.  It shows exactly

13    when an employee comes to work, what time they hit on

14    the clock, what time they hit out for lunch, what time

15    they hit back in, any types of move they make from

16    operation to operation, the base operation they are

17    on.

18              And if a supervisor has to input anything,

19    then the last four digits of their social security

20    would always appear showing that the employee didn't

21    hit the clock, but a supervisor actually went in

22    manually and put time in for them.

23         Q    Okay, now, you said a TACS, is that T-A-C-S?

24         A    Yes, Time and Attendance Control System.

25         Q    Okay.  It's basically the time clock for

                                                         115

1     employees, correct?

2          A    Correct.

3          Q    Can you identify Agency Exhibit No. 1 for

4     the record?

5               MR. WOLFE:  Objection to the exhibit.  It

6     wasn't provided to us prior to the hearing.

7               JUDGE HODGES:  Okay.  Do you want to

8     respond?

9               MR. CHAKERES:  It's going to impeachment of

10    Mr. Harper's testimony, and impeachment -- you don't

11    produce impeachment exhibits until after -- until the

12    hearing.  There is no obligation to predisclose it.

13              JUDGE HODGES:  Okay, you're impeaching his

050721A.TXT

14          prior testimony with the testimony of this witness?

15                  MR. CHAKERES:  Correct.  And this document.

16                  JUDGE HODGES:  And you are attempting to use

17          the document for that purpose.  Now, is the document

18          refreshing her memory or is the document -- I'm just

19          trying to get the specification as to how you are

20          going to use the document.

21                  MR. CHAKERES:  It's to corroborate her prior

22          testimony that lunch was at 4:00 that day.  Mr. Harper

23          said that lunch was at 3:30, and this is also going to

24          impeach Mr. Harper's testimony.

25                  JUDGE HODGES:  Okay.


                                                                116

1                   MR. WOLFE:  Your Honor, it's being offered

2           for its truth as a factual effort to prove the falsity

3           of Mr. Harper's previous testimony, which is not being

4           offered into evidence on that basis.

5                   JUDGE HODGES:  Is there some rule that is in

6           violation here in terms of the federal rules?

7                   MR. WOLFE:  It's attempting to prove poor

8           character by exterior proof.

9                   JUDGE HODGES:  Okay, let's go off the record

10          for a moment.

11                  (Discussion held off the record.)

12                  JUDGE HODGES:  While off the record, there

13          was a discussion regarding the use of a document that

14          Mr. Chakeres has shown the witness.  It is, I believe,

15          some clock rings reflecting the dates of September 30,

                                Page 105

050721A.TXT
16    2002, and October 1, 2002.

17             Mr. Wolfe has objected to any use of this

18    document, and I'm going to allow him to put his

19    objections on the record at this time.

20             MR. WOLFE:   Thank you, Your Honor.

21             The document wasn't previously provided to

22    counsel.  It is to a degree apparent proffer and said

23    it supports testimony that has already been offered by

24    the current witness in opposition to testimony that

25    our client has offered.  We didn't know the document


117

1    was coming.  He has already testified that he is

2    unable to read it or to understand it, so it is unfair

3    and prejudicial to Complainant for this document to be

4    used at this time.

5             JUDGE HODGES:   Okay.  I will now hear from

6    Mr. Chakeres.

7             MR. CHAKERES:   The document is being offered

8    for several reasons.

9             First, the document is being offered to

10   impeach the prior testimony of Mr. Harper.  The Rules

11   of Evidence do not state -- the Rules of Evidence are

12   clear that we can submit evidence at any time, any

13   type of impeachment evidence through any source so

14   long as it's entered into evidence to impeach his

15   credibility.  It's clear, and the document can be

16   admitted for that purpose, and that purpose only.

17             The document is also being admitted or

18   proffered for admission to show that Ms. Hembry's

050721A.TXT

19    testimony is accurate.  It's corroborative evidence.

20    What eventually is going to come down to this case is

21    whether or not you're going to believe Ms. Hembry is

22    more credible or Mr. Harper is more credible, and this

23    is evidence that as you look at and see and appraise

24    in accessing those individuals' credibility.

25              JUDGE HODGES:  Okay.  Well, this is an

118

1    important point.  Since the credibility is central to

2    the case and the lunch time you have identified is an

3    integral point, why are we seeing this document now

4    for the first time today?

5              MR. CHAKERES:  Because Mr. Harper's

6    testimony this morning creates the need to present

7    this document.  Had he said he went to lunch at 4:00

8    instead of 3:30, this document would not be used.

9    It's his testimony today that creates the need for the

10    document.

11              JUDGE HODGES:  Okay.  And finally, how would

12    you respond to Complainant's objections with respect

13    to notice or knowledge.  They have no opportunity to

14    either be familiar with the document or to have time

15    to prepare an adequate response to your use of the

16    document?

17              MR. CHAKERES:  Complainant never propounded

18    any discovery request on us.

19              JUDGE HODGES:  Okay.  That is the response.

20              All right, I have listened to both sides and

050721A.TXT
21    you have presented your arguments on the record.  I am

22    going to allow the admission of the document

23    notwithstanding the instructions I provided in the

24    notice.

25              I'm provided by the argument with respect to


119

1    Complainant's testimony regarding the time that the

2    lunch was taken, and that it is necessary and relevant

3    with regard to the issue of impeachment.

4              So would you like to mark it at this time?

5              MR. CHAKERES:  I have already premarked it

6    as Agency Exhibit 1, Your Honor.

7              JUDGE HODGES:  Okay.  Let the record reflect

8    that A-1 is received into evidence subject to the

9    Complainant's objection which has already been placed

10    on record.

11                        (The document referred to was

12                        marked for identification as

13                        Agency Exhibit No. 1, and

14                        received in evidence.)

15              MR. CHAKERES:  Your Honor, did you get a

16    copy?

17              JUDGE HODGES:  I did not.

18              MR. CHAKERES:  Here you go.

19              JUDGE HODGES:  Okay, let's resume and I

20    thank you all for your patience.

21              BY MR. CHAKERES:

22        Q    Ms. Hembry, can you please identify Exhibit

23    No. 1 for the record?

Page 108

050721A.TXT

24        A    It's a TACS form, time and attendance
25    record.


                                                120

1         Q    And it is for whom?
2         A    It's for all employees.
3         Q    But this one in particular, who is it for?
4         A    For James Harper.
5         Q    The Complainant in this case, correct?
6         A    Correct.
7         Q    Okay.  And the clock ring is essentially a
8    time clock report, correct?
9         A    Correct.
10        Q    And it shows what time Mr. Harper came to
11   work, left work, and then punched out, is that
12   correct?
13        A    Correct.
14        Q    Okay.  Is the period of September 30, 2002
15   through October 1, 2002 on this report?
16        A    Correct.
17        Q    Can you tell the judge where that is?
18        A    September 30th to October 1st would be
19   Tuesday, which would be Monday night or Tuesday
20   because the tour would start at 10:30.  So 9:30, 2250
21   would be the time that he came to work.  He hit the
22   clock.  BT stands for begin to work.  He hit the clock
23   at 2253, which means about 10:31.
24             The next one would be out to lunch.  He hit
25   at 4:01.  The IL is in lunch.  He came back from lunch
                    Page 109

050721A. TXT

121

1    late.   You get 30 minutes, 50 units.   He should have

2    been back from lunch no later than 4:51, but he was

3    late.   He hit back in a t 4:66, which means he took an

4    extra 10 - 12 minutes, and then he ended his tour at

5    7:00.

6         Q    Now, you kept say units.   What's a unit?

7         A    A unit is how they perceive the work.   Every

8    50 units, like 2250 -- an extra 30 units would be

9    11:00, so they break the time off, sort of like

10   military time so to speak.

11        Q    The Postal Service doesn't use a regular

12   clock --

13        A    No.

14        Q    -- on its clock, correct?   Okay.

15             And a unit is actually one one-hundredth of

16   an hour; is that correct?

17        A    Correct.

18        Q    Okay.   So actually 2250 would be 10:30?

19        A    Correct.

20        Q    And then 2253 would be a few minutes, like

21   maybe two minutes after 10:30?

22        A    Correct.

23        Q    Okay.   So on the exhibit that says -- on

24   Exhibit 1 where it's marked Tuesday, you have a BT.

25   What does that stand before?

Page 110

050721A.TXT

1      A    Begin tour.

2      Q    And on 9-30, what time did Mr. Harper clock

3    in?

4      A    2253.

5      Q    And then you have an OL, is that right?

6      A    Yes.

7      Q    What does the OL stand for?

8      A    Out to lunch.

9      Q    Okay.  And what time did he go out to lunch?

10      A    4:01.

11      Q    And then you have an IL, what does that

12    stand for?

13      A    In lunch.

14      Q    And what does out lunch and in lunch mean?

15      A    That he is taking his 30-minute lunch.  It

16    tells you what time he get off the clock to take his

17    lunch and what time he get back in.

18      Q    And what time did he come back in from

19    lunch?

20      A    4:66.

21      Q    And then the ET stands for end tour; is that

22    correct?

23      A    Yes.

24      Q    And what time did he finish work that day?

25      A    Seven o'clock sharp.

1      Q    Now, let me show you what's been previously

Page 111

050721A.TXT
2    marked as Agency Exhibit No. 3, and can you identify

3    Agency Exhibit No. 3 for the record?

4         A    This is an end of run summary report.

5         Q    And can you explain what the end of run

6    summary report is?

7         A    The end of run summary report is a hard copy

8    of a total summary of every particular class of mail

9    that is run on a particular machine, beginning with

10   tour 1, tour 2 and tour 3.  So at any given time if

11   you want to know what machine processed what class of

12   mail and how much mail they ran, how long they ran it,

13   you would pull this report.

14        Q    Okay.  Do you use these reports in your

15   daily work activities?

16        A    Every day.

17        Q    Okay.  And you're familiar with the report;

18   is that correct?

19        A    Yes.

20             MR. WOLFE:  Objection.  Based on the

21   witness's testimony, it appears to be going towards

22   productivity which Your Honor has already ruled it's

23   not relevant to this case.

24             MR. CHAKERES:  This report is going to show

25   the times -- this is another impeachment document


124
1    that's going to impeach Mr. Harper's prior testimony.

2    You will remember that he testified that the machines

3    were not running between the hours of 1 and 2:40 a.m.

4    on October 1st.  This document will show that his

050721A.TXT

5      testimony is not accurate.

6              JUDGE HODGES:  Okay.  The same rationale

7      that I used for the first document applies to this

8      one.  Did you want to renew your objection to the use

9      of the document?

10             MR. WOLFE:  Yes, Your Honor.

11             JUDGE HODGES:  Okay.  Let the record reflect

12     that the objection also applies to the use of this

13     document.

14             I do have some concerns procedurally,

15     however, that we have got some different markings

16     going on, and I don't want the transcript to be

17     confused.  So we have already received this document

18     as A-1.

19             MR. CHAKERES:  That's Agency -- correct.

20             JUDGE HODGES:  Right.  I'm going to ask the

21     court reporter to -- do you have a label, some labels?

22             THE COURT REPORTER:  Yes.

23             JUDGE HODGES:  Can you label this and write

24     A-1 on the label, please?

25             And I apologize, Mr. Chakeres, for the


125

1      interruption.  If my memory serves me correct, Mr.

2      Wolfe, the document that you utilized during

3      Complainant's examination were already a part of the

4      Report of Investigation?

5              MR. WOLFE:  That's correct, Your Honor.

6              JUDGE HODGES:  Okay.  Now, so this document

050721A.TXT
 7    then will be marked as A-2?

 8              MR. CHAKERES:  Actually we used the document

 9    during Mr. Harper's testimony that we identified as

10    Agency Exhibit 2, but did not admit it.

11              JUDGE HODGES:  Okay.

12              MR. CHAKERES:  That's why this one is now A-

13    3, or Agency Exhibit No. 3.

14              JUDGE HODGES:  Okay.  Is it your contention

15    that A-2 should be included with the transcript as a

16    non-received document?

17              MR. CHAKERES:  Yes, Your Honor.

18              JUDGE HODGES:  Then we need to mark it A-2

19    with the label.

20              Do you recall which document that was?

21              MR. CHAKERES:  This document right there?

22              JUDGE HODGES:  Can you mark this document as

23    A-2.

24    //

25    //


                                                           126

 1                        (The document referred to was

 2                         marked for identification as

 3                         Agency Exhibit No. A-2.)

 4              JUDGE HODGES:  Let the record reflect that

 5    A-2 is marked.  It is not received into evidence.

 6              And while you are up, if you can hand this

 7    to her.  We're going to mark this A-3.

 8                        (The document referred to was

 9                         marked for identification as

                         Page 114

050721A.TXT

10                          Agency Exhibit No. 3.)

11              JUDGE HODGES:  Okay, A-3 is received into

12      evidence subject to Complainant's objection.

13                          (The document referred to,

14                          previously identified as

15                          Agency Exhibit No. 3, was

16                          received in evidence.)

17              JUDGE HODGES:  All right, let's resume.

18      Thank you.

19              BY MR. CHAKERES:

20         Q    Now, Agency Exhibit 3, you said it was an

21      end run report.

22         A    Correct.

23         Q    And it reports what time the machines were

24      running; is that correct?

25         A    It will tell you what time I actually


                                                        127

1       started the machine up, what machine I was working on,

2       the type of mail that I was running, and the total

3       number of pieces that were put through the machine.

4          Q    And it would also say how much -- what time

5       the machine started running and --

6          A    Start and stop.

7          Q    Okay.  Let's take a look at the first column

8       that says "site".  You will see a number there 20898-

9       997. What is that?

10         A    That is the site at Suburban Maryland.

11         Q    Okay, and the second column is M-A-C-H type.

                        Page 115

050721A.TXT
12    What is that?

13          A    That is the type of machine.

14          Q    And what type of machine is being reported

15    on Exhibit No. 3?

16          A    Automated flat sorting machine 100.

17          Q    So those were the machines used in the flat

18    sorter section, correct?

19          A    Correct.

20          Q    Okay.  Now you have an N-N-O column.  What

21    is that column?

22          A    Oh, that's the number, the machine number.

23          Q    Okay.  And machine No. 5, was that the one

24    that was used on -- there is a No. 5 in that column.

25    What does that No. 5 refer to?

128

1          A    Number 5 is the machine that was designated

2    for Brentwood employees.

3          Q    Okay.  So this is a report on the machines

4    for Brentwood employees during the period of time

5    September 30, 2002 through October 1, 2002?

6          A    Correct.

7          Q    Okay.  Now, there is an OP number.  What

8    does that column stand for?

9          A    That is the operation number.

10          Q    Okay.  And what is operation 335, or let's

11    start at the top, 33600?

12          A    336 is a secondary operation.

13          Q    Okay.  And 33500?

14          A    That is a primary operation.

050721A.TXT

15        Q      Okay.   334000?

16        A      334 is official.

17        Q      Okay.   331000?

18        A      Outgoing primary.

19        Q      Okay.   And then 335020, what would that be?

20        A      The same, primary.

21        Q      Okay.   And the next column is sort program.

22   What does that stand for?

23        A      That just breaks it down even further.   It

24   gives the sort operation number actually made.   It

25   will tell you the name of it is.   Like 335 is first


                                                        129

1    through.   335 has an actual name.

2              So when you key in 335, then the screen will

3    blanket to let you know that you're running first 335,

4    which is a primary operation number for primary mail.

5         Q      So this is basically what type of mail is

6    being ran?

7         A      Correct.

8         Q      Okay.   Now tour number, is that a shift?

9         A      Yes.

10        Q      Okay.   Run number, what is that?

11        A      You may have several runs.   That means

12   you're running more than one particular type of mail

13   during the course of the night.   So you may start off

14   with run No. 1, end that run, you go up on another

15   run, and that's run No. 2, until you completed your

16   tour of duty.   And depending on how much volume of

050721A.TXT
17    mail you have for each particular class, you could
18    stay on one run for several hours or you could run
19    maybe six or seven type classes of mail in a eight-
20    hour period.
21        Q    Start, what does that column mean?
22        A    That's the time we start, the actual date.
23        Q    Okay.  So it gives you the date and the
24    actual time; is that correct?
25        A    Yes.

                                                  130
1        Q    Okay.  And then end, that column means what?
2        A    The same thing.  the time, the date, the
3    actual start and stop.
4        Q    Okay.  The MODS date, what is that?
5        A    That's the MODS date.  That's -- because for
6    tour 1, because we process prior to 12:00, they have
7    what they call a MOD date, which is the actual day.
8    So when I say Tuesday, in MODS' term, that would mean
9    Monday night for actual Tuesday, but for 201 purposes
10    for MOD it is actually considered Tuesday.
11            JUDGE HODGES:  This is probably more detail
12    than I need.  If this document can show that --
13    reflect what Mr. Harper's level of production was
14    during the relevant time period, that's probably what
15    is most relevant.
16            MR. CHAKERES:  Okay.
17            BY MR. CHAKERES:
18        Q    Let's go 13 lines down, and you will see at
19    the beginning of the tour, you will see a No. 1 about
                        Page 118

050721A.TXT

20    midway, correct?

21         A    Yes.

22         Q    And about 13 lines down you will see a No. 8

23    on the run, 9-30-02, correct?

24         A    Yes.

25         Q    And then 2257, correct?

131

1          A    Correct.

2          Q    And then it keeps going over to 10-1-02,

3     039, correct?

4          A    Correct.

5          Q    What does that refer to?

6          A    That means that I started the machine up at

7     almost 11:00, maybe three minutes to 11, and I

8     processed all the way until 20 minutes to 1 the

9     following morning.  So I started at 9:30 p.m. and

10    ended the run at 12:39 a.m.

11         Q    Okay.  Then the next line down you will see

12    10-1-02, 105.  What does that refer to?

13         A    Okay, I started the machine back up at 1:05

14    and it ran until 1:42.

15         Q    Okay.  Now, when you say it was running,

16    that means there were mail processors at the flat

17    sorter machine working during this time?

18         A    Processing mail, correct.

19         Q    And when you are saying processing mail,

20    what do you mean by that?

21         A    The machine is being loaded.  The machine is

Page 119

050721A.TXT

22    running mail, sorting mail, processing mail.

23         Q    Okay.  Was Mr. Harper working during that

24    period of time on October 1, 2002?

25         A    Yes, he was.

132

 1         Q    So he was working at the flat sorter machine

 2    between 1:00 and 1:42?

 3         A    Yes.

 4         Q    Now, the next line down, it shows a date of

 5    10-1-02 at 2:30.  10-1-02 to 3:51, correct?

 6         A    Correct.

 7         Q    What does that line mean?

 8         A    That's another one that I started, and the

 9    machine was running from 2:30 to 3:30 for another

10    hour.

11         Q    Now, at the time that Mr. Harper was at your

12    desk filling out the 1767, was the machine operating?

13         A    Yes, it was.

14         Q    Okay.  Was mail still needed to be loaded?

15         A    Yes.

16         Q    He walked away from his duties, in other

17    words?

18         A    Yes.

19         Q    At 10-1-02, the machine started operating

20    again?

21         A    Right.  Now, depending on what goes through

22    the machine, you might have like mechanical issues

23    with the machine, whether the machine will just stop.

24    Something goes through the machine, it didn't read,
                        Page 120

050721A.TXT
25      and it will stop.  So you would clear what they call a

133

1      jam.

2              As you can see, the machine ran from 2:33 to

3      3:51, so whatever happened, it only took a minute for

4      me to get that machine back up and running because it

5      started right back up at 3:52.

6          Q    Okay.  Now, is this like the TACS that runs

7      on actual time?

8          A    It runs on actual time.

9          Q    So 3:51 is basically 9 minutes to 4 in the

10     morning?

11         A    Yes.

12         Q    Okay.  And then 3:52 is 8 minutes to 4 in

13     the morning?

14         A    Right.  Correct.

15         Q    Now, did you discipline Mr. Harper just

16     because he didn't quickly get out of your desk and

17     stop filling out the 1767?

18         A    No.

19         Q    Why was it a discipline issue?

20         A    It was an combination of Mr. Harper's work

21     performance for the entire night.  My job as a

22     supervisor is to instruct and guide the employees on

23     the flat sorter for the efficiency and productivity of

24     our customers.

25              If employees don't do their jobs, then we

050721A.TXT

134

1    can't be successful.

2            As a supervisor, it is my job to ensure that

3    the employees are gainfully employed at all times.  If

4    they fail to meet the requirements, then it is my job

5    to discipline them, and that is what happened.  It's a

6    culmination of having to talk to Mr. Harper about his

7    work habits, him not -- having to repeat the

8    instructions more than once, him ignoring me,

9    pretending that he didn't hear me.  Mr. Harper, get

10   off the cell point.  He keep talking, like I'll get

11   off when I get ready, I'm going to keep talking until

12   I'm finished.  He gets off the phone.  Then he goes

13   back to work.

14           Then he is not keeping the ledgers loaded.

15   You need to keep the ledgers loaded.  We are required

16   to meet productivity.  If you don't do that, I'll

17   leave the machine.  I come back.  You're sitting at

18   the desk.  Everybody is working but you.  You are

19   covered up writing.

20           So I approach you, Mr. Harper.  What are you

21   doing?  Filling out a form.  Well, if it's not an

22   immediate safety hazard, Mr. Harper, then you need to

23   go to work.  The post office pays you to work. Eight

24   hours work for eight hours pay with the exception of

25   your luncheon break.

135

050721A.TXT

1          And Mr. Harper is no different from any

2    other employee that works for me.  There are standards

3    that are set that I expect each employee to fulfill.

4    If you cannot fulfill your job, then disciplinary

5    action will be taken, and it's clear and as simply as

6    that.

7          MR. CHAKERES:  I have no further questions.

8          JUDGE HODGES:  At this point, I would like

9    to break for one hour for lunch.  Plan to be back on

10   record at 1:25.

11          While we are on the lunch recess, please do

12   not speak to anyone about these questions or this

13   complaint other than counsel.  Is that understood?

14          THE WITNESS:  Yes.

15          JUDGE HODGES:  Thank you very much.  We are

16   in recess.

17          (Whereupon, at 12:26 p.m., the hearing in

18   the above-entitled matter was recessed, to resume at

19   1:20 p.m. this same day, Thursday, July 21, 2005.)

20   //

21   //

22   //

23   //

24   //

25   //

136

1          A F T E R N O O N   S E S S I O N

2                              (1:25 p.m.)

Page 123

050721A.TXT
```
 3              JUDGE HODGES:  We are back on the record
 4    after a luncheon recess at approximately 1:25 p.m.
 5              We will begin with the cross-examination of
 6    the witness.  Ms. Hembry, I would like to remind you
 7    you are still under oath.
 8              Whereupon,
 9                     LYDIA HEMBRY
10              having previously duly sworn, was recalled
11    as a witness and was examined and testified further as
12    follows:
13              JUDGE HODGES:  I also instruct you all to
14    try and speak one at a time.
15              Mr. Wolfe, you may begin.
16              MR. WOLFE:  Thank you, Your Honor.
17                     CROSS-EXAMINATION
18              BY MR. WOLFE:
19         Q    Good afternoon, Ms. Hembry.
20         A    Good afternoon.
21         Q    My name is Zachary Wolfe.  I am the attorney
22    for James Harper.  We haven't met before.  How are you
23    today?
24         A    Fine.
25         Q    Good.  I want to ask you to turn your
```

137
```
 1    attention back to Agency Exhibit No. 1, and I'm sorry,
 2    what was the term that you used for this document
 3    again?
 4         A    TACS report.
 5         Q    Yes, thank you.
```
Page 124

050721A.TXT

6            I was wondering if you would tell me how it

7    is that it's created.

8        A    They have what they call a badge reader, and

9    employees are issued a time card.  And when they swipe

10   their card, it's entered into a computer system.

11   Supervisors or management are given access to this

12   particular system in the data site because in some

13   instances where an employee may lose a time card, or

14   they forget to hit out for lunch or something goes

15   wrong, we have to manually go into the system and

16   correct their time so it equals up to eight hours for

17   employees.

18       Q    I see.  How frequently do you have to do

19   that?

20       A    Every day.  Every day.

21       Q    Commonly these document reflects a

22   supervisor's notation of the computerized record, is

23   that right?

24       A    Correct.

25       Q    Who keeps the time card that you referenced,


138

1    the badge that you referenced?

2        A    The supervisors are supposed to keep the

3    badges.  We pass them out at the beginning of the tour

4    and at the end of the tour we collect them, and pass

5    them out the following night.

6        Q    Okay.  Do they keep them with them

7    throughout the shift?  I'm sorry.  Do the employees

Page 125

050721A.TXT

8      keep the badges with them throughout their shift?

9           A     They are not supposed to.  They have what

10     they call a time rack where once they get in they go

11     into a rack, and those employees are instructed to

12     take their time badges out of the rack for lunch, and

13     then hit out for lunch, and hit back in, put it back

14     in the rack.  At the end of the day they hit out, and

15     then they put them -- well, at Suburban there was a

16     little box that they would turn in at the end of the

17     day, and then we would collect them.

18          Q     Does the supervisor or someone else ever

19     collect those badges during the work day?

20          A     Only the supervisors.

21          Q     In other words, they are not always sitting

22     there in the rack?

23          A     No.

24          Q     Okay.  So what happens if someone wants to

25     go to lunch is their badge is not there for their use?


139

1           A     If their badge is not there?

2           Q     Yes.

3           A     The supervisor can get the badge or they are

4      told to go to lunch and the supervisors will input

5      their time.

6           Q     Okay.  So in other words, these forms are --

7      you try to make them as accurate as possible in terms

8      of the numbers of hours of work, but the precise ins

9      and outs is sometimes flexible, correct?

10          A     No.  You mean in terms of what times the

                          Page 126

050721A.TXT

11    employees are told to go to lunch?

12        Q    Yes.

13        A    Yes.  This is very accurate because it

14    reflects exactly what's done as you can tell.  The

15    only time that -- any time you see four digits means

16    that someone actually went into the system and put

17    time in.  If you don't see anything, that means the

18    employee hit their own time card.

19        Q    And you're talking about the four digits

20    that are where?  I'm sorry.

21        A    On the day of Tuesday?

22        Q    Yes.

23        A    If you go all the way across, you see that

24    00.18.  Okay, 455, that means that annual leave was

25    used, which a regular employee has to come up with


                                                    140

1     full eight hours.  So if they are late or they take a

2     late lunch, it has to balance out eight hours.

3          So because he took a longer lunch, because

4     he took more than 30 minutes, someone had to input 18

5     units of annual leave to balance out a full eight

6     hours.  But the only time you will see -- when you see

7     a social security, it indicates that someone manually

8     went into the system to input time.  Otherwise, it

9     means that the employees themselves hit the time

10    badge.

11        Q    I see.  Okay, so where there are three Xes,

12    a dash, two Xes and then four actual --

                        Page 127

050721A.TXT
13        A    Correct.
14        Q    -- digits, that's the social security
15   number, and it's those last four digits that you
16   referred to?
17        A    Correct.
18        Q    Okay.  So this indicates that for the
19   Tuesday shift, the one that began September 30th and
20   concluded October 1st, someone went in and altered,
21   made adjustments to Mr. Harper's records?
22        A    Correct.
23        Q    Turning back then to Agency No. 3, which is
24   titled end run summary report.
25        A    Okay.

                                                    141
1        Q    Is that how you refer to this document?
2        A    Yes.
3        Q    Again it's a form with which I'm not
4   familiar, so I hope that you will help me to clarify a
5   couple of things here.
6        A    Sure.
7        Q    When you are dealing with late on September
8   30th and early morning hours on October 1st, am I
9   reading it correctly that where tour No. 1 begins in
10   that time frame at 12:57?
11        A    Correct.
12        Q    The next line down begins at 1:05?
13        A    Correct.
14        Q    And that line there indicates that the
15   machine ran from 1:05 until 1:42 in the morning --
                    Page 128

050721A.TXT

16    A    Correct.

17    Q    -- on October 1st.

18    A    Correct.

19    Q    And then the machine was not running between

20    2:21 and 2:33 in the morning; is that correct?

21    A    Correct.

22    Q    Okay.  So in fact the machine was not

23    operational around 2:00 in the morning?

24    A    Correct.

25    Q    What is Mr. Harper's relationship with

142

1    Brentwood Exposed to your understanding?

2    A    I don't know what his relationship is to

3    Brentwood Exposed.  I do know that Mr. Harper has been

4    the spokesperson for Brentwood Exposed.  Now whether

5    or not he's in the capacity of the president or the

6    head spokesperson, I couldn't tell you.

7    Q    Okay.  And you used the word "spokesperson"

8    there.  I think a number of recent statements he has

9    been the spokesperson, is that right?

10    A    Yes, sir.

11    Q    What do you mean by that?

12    A    In terms of what the organization stands

13    for, I think Harper may be one of the people that were

14    either chosen or nominated or however they did to to

15    speak on the behalf of the people in the group.

16    Q    Okay.  You know Mr. Harper, don't you, to be

17    someone who has made a lot of complaints about

050721A.TXT
18    discrimination and mismanagement, right?

19        A    Correct.

20        Q    Including complaints about discrimination by

21    you, correct?

22        A    Correct.

23        Q    Okay.  Let me ask you about another piece of

24    paper here.

25            MR. WOLFE:  And I'm sorry, I don't have


143

1    copies for counsel or Your Honor, but this is from

2    page 22 of the Report of Investigation.

3            JUDGE HODGES:  Okay.  If you will just allow

4    us to locate it then.

5            MR. WOLFE:  And I'll hand a copy to the

6    witness.

7            JUDGE HODGES:  All right, that will be fine.

8            MR. CHAKERES:  What is it?  Her statement?

9            MR. WOLFE:  Yes.

10           MR. CHAKERES:  Okay.

11           JUDGE HODGES:  Do you have it, Mr. Chakeres?

12           MR. CHAKERES:  Yes, Your Honor.

13           JUDGE HODGES:  All right, you may proceed,

14    Mr. Wolfe.

15           BY MR. WOLFE:

16        Q    If you could just take a look at that page

17    and in particular your responses to what's marked as

18    A-20.

19        A    Yes, sir.

20        Q    And let me know when you finish and had a
                    Page 130

050721A.TXT

21      chance to read that.

22              (Witness reviews document.)

23              THE WITNESS:   Correct.

24              BY MR. WOLFE:

25      Q    You referred there to a meeting with Mr.


                                                    144

1       Harper and others in which he complained of

2       discrimination that took place during the week of

3       September 25; is that correct?

4       A    Correct.

5       Q    Okay.  When was that meeting?

6       A    Mr. Harper on a routine basis would have

7       issue with any instruction that I gave him that he

8       didn't want to comply with.  So on a weekly basis he

9       would have the need to see a shop steward, or want to

10      speak with a shop steward, and then in turn talk to my

11      manager about what he felt like, I guess what issues

12      with him in terms of my ability to instruct him in his

13      performance of his duties.

14      Q    So you agree then that on October 4th when

15      you issued him the notice of seven-day suspension, you

16      were aware that he had been complaining about

17      discrimination by you, and then stated that he was

18      going to file EEO charges; is that right?

19      A    No, sir, I was not.

20      Q    Why is that?

21      A    Because the meeting that you're speaking of

22      when he spoke of an EEO, that was after the issue of

                        Page 131

050721A.TXT
23   discipline.  The meeting that occurred with my

24   manager, Mr. Harper, and another stop steward was

25   brought about upon Mr. Harper's request.

145

1           When he went into what is complaint was he

2    initially dated that he had -- was going to file an

3    EEO, or that he had filed.  At which point my manager

4    ended the meeting because neither one of us had any

5    knowledge of an EEO.  We thought we were getting

6    together to try to resolve other issues.

7           So at that point when he stated that he had

8    filed an EEO, the manager just stopped the meeting.

9    He was like halt.  If you filed an EEO, then there is

10   no point with us even going through with this meeting,

11   so we can just end it.  Whatever your complaint is you

12   take it up with the EEO.

13       Q   You started to say that he said that he

14   would file an EEO.

15       A   I'm not sure what word he used.  I just

16   remember when he said something about an EEO, my

17   manager asked him did you file an EEO.  And he said

18   yes, and Mr. Tucker said, well, if you filed an EEO,

19   then there is no point to us having a meeting, so you

20   allow whatever complaint you have to go through the

21   EEO process.

22       Q   So what's this meeting on September 25th

23   that you referred to?

24       A   Like I said before, Harper would routinely

25   have meetings, would want to address any type of
                     Page 132

050721A. TXT

146

1    issue.  Any time I addressed Mr. Harper's work
2    performance, he would then request to see a shop
3    steward and request to see the manager and me.
4            Maybe it was the tone of my voice.  I'm
5    speaking too aggressively.  He didn't like the way I
6    was giving direction.  I'm singling him out.  Anything
7    that he felt in his mind was an issue, he would
8    request a meeting.  Not just with me, but he wanted
9    the manager and the supervisors and the shop stewards
10   to attend.
11           So this just could have been one of many
12   that I had because I had more than one meeting with
13   Harper with a shop steward available and my manager.
14       Q    And means more than one meeting.
15       A    Mm-hmm.
16       Q    Did he complaint about discriminated
17   against?
18       A    The discrimination was never used.  He never
19   used the word discrimination.
20       Q    Okay.  He said singled out?
21       A    He never used that either.  The first time I
22   heard singled out was in an EEO redress.
23       Q    Okay.  If you could flip the page to the
24   previous page, and if you could take a look at your
25   answer down at the bottom of the page, if you can just

050721A.TXT

147

1    read it.

2         A    Are you talking about page A-19?

3         Q    I'm sorry, A-18.

4         A    Okay.

5              (Witness reviews document.)

6              THE WITNESS:  Correct.

7              BY MR. WOLFE:

8         Q    That's the meeting that you're talking about

9    where he referred to an EEO charge?

10        A    Correct.

11        Q    Okay.  And it's the one that you say line

12   20, you're not sure of the date, but some time around

13   that; is that correct?

14        A    Right, because the notes that we had were

15   transported from Suburban to the Brentwood facility.

16   The records were lost.  So I was merely relying

17   completely upon my memory and not my notes.

18             After I was allowed to find my notes, I was

19   off all week.

20        Q    Okay.  But when you were filling out this

21   form, you knew that the discipline that he was

22   challenging took place on October 4th, right?

23        A    Yes.

24        Q    Okay.  And you put down September 20th,

25   knowing that we're talking about -- it actually was on

148

1    October 4th?

050721A. TXT

2          A     Like I said in the complaint, if you read, I

3     specifically stated that I was not sure of the date

4     because I had handwritten notes to verify.  So I wrote

5     a date not being completely sure, which is why I made

6     sure that I wrote "not completely sure of the date."

7     The records were lost in transition from Suburban to

8     Brentwood.

9          Q     In completing an EEO investigative affidavit

10    regarding an October 4th incident where he is issuing

11    of discipline by you where he is saying retaliation.

12         A     I'm sorry?

13         Q     Where he is saying that it's in retaliation,

14    wouldn't you have strongly in your mind whether you

15    knew about whether he said, you know, before or after

16    the date that you issued that letter?

17         A     Not really, no.

18               MR. WOLFE:   That's all I have.

19               JUDGE HODGES:   Mr. Chakeres, any redirect?

20               MR. WOLFE:   I'm sorry.  May I retrieve my

21    ROI.

22               THE WITNESS:   Oh, sorry.

23               MR. CHAKERES:   No, Your Honor.

24               JUDGE HODGES:   I have a couple of questions

25    for the witness, and I want you all to listen

149

1     carefully to my questions.  If you have not already

2     covered this area, I will allow you to ask some

3     follow-up questions to my questions, okay.

Page 135

050721A.TXT
```
 4                Ms. Hembry, you have been asked a series of
 5        questions regarding the notice of suspension issued on
 6        October 4, 2002.
 7                THE WITNESS:  Correct.
 8                JUDGE HODGES:  Okay.  What happened after --
 9        well, let me rephrase.  What day did you actually
10        issue the notice, if you recall?
11                THE WITNESS:  If I recall, it was issued
12        October 4th.
13                JUDGE HODGES:  Okay.
14                THE WITNESS:  The actual letter.
15                JUDGE HODGES:  How was the notice
16        delivered -- let me rephrase.  Are you aware of how
17        the Complainant received the notice?
18                THE WITNESS:  Yes.  I would have called him
19        into the office with the presence of the shop steward
20        and informed him, actually read the letter to him.  I
21        would have issued the letter.
22                JUDGE HODGES:  Do you have any recollection
23        of that interaction as you sit here today in terms of
24        what he said to you when he got the letter, or any
25        communication you all had?
```

                                                              150
```
 1                THE WITNESS:  I remember him asking me why
 2        did I feel the need to give him this letter, why was
 3        he getting it.  And I explained to him he was
 4        receiving this letter because of his work performance.
 5        He was very upset with me, and he was verbalizing a
 6        lot of things, and the shop steward kept trying to get
```
                             Page 136

050721A.TXT

7   him to calm down.  He kept telling him be quiet, let
8   me handle it.  Be quiet, let me handle it.
9           And I proceeded to read through the letter
10  to tell him what his rights were under Article 15,
11  that he had a right to file after he received the
12  letter, but to allow me to finish reading because
13  while I was reading the letter he was ranting and
14  raving about it was unfair, and I shouldn't give him
15  the letter, and I don't deserve it.
16          And the shop steward was clearly agitated
17  with him, getting him to try to quiet down until I
18  could read, and then give him the letter.
19          JUDGE HODGES:  When was the suspension
20  effective?
21          THE WITNESS:  Well, with the suspension,
22  it's not effective -- it has to go through the
23  grievance procedure.  Once an employee receives a
24  letter or any type of disciplinary action, then they
25  have 14 days to file, and then they file the


                                                          151
1   grievance.  Then the shop steward requests information
2   from the supervisor to support documentation for that
3   particular action.
4           We are given five days to give them
5   information back to the shop steward, and then we set
6   up an appointment with the shop steward to have a step
7   1 meeting to resolve.
8           So it could take anywhere from, let's see,

050721A.TXT

9   14 days to file, then five days to get the letter of

10   information request, another five days to meet with

11   the step 1.

12        JUDGE HODGES:  So let's stop and take it

13   step by step.  I'm interested in the procedure.

14        Do you remember whether or not a grievance

15   was filed in this case with respect to the October 4,

16   2002 notice?

17        THE WITNESS:  I cannot recall if he actually

18   filed.

19        JUDGE HODGES:  Okay.

20        THE WITNESS:  I cannot recall whether or not

21   he filed.  But upon my investigation later on, it was

22   brought up to me by another supervisor who had issued

23   the initial disciplinary action for the letter of

24   warning -- Connie Brown, which was the other

25   supervisor who gave the initial letter, told me that

152

1   he had resolved the letter because he found out that I

2   had issued a seven-day.  He said, "I think you should

3   not have issued that because I resolved it."

4        And I said, "Well, what was the resolution?"

5   He said, "I think his letter was rescinded."  And I

6   said, "Well, if that's the case, then the seven day is

7   not going to stand.  It's going to be rescinded when

8   he files."

9        JUDGE HODGES:  Okay.  During the two weeks

10   or 14 days after the notice was issued, do you know

11   whether or not Complainant continued to work during

Page 138

050721A.TXT

12      the two weeks?

13              THE WITNESS:  No, he did not.

14              JUDGE HODGES:  How are you aware of that?

15              THE WITNESS:  Because shortly after he

16      received the suspension, he complained of either a

17      headache or chest pains or something to that nature.

18      He felt -- they didn't have a nurse on duty, a medical

19      staff on duty at Suburban.  And I think he was

20      transported to Shady Grove Hospital complaining of

21      either a headache or chest pains, and he wanted to go

22      out.  I don't know whether his blood pressure or

23      something was wrong.  And because we didn't have

24      medical staffing, he was sent off to Shady Grove.

25              JUDGE HODGES:  Okay.  Now, do you recall

153

1       whether or not this occurred on the day that you gave

2       him the notice?

3               THE WITNESS:  Yes, it did occur on that day.

4               JUDGE HODGES:  Okay.  What happened after he

5       went to the hospital, if you know, in terms of his

6       work?  Did he return to work?  Was he out of work?

7       Let me take them one at a time.

8               How long was he out of work after he went to

9       the hospital?

10              THE WITNESS:  I'm not sure.

11              JUDGE HODGES:  Okay.

12              THE WITNESS:  I'm not sure.

13              JUDGE HODGES:  That's okay.  I only want you

                        Page 139

050721A.TXT
14    to answer if you know.

15            Do you know if he eventually returned to

16    work following being transported to the hospital?

17            THE WITNESS:  Yes, he did come back

18    eventually.

19            JUDGE HODGES:  Do you have any idea as to

20    how much time or around what time frame that was?

21            THE WITNESS:  No.

22            JUDGE HODGES:  Okay.  When he did return to

23    work, did he return to work in the flat sorter area

24    under your supervision?

25            THE WITNESS:  Yes, sir, he did.

154

1            JUDGE HODGES:  Okay.  Now, as you best can

2    remember, what happened to the notice?

3            THE WITNESS:  As far as I know, the letter

4    was rescinded and removed from his file, as far as I

5    know.

6            JUDGE HODGES:  Okay.  Do you recall whether

7    or not you were involved in that process?

8            THE WITNESS:  No, I was not.

9            JUDGE HODGES:  Do you recall whether or not

10    you were notified that the letter had been rescinded?

11            THE WITNESS:  I think I was notified that

12    the letter was rescinded by the union.

13            JUDGE HODGES:  And do you recall whether

14    that was done verbally, whether it was in writing --

15            THE WITNESS:  Yes, it was verbally.

16            JUDGE HODGES:  Okay, let me finish the
            Page 140

050721A.TXT

17    question.

18            Do you recall which individual informed you

19    that the notice had been rescinded?

20            THE WITNESS:  I don't recall who told me.

21            JUDGE HODGES:  Okay, that's fine.

22            Do you have any recollection of how much

23    time elapsed between the time that you issued the

24    notice and you were verbally informed that it had ben

25    rescinded?


                                                    155

 1            THE WITNESS:  A little over 30 days.

 2            JUDGE HODGES:  Now, at the time that you

 3    were notified that the letter or the notice, rather,

 4    had been rescinded, do you recall whether or not

 5    Complainant had already returned to work at that point

 6    or not?

 7            THE WITNESS:  Yes, he had come back to work.

 8            JUDGE HODGES:  Okay. So would it be an

 9    accurate summary of your testimony that although you

10    don't recall the specific day or the time frame in

11    which he returned from his being transported to the

12    hospital, he would have returned within the 30-day

13    period between the time the notice was issued and the

14    time that you were verbally informed it had been

15    rescinded?

16            THE WITNESS:  Yes.

17            JUDGE HODGES:  Okay, I don't have any

18    additional questions for the witness.  Any follow up?

                    Page 141

050721A.TXT
19    We will start with the Complainant, Mr. Wolfe?
20              MR. WOLFE:  No, Your Honor.
21              JUDGE HODGES:  And Mr. Chakeres?
22              MR. CHAKERES:  No, Your Honor.
23              JUDGE HODGES:  All right.  Then it appears,
24    Ms. Hembry, you have completed your testimony.  I
25    would like to thank you very much for coming and

156

1    testifying.
2              Again, I'm ordering you not to speak to
3    anyone about these questions or this complaint,
4    including people who have testified.  Okay, in the
5    event that the order is not followed a sanction may be
6    imposed including a judgment issued in favor of one
7    party or the other.
8              Do you understand the seriousness of that
9    order?
10             THE WITNESS:  Yes, sir.
11             JUDGE HODGES:  Thank you very much.  You are
12   excused.  Have a good afternoon.
13             THE WITNESS:  Thank you.
14             (Witness excused.)
15             JUDGE HODGES:  Let's go off the record,
16   please.
17             (Whereupon, a short recess was taken.)
18             JUDGE HODGES:  Back on the record after a
19   brief recess.
20             We are ready to begin with the closing
21   statements.  We're going to start with the Complainant

050721A.TXT

22    first.  You will have approximately five minutes.

23              MR. WOLFE:   Thank you, Your Honor.

24              Our closing is essentially as we stated it

25    would be at the opening statement.  Mr. Harper was an

157

1    accomplished employee prior to the anthrax attacks and

2    his participation in the Brentwood Exposed, and

3    allegations of racism and discrimination.

4              In his words, his acting supervisor on

5    numerous occasions, there were isolated incidents of

6    discipline against him for attendance.   Never any

7    suggestion of attitude problems, or poor work

8    performance or anything of that nature.

9              He is indicating outspoken about racism

10   generally and discrimination generally and against him

11   in particular, whether the discrimination against him

12   is based on his retaliation for him complaining about

13   such things or his race or his gender.

14             His shop steward said that he heard Mr.

15   Harper talk about this frequently, openly in front of

16   everyone at the Postal Service.  He himself testified

17   that he talked about it frequently, openly in front of

18   many, many people.

19             Ms. Hembry described him as a spokesperson

20   for the Brentwood Exposed both in her testimony here

21   today and in the documents.

22             They were sending this incident of extreme

23   discipline, the shop steward described as ridiculous.

050721A.TXT
24    We know that Mr. Harper -- that all employees are
25    encouraged to fill out forms of this nature.  He

158

1    filled out the form.  He was instructed to stop
2    filling out of the form and return to work.  He
3    stopped filling out the form, and he returned to work.
4    Yet he was given a notice that he would be suspended
5    for seven days.
6           The precise nature of how it happened is --
7    the way that the agency has attempted to create some
8    efforts to impeach Mr. Harper's credibility.
9           First, there is the issue of when the form
10   was filled out.  Mr. Harper said it was around 2:00 -
11   2:20, and that during that time the machines were not
12   operational.  The testimony by Ms. Hembry and the
13   documents provided which she referenced verified that
14   around 2:00 or 2:20 on that date the machines were not
15   operational.
16          Then there is also an issue about whether or
17   not he went to lunch at 3:30 or 4:00.  I'm not sure
18   that Mr. Harper is completely certain that it was 3:30
19   or 4:00, but it was around 3:30ish is what he
20   testified to.
21          In any event, the records that were
22   presented to assert that it was 4:00, Ms. Hembry
23   testified those records are not always based on
24   mechanical creation, but sometimes they are manually
25   input, and she testified the documents she had relied

050721A.TXT

159

1    on indicated that it was not created by mechanical
2    input but it was rather altered by an individual.
3              All of this together suggests that the
4    agency is attempting to cover up for a retaliatory
5    motive.  As we mentioned, both Mr. Harper and indeed
6    Ms. Hembry indicated that everybody knew that he was
7    complaining about discrimination and racism, and being
8    singled out to being discriminated against.
9              Ms. Hembry first said that, yes, in fact,
10   she knew about it prior to this activity.  She signed
11   a sworn document under oath giving the date around
12   September 20th.  At another incident she refers to
13   this being around September 25th.  Everyone is saying
14   that he was complaining of discrimination and racism,
15   and being singled out and saying that he was going to
16   file an EEO complaint.
17             But somehow in all of these meetings Ms.
18   Hembry tries to say that with her alone he didn't
19   mention any of these things.  They are not credible.
20             Initially, she noted on those forms the date
21   that referred to EEO activities.  She has a reference
22   in her sworn statement that Mr. Harper referred to
23   filing an EEO.
24             She attempts to now move that date
25   previously, but the fact is that she was filling those

050721A. TXT

160

1    forms that said quite clearly on it this is an

2    allegation of retaliation for what you did on October

3    4th, and she wrote down a date that preceded October

4    4th.  I don't believe she would have done that unless

5    she believed that the awareness of -- that in fact

6    there was an allegation of EEO complaint happening

7    before October 4th.

8              We have already discussed the incident

9    itself was ridiculous and itself is indicative of

10   covering up for a motive to take this level of an

11   action for filling out a form and stopping when you

12   are told to do so.

13             And finally, I want to note that it was

14   brought out during Ms. Hembry's testimony that her

15   husband who was a member of Brentwood Exposed, it was

16   also clear from Ms. Hembry's testimony that she was

17   angry about Mr. Harper challenging of her.  She

18   clearly thought Mr. Harper threatened her authority,

19   that indicated he was standing up forthright and

20   complaining about things that she would rather not --

21   that he not complain about.

22             This, of course, and I mention this in

23   regard to her husband's involvement because, of

24   course, this is quite different from an abstract

25   advocacy situation.  The fact that Mr. Harper was a

161

1    outspoken and those are protected activities, and she

2    didn't like that someone under her command was making

                              Page 146

050721A.TXT

3    allegations of this nature, demanding the right to

4    make allegations of this nature, demanding that the

5    Postal Service conduct itself appropriately, and when

6    he was being singled out and mistreated, and he called

7    it discrimination and he called it retaliation that

8    was an affront to her.

9        All of this, we believe, is sufficient to

10    establish a foundation for discrimination and

11    retaliation and that you rule in favor of Mr. Harper.

12        JUDGE HODGES:  Thank you.

13        Mr. Chakeres.

14        MR. CHAKERES:  Your Honor, I think there is

15    a couple of issues here that need to be addressed, and

16    the first one is whether or not there was prior

17    knowledge of prior EEO activity, and also more

18    importantly, the oral proximity between the prior EEO

19    activity and the disciplinary action that was taken.

20        Mr. Harper failed to testify that there was

21    any oral proximity between his actions taken with

22    Brentwood Exposed and the letter of decision, or the

23    discipline, the suspension letter.  What they tried to

24    do and pinpoint is this so-called September meetings

25    where Mr. Harper alleged EEO rights.


162

1        And his memory on the September meetings

2    are, quite frankly, a little shall we say skeptical.

3        First, he claims Ms. Hembry is at the

4    September meetings, but in response to -- in the

Page 147

050721A.TXT
5     documents to the Department of Labor, he fails to even
6     mention that she is present.  He mentions that Ms.
7     Vick and Mr. Tucker were present at the September
8     meetings.
9               What is even more interesting is he says at
10    the September meeting he said he was going to file an
11    EEO.  Well, that's not right.  What he said was he had
12    filed an EEO, and what's interesting about Mr.
13    Harper's testimony is that when he was asked to look
14    at Ms. Hembry's affidavit and verify whether or not
15    what she wrote in the affidavit was accurate about the
16    meeting, he said yes.
17              And Ms. Hembry's statement says
18    specifically, "During that meeting, Mr. Harper
19    informed management Tucker he had filed an EEO
20    complaint."
21              In other words, these meetings occurred
22    after he had filed his EEO complaints which means that
23    all her prior knowledge of the EEO, she was not aware
24    of the EEO activities until after the decision and the
25    disciplinary letter was issued.


163
1               What is more important, and you can take a
2     look at his affidavit B, page 20, I believe, he was
3     specifically asked in his examination by his own
4     counsel is what Ms. Hembry say after it, and he said
5     yes, and she says that he informed Tucker he had filed
6     an EEO complaint, not was going to file an EEO
7     complaint.
                        Page 148

050721A.TXT

8         Now, let's take a look at the reasons for
9   the discipline.  The reasons for the discipline is
10   employees at the Postal Service are paid to be
11   productive employees.  They are paid to listen to
12   their supervisors.  They are paid to follow
13   instructions.
14         On the night in question Mr. Harper did none
15   of that.  What Mr. Harper was doing, according to Ms.
16   Hembry, was he was talking on his cell phone, he
17   wasn't loading his ledge, he wasn't doing any work.
18   He would like take off, leave his work station while
19   work was being performed to write a safety hazard
20   report.
21         And what was the safety hazard report?
22   According to Mr. Harper, it was because Ms. Hembry was
23   harassing him.  I think that alone is previous dubious
24   as to what the safety hazard report was for.
25         Safety hazard reports are to report an

164

1   actual safety hazard.  A machine is broken, exposed
2   wires, something along that nature.  Not my supervisor
3   is harassing me.
4         Let's take a look at the testimony because
5   they are completely divergent as to what happened that
6   night.  Mr. Harper claims he went to the union office.
7   Mr. Harper claims that between 1:00 and 2:40 he stood
8   there at the flat sorter machine doing nothing.  There
9   were no employees present.  There was nothing going

Page 149

050721A.TXT
10    on.  He was by the supervisor's desk where the 1767

11    form is available for him, and he just stood there.

12              Does that sound credible?  I would say no.

13    Let's think about it, Judge.  He said the reason why

14    he filled out the 1767 form was because Ms. Hembry

15    came to the union office and harassed him.

16              Well, if you were an employee and you felt

17    harassed and you thought this was a safety hazard,

18    when you came to the desk at 1:00 and nobody was

19    there, wouldn't you fill out the form?

20              At 1:15 when nobody was there, wouldn't you

21    fill out the form?  At 1:30 when supposedly nobody was

22    there, wouldn't you have filled out the form?  At 1:45

23    when nobody was there, wouldn't you have filled out

24    the form?  At 2:00 or after he said,  he's not even

25    sure what time he filled out the form.  Was it 2:00 or


                                                    165

1    after?  Maybe it's 2:20 is what he testified to.

2              You would think that within an hour and a

3    half the two sentences that he wrote on the form would

4    have been written.

5              What's more likely -- what Mr. Harper said

6    is true?  No.  If you look at Agency Exhibit 3, it

7    specifically shows you that the machines were

8    operating between 1:00 and 1:45.  So his credibility

9    as to the situation is greatly diminished.

10              Let's take a look at what Ms. Hembry

11    testified to.  Ms. Hembry said it was 2:20, it was

12    around 2:20.  Mr. Harper wasn't loading his ledge, and
                        Page 150

050721A.TXT

13      she came up to him.  He was talking on the phone.  She

14      said get off the phone, start loading your ledge.

15      Does that sound true?  Well, think about it.

16              Ms. Hembry also explained what you do before

17      the machine start running.  You remember she testified

18      that before she pushes the button to start the

19      machines up all the ledges have to be loaded.

20              According to the report, and what they have

21      to do is pull mail off, cull it, face it, put it on

22      the ledge.  This all takes time.

23              If you look at Agency Exhibit 3, the machine

24      began to run at 2:33.  Certainly at 2:20 for the

25      machine to turn on at 2:33 Mr. Harper had to be


                                                        166

1       loading his ledge before that, and it takes time

2       before that.

3               So what was happening that day was Mr.

4       Harper was on the phone talking, not doing his work

5       right before the run was supposed to begin, and Ms.

6       Hembry came up to him and said get to work.  But that

7       then Mr. Harper decides that was the harassment.  This

8       is probably what went on that day.

9               Mr. Harper then thought that was the

10      harassment.  So at 3:30 a.m. he is over at the desk

11      writing up his report.  But unfortunately, at 3:30

12      a.m. the machine was running.  There was work to be

13      done, and he should have been at his job, at his

14      machine moving the mail.

050721A.TXT
```
15              Why?  Because that's the critical time to do
16      the work that needs to be done because there is a
17      dispatch at 4:00.  The operation is very time-
18      sensitive.
19              Now, if you take Ms. Hembry's version of
20      events and see what happens, it makes complete sense
21      as to why the discipline was issued.  The discipline
22      is issued because you have an employee who is not
23      doing his job, and was screwing around, wasn't doing
24      his work, avoiding his work, so the supervisor came up
25      and said here is your discipline.
```

167
```
1               Was it because Mr. Harper was a member of
2       Brentwood Exposed?  No.  Ms. Hembry could have been a
3       member.  Her husband is a member of Brentwood Exposed.
4               The discipline wasn't issued for that.  The
5       discipline was issued because it is poor work
6       performance.
7               Was it because of his prior EEO activity?
8       If you read Ms. Hembry's affidavit, her EEO affidavits
9       that were submitted in this case, and also the
10      affidavit that was submitted by the agency in response
11      to the EEOC order on whether there was an issue of
12      fact here, Ms. Hembry explains very carefully she did
13      not know.
14              The first statement in her EEO affidavit,
15      she was not aware of any prior EEO activity.  She was
16      not aware of any prior EEO activity.  The meeting that
17      she said didn't occur until after the EEO case was
```

050721A.TXT

18    filed, which means the discipline was issued before

19    Mr. Harper filed any EEO action.

20         Ms. Hembry explains in her supplemental

21    affidavit that was part of our submission in response

22    to the EEOC's order that once she was able to review

23    the record she realized that the meeting that she had

24    referenced originally, that September 26th meeting,

25    didn't occur until October, after the discipline was


                                                    168


1    issued.

2         Clearly, there is no knowledge of prior EEO

3    activity.  There has been no evidence of a

4    relationship between the issuance of the discipline

5    and Mr. Harper's prior EEO activity, and the

6    justifications for what the agency did was fully --

7    the agency's actions were fully justified because the

8    discipline was issued for performance reasons.

9         Thank you.

10         JUDGE HODGES:  Thank you.  Let's go off the

11    record for a moment, please.

12         (Discussion held off the record.)

13         JUDGE HODGES:  Back on the record.

14         We have completed the closing statements.  I

15    have informed the parties off the record that I intend

16    to issue a bench decision in this case on Wednesday,

17    July 27th at 11 a.m.  The parties will be contacted by

18    telephone to receive the decision, and I also need a

19    telephone number for the court reporter, who can be at

                        Page 153

050721A.TXT
20   her office or any location she chooses as long as I

21   can reach her by telephone.

22           The hearing record will be closed until the

23   bench decision is issued, and I declare this hearing

24   closed at approximately 2:20 p.m. on July 21st in the

25   year 2005.


                                                    169
 1           Let's go off the record, please.

 2           (Whereupon, at 2:20 p.m., the hearing in the

 3   above-entitled matter was adjourned.)

 4   //

 5   //

 6   //

 7   //

 8   //

 9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

050721A.TXT

23    //

24    //

25    //

                                                        170

1                    REPORTER'S CERTIFICATE

2

3    DOCKET NO.:      1K-206-0004-03

4    CASE TITLE:      James Harper v John E. Potter,

5                     Postmaster General, U.S. Postal

6                     Service

7    HEARING DATE:    July 21, 2005

8    LOCATION:        Washington, D.C.

9

10          I hereby certify that the proceedings and

11    evidence are contained fully and accurately on the

12    tapes and notes reported by me at the hearing in the

13    above case before the Equal Employment Opportunity

14    Commission.

15

16                             Date:  July 28, 2005

17

18

19                     Bernadette Herboso
20                     Official Reporter
21                     Heritage Reporting Corporation
22                     Suite 600
23                     1220 L Street, N.W.
24                     Washington, D.C.  20005-4018