UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES HARPER, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 06-0161 (RMC) |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN E. POTTER, | ) | |
| Postmaster General, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS
AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff James Harper, by and through undersigned counsel and pursuant to LCvR 56.1 and the Scheduling Order in this case, respectfully submits these points and authorities in opposition to Defendant's Motion for Summary Judgment, and respectfully requests that this Honorable Court deny the relief Defendant requests.

**I.    Nature of This Case and Brief Statement of Facts**

Mr. Harper began employment with the Postal Service in 1988 and worked there essentially without incident until the terrifying set of events surrounding the discovery of Anthrax in October 2001 at the facility where he worked.  A man that he worked side-by-side with on the same machine for years, and who was a close person friend, died from exposure to Anthrax.

Mr. Harper was deeply effected by these events, and by what he perceived to be mismanagement and racism in the response to these events.  He was quoted in various broadcast and print media as he advanced his complaints.  For example, he complained that when white employees on Capitol Hill were thought to be in danger,

the response was swift and thorough; but black workers at the Post Office were left to work in contaminated facilities for days.  (Ex. 2 ¶ 2 (Harper Decl.)  *See e.g. One Year Later, D.C. Postal Workers Question Handling of Anthrax Crisis, Los Angeles Times*, Oct. 15, 2002 (quoting Mr. Harper and noting, "Most of the Brentwood workers are black, and some say they think of themselves as forgotten victims not only of an elusive bioterrorist but of a 'racist' experiment by the Centers for Disease Control to study the effects of Anthrax on humans.").

The Postal Service and Mr. Harper's supervisors were aware of his criticism of the treatment of postal workers, which included allegations of racism.  The alleged discriminating official, Ms. Hembry, herself links Mr. Harper's complaints of retaliation to his public statements.  (Ex. 1, ROI[1] at 18 ("Mr. Harper, in my opinion wants special treatment because he is a spokesperson for Brentwood Exposed."))

Thereafter and in retaliation, Mr. Harper was subjected to unjustified intense scrutiny and harassment, including disciplinary actions that were ultimately rescinded.  (Ex. 2, Harper Decl. ¶ 4; Ex. 1, ROI at 37-38.)  He was not always certain of the reasons for this mistreatment at the time, sometimes characterizing it generically as discrimination or retaliation.

As most directly pertinent to the present case, Mr. Harper met with Supervisor Lydia Faye Hembry, Manager Melvin Tucker, and Manager Ella Vick on or about September 23, 2002.  (Ex. 2, Harper Decl. ¶ 5; Ex. 1, ROI at 21-22, 63.)  During this meeting, Mr. Harper told the others present that he intended to "file an EEO."  (Ex. 2, Harper Decl. ¶ 6; Ex. 1, ROI at 21-22.)  Manager Tucker acknowledged Mr. Harper's statement, announcing to the others present that the

---

[1] Relevant documents from the Report of Investigation are cited herein as "ROI" followed by the page number of that Report, and are attached hereto as Exhibit 1.

issues would be addressed through the EEO process, and ending the meeting. (Ex. 2, Harper Decl. at ¶ 6; Ex. 1, ROI at 21-22.) These facts are sworn to by Mr. Harper in the attached Affidavit (Ex. 1 ¶¶ 5-6) and were referenced in his EEO Complaint (Ex. 1, ROI at 63). Furthermore, these facts are consistent with Ms. Hembry's sworn statement dated August 23, 2003. (Ex. 1, ROI at 21-22.)

On October 1, 2002, Ms. Hembry found Mr. Harper filling out a "1767 Form." (Ex. 1, ROI at 35; Ex. 2, Harper Decl. ¶ 6.) This form is entitled "Report of Hazard, Unsafe Condition or Practice." (Ex. 1, ROI at 44.) On the form, Mr. Harper reported that "Ms. Hembry is harassing me and causing me undue stress making my work area unsafe." (Ex. 1, ROI at 44.) Ms. Hembry instructed Mr. Harper to return to work and to complete this form during his lunch break. (Ex. 2, Harper Decl. ¶ 7; Ex. 2, ROI at 35.)

It is undisputed that Mr. Harper told Ms. Hembry he would do as instructed but would note Ms. Hembry's instruction on the form when he competed it during his break, and that he then immediately returned to work. (Ex. 1, ROI at 35 (Notice of Suspension); Ex. 2, Harper Decl. ¶ 6.)

In addition to completing a 1767 Form, Mr. Harper entered pre-complaint counseling on October 2, 2002, alleging that he had been subjected to harassment by Ms. Hembry. (Ex. 1, ROI at 69.)

On October 4, 2002, Ms. Hembry issued Mr. Harper a seven-day suspension. (Ex. 1, ROI at 35.)

By its terms, the October 4, 2002, suspension was based on a July 26, 2002, Letter of Warning. (*Id.*) Reference to and reliance upon this Letter in the October 4 action was improper because the Letter had been rescinded two months earlier, on August 4, 2002. (Ex. 1, ROI at 38.)

3

The October 4 seven-day suspension likewise was rescinded in a grievance resolution dated November 13, 2002.  (Ex. 1, ROI at 37.)

The act of retaliation on October 4, 2002, severely effected Mr. Harper.  Shortly after Ms. Hembry gave Mr. Harper the suspension letter, Mr. Harper experienced physical manifestations of extreme anxiety.  He told his manager that he needed medical attention, and Manager Tucker drove Mr. Harper to the hospital.  The hospital documented his chest pains, headache, dizziness, and other physical symptoms.  (Ex. 1, ROI at 93-96.)

The doctor ordered Mr. Harper to stay away from work for the following two days, October 4 and 5.  (Ex. 1, ROI at 94.)  He was already scheduled to be off work on October 6 and 7.  Even days after the notice of suspension, however, Mr. Harper continued suffering serious physical manifestations of anxiety over this act of retaliation.  He sought medical attention from another doctor on October 7, who ordered him to stay away from work until October 16.  (Ex. 1, ROI at 46.)  He has since been diagnosed with severe emotional harm, stemming from the harassment and retaliation he suffered at the Post Office, leaving him unable to work.

## II.     Standards for Summary Judgment in Employment Discrimination Cases

"Summary judgment is an extreme remedy."  *Weiss v. Kay Jewelry Stores, Inc.*, 470 F.2d 1259, 1262 (D.C. Cir. 1972).  Summary judgment is available only when there is no material fact in dispute, and it is clear both that the moving party is entitled to judgment as a matter of law and that the non-moving party would not be able to prevail under any discernible circumstances.  *Id.* at 1262.  Summary judgment is to be awarded only when the facts are "quite clear."  *Id.*

4

Particularly in the context of a case alleging discrimination, summary judgment is sparingly granted because issues of motive and credibility almost always require evaluation of live testimony by the fact finder. "In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir. 2004).

At the summary judgment stage, all reasonable inferences must be drawn in favor of the nonmoving party, "including questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991).

Thus, to survive summary judgment, the non-moving party need only show that the facts in the record, viewed in the light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, can support more than one conclusion, at least one of which reasonably could lead to judgment in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

> In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All reasonable doubts about the facts should be resolved in favor of the non-movant. If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial. <u>Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment.</u>

*Clemons v. Dougherty County,* 684 F.2d 1365, 1368-69 (11th Cir. 1982) (citations omitted) (emphasis added).

**Argument**

Defendant advances three arguments: that an administrative complaint was not timely filed, that Mr. Harper has failed to make out a prima facie case for two reasons, and that the employer's proffered basis should entitle it to summary judgment. Plaintiff addresses each of these claims in turn, and demonstrates that Defendant has not met its burden on any assertion.

As described next, Plaintiff's administrative complaint was timely filed; and in any event, Defendant has waived any objection to the 2002 filing. In Part IV, Plaintiff demonstrates that he has made out a prima facie case. As to the two asserted failings, the law is clear that employees may challenge retaliatory suspensions even if later rescinded, and record evidence raises a genuine issue of fact as to the employer's knowledge of protected activities at the time of the suspension. In Part V, Plaintiff shows that the proffered nondiscriminatory basis for the discipline rests upon disputed issues of fact and is of such questionable credibility that it must be presented to the jury rather than summarily adopted.

### III.   Plaintiff timely filed his Complaint of Discrimination.

Defendant first argues that Mr. Harper failed to file a formal administrative complaint of discrimination within fifteen days of receipt of the Notice of Right to File, as required by 29 C.F.R. § 1614.106. (Def's Mem. 16-17.) Defendant notes that the Notice was delivered to Mr. Harper's home on December 14, 2002, and therefore asserts that Mr. Harper's Complaint would have been due on December 29. (*Id.*) Defendant also notes that Mr. Harper filed his Complaint on December 30. (*Id.*)

6

Defendant's assertion that Mr. Harper's filing was late was apparently developed without reference to a calendar. December 29, 2002, was a Sunday. Accordingly, the deadline for filing was automatically extended until the next business day. 29 C.F.R. § 1614.604(d) ("the last day of the period shall be included, unless it falls on a Saturday, Sunday, or Federal holiday, in which case the period shall be extended to include the next business day").

Thus, Mr. Harper's filing of his Complaint on Monday, December 30, 2002, was timely.[2]

---

[2] In the alternative, Defendant has waived any objection to the timeliness of the December 30, 2002, Complaint. On February 5, 2003, Defendant wrote a letter to Mr. Harper that begins "We have received your complaint of discrimination filed on December 30, 2002. Your complaint has been accepted for investigation." Over the following three and half years, this matter was investigated by Defendant's EEO office, subject of a (denied) summary judgment motion at the EEOC, proceeded to full hearing, and ultimately was resolved on the merits by the Defendant. At no time until the instant motion did Defendant raise the issue of timeliness of the December 30, 2002, Complaint.

The time periods prescribed by 29 C.F.R. § 1614.106 are not jurisdictional and are subject to waiver. *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) ("the administrative time limits created by the EEOC erect no jurisdictional bars to bringing suit. Rather, functioning like statutes of limitations, these time limits are subject to equitable tolling, estoppel, and waiver."); *see also National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002) ("the time period for filing a charge remains subject to application of equitable doctrines such as waiver").

Defendant issued a Notice of Final Action on October 30, 2005, resolving Mr. Harper's claim on the merits, without ever raising the timeliness issue there or previously. This Circuit has made clear that where agencies "not only accept and investigate a complaint, but also decide it on the merits — all without mentioning timeliness — their failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit." *Bowden*, 106 F.3d at 438; *accord Horton v. Potter*, 369 F.3d 906, 911 (6th Cir. 2004) ("waiver occurs when the agency decides the complaint on the merits without addressing the untimeliness defense"); *Ester v. Principi*, 250 F.3d 1068, 1071-72 (7th Cir. 2001) ("when an agency decides the merits of a complaint, without addressing the question of timeliness, it has waived a timeliness defense in a subsequent lawsuit").

Accordingly, Defendant has waived the issue of timeliness of the 2002 administrative complaint.

7

### IV. Mr. Harper has made out a prima facie case, with sufficient record evidence to allow a reasonable finder of fact to rule in his favor.

Under its attack on Mr. Harper's prima facie case, Defendant first argues that Mr. Harper suffered no adverse action. (Def's Mem. 20.) It next claims that the alleged discriminating official was not aware of Mr. Harper's "recent EEO activity." (*Id.* at 21.) Plaintiff addresses these points in turn.

### A. Mr. Harper suffered actionable retaliation.

Most essentially, the Postal Service asks this Court to find that, as matter of law, a reasonable employee would not be dissuaded from engaging in protected activity, despite knowing that a co-worker who did so was given a retaliatory letter of suspension, if it is also true that the co-worker later successfully challenged the suspension. (Def's Mem. 20.)

Such a conclusion would severely undermine the purposes of the anti-retaliation provision of the Civil Rights Act, and is contrary to law. As a simple logical matter, most employees are aware that retaliatory suspensions can be challenged through a number of avenues, but that does not mean that the presentation of a retaliatory letter from the employer stating that someone will be suspended for seven days is not highly likely to dissuade a reasonable employee from opposing discrimination. As a legal matter, Defendant cannot cite a single case in which any court refused to allow a plaintiff to challenge a retaliatory suspension merely because the employer backed down after the employee challenged it formally.

It is undisputed that on October 4, 2002, the Agency served Mr. Harper with a letter that begins, "You are hereby notified that you will be suspended for a period of Seven (7) days." (Ex. 1, ROI at 35.)

8

While it is true that Mr. Harper successfully contested this action through a union grievance, the act of retaliation – and the violation of Mr. Harper's rights under the Civil Rights Act – was done. To accept the Postal Service's invitation to hold that a rescinded action cannot be a basis for complaining of a violation of the right not to be retaliated against would frustrate the purposes of Title VII immeasurably.

Defendant cites the Supreme Court's recent decision in *Burlington Northern* in support of its argument. However, *Burlington Northern* expressly rejected the assertion that a rescinded action cannot be the basis for a retaliation claim. *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. ---, 126 S. Ct. 2405, 2417-18 (2006). The employer there made the same argument that Defendant attempts to advance here: that the suspension "lacked statutory significance because Burlington ultimately reinstated [plaintiff] White with backpay." *Id.* at 2417. The Supreme Court clearly rejected that argument. "We would undermine the significance of that congressional judgment were we to conclude that employers could avoid liability in these circumstances." *Id.*

Defendant's attempt to distinguish *Burlington Northern* on the basis that the plaintiff there suffered a suspension before it was rescinded (while Mr. Harper's suspension was rescinded before it was served) is contrary to the Court's reasoning. Most directly, the Court makes clear that it is the "fear of economic retaliation" that makes a rescinded suspension actionable. *Id.* at 2418 (*quoting Mitchell* v. *Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292 (1960)).

Mr. Harper clearly was under a "fear of economic retaliation." It was far from certain at the time the suspension letter was issued whether or not he would be

9

successful in having it rescinded at some future date. He was thus under a threat of suspension, with the attendant looming economic hardship and other harm. He was under this threat for over a month; the October 4, 2002, suspension letter was not rescinded until November 13, 2002. (Ex. 1, ROI at 37.)

Moreover, the entire opinion in *Burlington Northern* reaffirms the importance of the anti-retaliation provision of the Civil Rights Act and the breadth of retaliatory actions that are actionable. The Court explains that "the anti-retaliation provision, unlike the substantive provision, is not limited to discriminatory action that affect the terms and conditions of employment." *Id*. at 2412-13. Although the Court sets a bar for actionable retaliation, it does so "to separate significant from trivial harms." *Id*. at 2415. It makes clear that its intent is to exclude complaints of "petty slights or minor annoyances." *Id*.

When the Postal Service gave Mr. Harper a letter stating that he would be suspended for seven days, this was no "petty slight or minor annoyance"; rather, it would inspire in any employee the sort of "fear of economic retaliation" that the Supreme Court has explained is actionable. *Id*. at 2415-18; *see also United States v. City of Phoenix*, 75 F.E.P. Cas. 1633, 1635 (D. Ariz. 1997) (rejecting defendant's argument that there was no adverse action because the one-day suspension was rescinded).

Notably, *Burlington Northern* approved this Circuit's longstanding reading of the anti-retaliation provision as broader than the discrimination provision, and its conclusion that retaliation that has no financial effects is still actionable. *See e.g. Passer v. American Chem. Soc.*, 935 F.2d 322, 331-32 (D.C. Cir. 1991) (even canceling a public event in a retired employee's honor is actionable).

Finally, Plaintiff notes that when Mr. Harper filed and succeeded in his grievance, he was vindicating his rights under the collective bargaining agreement. Here, he seeks to vindicate his rights under the Civil Rights Act. A union grievance – which must be resolved through non-judicial means and which can obtain only limited relief, as required by the union-management collective bargaining agreement – does not prevent an employee from pursuing his statutory rights in this Court. *See e.g. Airline Pilots Ass'n v. Northwest Airlines, Inc.*, 199 F.3d 477, 484 (D.C. Cir. 2000).

### B.  There is record evidence of a nexus between the protected activity and the adverse employment action.

Defendant next asserts that there is no evidence that the alleged discriminating official, Ms. Lydia Hembry, was aware of Mr. Harper's protected activities when she gave him the letter of suspension of October 4, 2002. This assertion is false.

First, the October 2, 2002, initiation of a complaint with the Agency's EEO office is not the only protected activity that Mr. Harper can point to. As related in detail below, just two weeks prior to this, he complained about discrimination against him during a meeting with a number of his superiors, including Ms. Hembry, and even told them that he intended to file formal charges.

Such statements are, of course, protected activity for purposes of the Civil Rights Act. "Protected activity need not take the form of a lawsuit of a formal complaint to an enforcement agency such as EEOC or the OHR. On the contrary, the protections of Title VII extend to an employee's informal complaints of discrimination to his or her superiors within the organization." *Carter-Obayuwana*

11

*v. Howard Univ.*, 764 A.2d 779, 790-91 (D.C. 2001), *citing Parker v. Baltimore & Ohio R.R. Co.,* 652 F.2d 1012, 1019 (D.C. Cir. 1981), and *McKenna v. Weinberger*, 729 F.2d 783, 791 (D.C. Cir. 1984).

Mr. Harper has repeatedly – and consistently – testified that, on or about September 23, 2002, there was a meeting attended by multiple officials, including Ms. Hembry, during which Mr. Harper stated that he intended to "file an EEO." Manager Tucker acknowledged Mr. Harper's statement, announcing to Ms. Hembry and the others present that the issues would be addressed through the EEO process, and ending the meeting. These facts were sworn to by Mr. Harper in an affidavit. (Ex. 2.) He also so testified at the EEOC hearing. (Def's Ex. 2 pt. 1 at 31, Tr. 34:7 – 35:2.) He referred to this meeting in his verified EEO Complaint as well. (Ex. 1, ROI at 63.)

Ms. Hembry agrees that there was such a meeting, but her sworn statements regarding the date on which it occurred have been inconsistent. In her August 23, 2002, affidavit, Ms. Hembry offered the following account:

> 9-20-02 (not completely sure of the date but around there)
> Mr. Harper requested a meeting with Mgr. Tucker and myself to try to resolve issues that were of concern to Mr. Harper. During that meeting, Mr. Harper informed manager Tucker that he had filed an EEO Complaint. Manager Tucker at that point ended the meeting and informed Mr. Harper that his issues would be dealt with in the complaint.

(ROI at 21; Ex. 1.)

Years later, Ms. Hembry attempted to depart from her sworn statement, stating now that the meeting occurred after October 4. The date on which the meeting occurred is thus a disputed issue of fact. Ms. Hembry's departure from what she previously stated under penalty of perjury should not be credited at the summary judgment stage; and it surely should not be given greater weight than Mr.

12

Harper's consistent, sworn statements. *Masson*, 501 U.S. at 520 (at summary judgment, all reasonable inferences must be drawn in favor of the non-moving party, "including questions of credibility and of the weight to be accorded particular evidence.").

Not only is it a mischaracterization of the record to state that there is no evidence showing that Ms. Hembry knew of Mr. Harper's recent protected activities when she gave him the suspension letter, it is also something of a red herring. A prima facie case does not require the plaintiff to demonstrate which <u>individuals</u> knew of the protected activity. As the Second Circuit notes, "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in protected activity." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000). Moreover, the nexus requirement need not be established with direct evidence of the individual's animus; it can be shown indirectly through close temporal proximity between the challenged action and the retaliation. "The causal connection component of the prima facie case may be established by showing that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).

Here, it is undisputed that Mr. Harper entered pre-Complaint counseling at the employer's EEO office only two days before he was served with a suspension letter. (Ex. 1, ROI at 69.) Mr. Harper testified that he saw the plant manager on his way out of the EEO office and told him that he had just filed a complaint. (Def's Ex. 1 pt. 1 at 35-36, Tr. 39:8-24.) The plant manager does not deny this, but rather states that he cannot recall it. (Def's Ex. 6.)

Accordingly, a reasonable fact finder could believe Mr. Harper's testimony – and indeed, Ms. Hembry's earlier sworn statement – and conclude that Ms. Hembry was aware of Mr. Harper's prior protected activity because he complained to her of discrimination and stated his intention to "file an EEO" during a meeting that took place approximately two weeks prior to the letter of suspension. Additionally, a reasonable fact finder could conclude that the close proximity in time between the additional protected activity of filing a complaint at the Agency's EEO office and the issuance of the suspension letter gives rise to a reasonable inference of discrimination. Either, independently, is sufficient to satisfy Mr. Harper's burden at this stage.

### V.     The Agency's proffered justification does not entitle it to summary judgment.

Finally, the Postal Service argues that it is entitled to summary judgment because it has proffered a nonretaliatory reason for the discipline. However, summary judgment may not be grated because of the myriad reasons to question the credibility of the Agency's proffered basis.

#### A.     Where there is any question as to the veracity of the employer's proffer, the evidence must be presented to the fact finder.

This Circuit has made plain that "a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Aka v. Washington Hospital Center*, 116 F.3d 876, 882 (D.C. Cir. 1997).

"If the plaintiff succeeds in showing a prima facie case and presents evidence that the defendant's proffered reason for the employment decision was pretextual — i.e., unworthy of belief, the plaintiff . . . is entitled to go to trial." *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995). "Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment." *Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995).

As the Supreme Court has explained:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. "[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination". In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) (internal citation omitted) (alteration in original) (reversing grant of summary judgment).

### B.   The Postal Service's proffered basis rests on disputed issues of fact, and its credibility is questionable.

Here, the Agency is now claiming that the discipline was justified because Mr. Harper used his cell phone, failed to keep his machine loaded, and "was otherwise unproductive and unresponsive to his supervisor's instruction." (Def's Mem. 22.)

Interestingly, this is different from the reasons the Postal Service proffered before the EEOC. There, it rested upon an assertion that Mr. Harper "had a history of not working productively." (Ex. 3 at 5.) Of course, this was not credible, and the Agency failed to provide any documentation or even identify any specific incidents.

15

Moreover, the Notice of Suspension itself listed "the elements of your past record [that] have been considered in arriving at this decision." ROI at 35.  It listed only one factor:  a July 26, 2002, "Letter of Warning for Failure to Follow Official Instructions."  *Id.*  (This was improper because that Letter had been rescinded two months earlier.  Ex. 1, ROI at 38.)  Absent in the list of "elements . . . considered" was any mention of "a history of not working productively," which the Postal Service told the EEOC was the basis.  (Ex. 3.)

So the Postal Service now has another *post hoc* rationalization for the discipline imposed upon Mr. Harper.  It, too, is severely lacking in credibility and as such, on the authorities cited *supra*, cannot serve as a basis for summary judgment against Plaintiff.

The first two asserted bases are factually disputed.  Cell phone use does not appear on the Letter of Suspension (Ex. 1, ROI at 38), which raises suspicion regarding the Defendant's current disputed claim that Mr. Harper violated such an assertedly strict policy.  This claim is also directly disputed by Mr. Harper's testimony that he was not using his cell phone on the date of the incident.  (Def's Ex. 2 pt. 2 at 3, Tr. 58:10-15.)  Mr. Harper also denies that he failed to keep his machine properly loaded (Tr. 40:19 – 42:5) and asserts that it was proper for him to take time from his work to complete a hazard report form, returning to work promptly when ordered to do so (Ex. 1 ¶ 7-8).  The notion that an employer would be motivated to suspend an employee for taking time to fill out a hazard report form is certainly one that should be evaluated by a fact finder, considering live testimony, rather than on summary judgment.

The Postal Service's third asserted basis – that Mr. Harper supposedly was "otherwise unproductive and unresponsive" – would seem an open invitation to

16

arbitrariness and cover for illegitimate motive. The mere assertion of such a characterization is not enough to entitle the employer to summary judgment. It is also contrary to the evidence that Mr. Harper complied with his supervisor's instructions, as discussed and summarized again next.

Finally, a reasonable fact finder would give due consideration to the nature of the incident. It is undisputed that Ms. Hembry asked Mr. Harper to cease filing out a Form 1767 and to return to work – and that Mr. Harper ceased filing out the form and returned to work promptly. (Ex. 1, ROI at 35; Ex. 2 ¶ 6.) At the EEOC hearing, Defense witness Ray Robinson acknowledged that disciplining Mr. Harper for failure to follow instructions was improper, testifying that "the reason why [the suspension] was rescinded was, number one, he did go back to his assignment, so it wasn't anything he failed to follow." (Def's Ex. 2 pt. 2 at 23, Tr. 79:18-20.)

The form in question was a "Report of Hazard, Unsafe Condition or Practice." (Ex. 1, ROI at 44.) The suspension was later rescinded. (Ex. 1, ROI at 37.)

A reasonable fact finder could well conclude that it is absurd to believe that the employer truly was motivated to suspend Mr. Harper because he started to fill out a hazard report and then returned to work as soon as he was instructed to do so. The reasonable fact finder could further conclude that this is cover for the employer's true, retaliatory motive. *See Reeves*, 530 U.S. at 147.

All of these factors call into question the truthfulness of the Agency's proffered basis, and would support a conclusion that the true motive was retaliation for Mr. Harper's prior protected activity. This is sufficient at the summary judgment stage. *See Reeves*, 530 U.S. at 147; *Aka*, 116 F.3d at 882; *Perdomo*, 67 F.3d at 145; *Randle*, 69 F.3d at 451.

## VI.	Conclusion

Defendant has failed to meet its heavy burden that would entitle it to summary judgment.

Plaintiff's administrative complaint was timely filed.  Even if it were not, Defendant waived this issue by accepting and deciding the administrative complaint on the merits without ever raising the issue of timeliness.

Plaintiff has made out a prima facie case.  A retaliatory letter of suspension is actionable, even if later suspended.  Being served with a letter that tells the employee he will be suspended for seven days is a serious act, likely to dissuade reasonable employees from opposing discrimination.  There is record evidence that the alleged discriminating official was aware of Mr. Harper's prior protected activity, including because he complained to her of discrimination and threatened to file an EEO charge just two weeks before the letter of suspension was issued.  Moreover, the fact that the suspension occurred just two days after he filed a formal charge, which was witnessed by management, gives rise to an inference that is sufficient at this stage.

Finally, the Defendant's proffer is insufficient to entitle it to summary judgment.  It rests upon disputed issues of fact and dubious claims, which must be presented to a fact finder who can evaluate live testimony and credibility.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court deny Defendant's Motion for Summary Judgment.

    Respectfully submitted,
    /s/ Zachary Wolfe (DC Bar No. 463548)
    People's Law Resource Center
    1725 I Street, NW, Suite 300
    Washington, DC 20006
    (202) 265-5965 – telephone
    (202) 250-6712 – facsimile